IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

**DEONNE MAGGETTE, ET AL**                                                                          **PLAINTIFFS**

                                                                          **CIVIL ACTION NO.2:07CV181-M-A**

**V.**                                                                                                    **LEAD CASE**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                                    **DEFENDANTS**

**CONSOLIDATED WITH**

**McKINLEY JACOBS, AS SPECIAL**                                                          **PLAINTIFFS**
**ADMINISTRATOR OF THE ESTATE OF**                                  **CIVIL ACTION NO. 2:07CV182-M-A**
**FANNIE JACOBS, DECEASED; ET AL**

**V.**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                                    **DEFENDANTS**

### FIRST REPORT AND RECOMMENDATIONS OF SPECIAL MASTER CRAIG BALL

Your Honor:

Thank you for the opportunity to serve the Court and parties as Special Master in this challenging case.

You appointed me to, *inter alia*, "investigate and advise the court concerning the nature, extent and sufficiency of the identification, preservation, collection, search, processing and production by the Defendants (including their officers, agents, employees, contractors and counsel) of potentially responsive information–particularly electronically stored information (ESI)–as it relates to discovery in this cause. The investigation includes, but is not limited to, claims by Defendants that archive documents and computer data were lost regarding tour and travel arrangements booked through the Gulfport regional office due to damage from Hurricane Katrina, efforts to preserve, recover or replicate such information and the ability, necessity, cost and complexity to do so."

 I've delved deeply into the matters that troubled the Court and which are the subject of a motion for dispositive sanctions.  After reviewing relevant pleadings and discovery, I had both sides bring me up-to-date and suggest material for my review, propose witnesses I should interview and weigh in on my scope of work.  I travelled to offices and data centers in Tunica, MS, Atlantic City, NJ and Las Vegas, NV. I interviewed 20 of Defendants' employees and counsel, inspected and queried systems and databases, reviewed records and investigated what the Defendants had done and failed to do in meeting their discovery obligations.  I particularly honed in on issues of data loss or spoliation, the status of sources

for responsive ESI and the accuracy and integrity of factual representations made to the Court concerning such matters.

Aided by Defendants' technical liaison, Tom O'Connor, and defense counsel, Robert Moore, I've worked to locate responsive information not previously or fully produced, with the goal that discovery issues aren't simply found but fixed. These efforts have been largely successful, and evidence claimed to have been lost or non-existent is being collected and produced.

Regrettably, I must confirm to the Court that the Defendants' conduct in discovery fell far below the conduct required by the Federal Rules of Civil Procedure and applicable case law. Plaintiffs were not furnished discoverable information in a timely or complete way, and certain responsive information has been irretrievably lost to spoliation as a consequence of the failure to preserve same as required by law. Further, Defendants made material misrepresentations of facts to the Court by affidavit, in pleadings and through counsel. It's my belief that the Plaintiffs have been prejudiced as a consequence of these abuses, and I recommend that such abuses be met with severe sanctions and remedial action at Defendants' cost.

In its July 23 order, the Court stated:

> The defendant essentially provides the same generalized objection to nearly every request followed with a response stating that no responsive documents exist. The court finds these responses to be both incredible and inadequate under the Federal Rules of Civil Procedure. The likelihood that a large national corporation has no documents responsive to these requests is slim. The defendant stated that certain documents were destroyed by Hurricane Katrina. The plaintiffs, however, provided deposition testimony that electronic records are kept and that, in general, computer data from Biloxi was replicated to the Atlantic center. Docket nos. 152-4 and 152-6. The defendant has presented no argument or evidence to rebut this information. Therefore, the court finds that it is reasonable to infer that even though some of the requested documents may have been destroyed by Hurricane Katrina, it is also likely that some of the information is kept as electronically stored information and is retrievable. Although the court cannot order a party produce something that does not exist, the court is not persuaded by the defendant's repetitive general objections that no such responsive documents exist and cannot conclude, as no such representation is made or supported, that the defendant has made a good faith effort to find and produce the requested documents. The court orders all defendants to search any available electronic databases for responsive information and produce it to the plaintiffs by August 21, 2009.

The Court correctly concluded that the likelihood of there being no responsive documents was slim. In fact, there were responsive documents in virtually all of the places one would ordinarily look for them. They were in the law department's files, in the Vital Records archives, on the desktop hard drives of persons with knowledge and within the customary databases crucial to Defendants' operations. The question is not **why weren't they found and produced** so much as **how could they have been missed** had a competent, good faith effort been made.

Most disturbing is the fact that I have been unable to establish that potentially responsive electronically stored information was lost due to the hurricane. As discussed later in this report, the suggestion of data "loss" in Katrina proved little more than an urban legend, and one that could have been easily de-bunked by talking to Harrah's IT staff. Though electronic data has been a source of contention in this case for a long time, the IT staff played almost no role in the preservation and collection of discoverable ESI.[1]

Though the Court ordered all Defendants to search any available electronic databases for responsive information and produce it to the plaintiffs by August 21, 2009, the Court's order was not complied with. Robert Moore communicated the Court's directive to the persons he believed capable of searching the databases, but due in part to Mr. Moore's lack of knowledge about his clients' systems, Mr. Moore directed his requests to the wrong people. He did not enlist the help of IT professionals within or without the Defendants' organization, and he unwisely relied upon persons lacking the requisite skill or rights of access to secure responsive ESI that was readily available. As a consequence, several crucial databases were never searched in compliance with the Court's mandate. The few searched were interrogated by persons who neither understood what they were searching nor how to competently search.

The Court concluded its July 23, 2009 order with the following emphasis:

> Regardless of the reasons for defendants' previous inadequate and false discovery responses, the undersigned has lost all patience with defendants and their counsel, who is well familiar with the Rules and policies of this court. If the court's directives regarding supplementation and production contained in this Order are not followed scrupulously by the defendants, the court will impose additional, censorious sanctions including, but not limited to, monetary sanctions imposed on both the defendants and their counsel and the further striking of the defendants' defenses.

Since the response to the Court's mandate principally consisted of the filing of affidavits from Robert Moore and Jennifer Reynolds, they bear careful scrutiny, especially as they come so late in the case and after the Court so heavily underscored the need for candor and completeness.

By far the Defendants' most egregious conduct was the presentation of false affidavits to the Court. Though patently false in some respects and recklessly inaccurate in others, I could not conclude that these affidavits rose to the level of perjury. After much probing and observation, I am *not* persuaded that the persons executing the affidavits had a willful and absolute appreciation that their assertions were materially false.

---

[1] The exception to this observation concerns the Defendants' efforts to preserve and produce information from an AS/400 server housing the complete contents of the Casino Management System claimed lost in Hurricane Katrina. Defense counsel acted swiftly and competently to effect a litigation hold for this server.

**Robert Moore's Affidavit: Testimony and Analysis**

1. Mr. Moore testified in his August 3, 2009 affidavit, ***"I am presently unaware of any additional documents responsive to any request for production of documents, was unaware of any additional documents when the responses were filed and so certify both of these facts to the court."***

I found no evidence to contradict this statement. Though there were certainly many additional responsive documents extant, I saw nothing to indicate that Mr. Moore was aware of their existence and acted to intentionally suppress them.

2. Mr. Moore testified: ***"I personally participated (again) in a manual and electronic search of every conceivable database in an effort to locate documents and information requested by plaintiffs' counsel in discovery."***

This is partly true and partly erroneous. I found no evidence that Mr. Moore participated in a manual review of *any* database, including the paper records readily available to him in his clients' Vital Records archives. I accept that Mr. Moore observed electronic searches being pursued at his behest by Ms. Jennifer Reynolds. However, Mr. Moore lacked any understanding of the data under scrutiny or of suitable ways to search those databases. Mr. Moore's unfamiliarity with databases and electronic search rendered him unable to recognize that Ms. Reynolds was variously searching the wrong data and employing the wrong searches while lacking the access rights necessary to accomplish the tasks she'd undertaken. Doubtlessly what Mr. Moore observed *looked* like a diligent effort, but he was ill equipped to judge and lacked the personal knowledge to state that he "personally participated (again) in a...search of every conceivable database." Even with his limited understanding of computers, Mr. Moore should have recognized that there were other databases (e.g., the Casino Management System, Lodging Management System and the payables and receivables systems) which were not searched in his presence or with his participation. He was also capable of discerning that the e-mail databases were never searched.

3. Mr. Moore testified: ***"I spoke with additional persons with knowledge so that I could confirm that the documents which could not be located were housed on the Mississippi Gulf Coast and were destroyed by Hurricane Katrina. I confirmed that along with the paper files which were stored on the Gulf Coast that the server that contained electronic copies of documents was also housed in this same location, and that the server which housed the electronic information was likewise destroyed."***

Strictly speaking, these are true statements, but they omit information important to any reader. A more forthcoming rendition would have said that the *originals* of some of the documents that could not be located were housed on the Mississippi Gulf Coast and were destroyed by Hurricane Katrina, but *copies* of some of the same documents were safely located in the Vital Records storage areas in Tunica. Many of these copies were routinely destroyed late in 2008 because of Defendants' failure to implement a litigation hold. Certainly, a more forthcoming rendition would have noted that there were *multiple* servers holding responsive information on the Gulf Coast and only *some* of these were damaged in the storm. Importantly, the affidavit should have conveyed that the statement regarding a *server* being destroyed had no bearing on the availability of *the data from that server* since its contents had been

replicated to the corporate computer facility in Atlantic City[2] before the hurricane hit, and no data was actually "lost."

4. Mr. Moore testified that **_Zero proof can be located within the records of any defendant for the proposition that the Walter's Group had ever been paid any commission prior to October 2004, either because the Walter's Group never received a commission payment or because the records no longer exist._"**

This statement is false, but in my opinion, it was not knowingly false when made. There is unequivocal proof in the Defendants' accounting records establishing that the Walter's Group had been paid commissions prior to October of 2004. The statement was not knowingly false because I believe that either Mr. Moore never sought or reviewed the accounting records until I required that they be scrutinized or because someone at Harrah's misled Mr. Moore about those records. It was certainly a reckless assertion because, on reflection, Mr. Moore should have appreciated that the only copies of his clients' records of commissions earned and paid in Tunica would not have been obliterated by events in Gulfport. Again, the Katrina excuse proved more appealing than a reasoned assessment of the facts.

**Jennifer Reynolds' Affidavit: Testimony and Analysis**

1. In her July 30, 2009 affidavit, Jennifer Reynolds testifies that she is "the Regional Manager, Accounts Receivable/Inventory Control Harrah's Entertainment Midsouth Region, in Tunica, Mississippi" and the person "most familiar with the circumstances of this accident, potential agreements entered into and with production of documents requested by plaintiffs' counsel through the discovery process." Ms. Reynolds avers, **"I searched both paper files and computer files with defense counsel by my side to locate these documents and all documents still in our possession were provided. We do not electronically store the records of my department and there is a document retention policy in place which calls for the destruction of our records after a specified time period."**

This is also a mixture of truth and falsity. It's true that Ms. Reynolds searched certain computer files with defense counsel by her side, but she had limited access to some databases, and no access to key databases, such as the Delphi database and accounting records prior to 2004. Further, as described in greater detail _infra_, she was searching the Vital Records database using search queries that she surely knew were senseless (e.g., searching the inventory of storage box _labels_ for the text, "Marean Walters"). Perhaps Ms. Reynolds searched certain paper files in counsel's presence in 2009, but she clearly did not search the Vital Records boxes holding responsive information. This is certain because most of these boxes were shredded late in 2008 and, when those that were not destroyed were searched in 2010, multiple responsive documents were readily found.

---

[2] Mr. Moore also testified, "_I questioned Ms. Reynolds and confirmed there is no 'Atlantic Center.' The only indication would be the Gulf Coast for this term._" In fact, the Gulf Coast data was replicated to Harrah's Atlantic City data center. Apparently neither Ms. Reynolds nor Mr. Moore made the connection. That's conceivable, but almost anyone in the Harrah's IT department would have understood this. Certainly every IT person I spoke to during my investigation was well aware of same. Unfortunately, Mr. Moore did not pose an IT question to an IT employee.

It is untrue for Ms. Reynolds to aver that, "all documents still in our possession were provided." In fact, there were responsive documents just outside Ms. Reynolds' office that weren't provided in discovery. There were responsive spreadsheets and databases on Ms. Reynolds' desktop computer--*documents Ms. Reynolds authored*--that weren't provided. Records in various databases were never searched, and even a packet of responsive material in corporate counsel's office never saw the light of day until 2010.

Ms. Reynolds testified that, **"*Documents which were requested and which could not be located were housed on the Mississippi Gulf Coast and were destroyed by Hurricane Katrina or were documents not kept until the Vital Records Department came into existence in June 2005.*"** Like Mr. Moore, Ms. Reynolds advances Hurricane Katrina as the cause of lost documents without revealing that copies of the "destroyed" documents were safely stored just a few steps from her office. The reference to the creation of the Vital Records Department is a red herring because, even if semantically accurate, Ms. Reynolds was well aware that the Vital Records Department kept documents older than June 2005. In fact, when I required a search of vital records in January of 2010, Ms. Reynolds had the Vital Records Department deliver boxes from October 2004 to her office. Though the Vital Records "Department" may have been formally constituted in July 2005, the same vital records had been long been housed in the warehouse.

Ms. Reynolds testified that, **"*Along with the paper files, the server that contained the documents was also housed on the Mississippi Gulf Coast and was also destroyed. Some electronic files were downloaded immediately before the hurricane made landfall, but these files were related to critical casino operations and the information requested by plaintiffs' counsel was not copied and there was no request to retain this information at the time the hurricane occurred. These facts were determined after a diligent search of both paper and computer generated files, and was confirmed by the Regional Director of Information Technology for Mid-South Region.*"** This statement is misleading in its discussion of a server that contained "the" documents. As noted, one or more servers were damaged after their contents had been replicated to Atlantic City, but Ms. Reynolds had no personal knowledge as to what these servers held versus servers that were undamaged. Further, neither she nor Mr. Moore acknowledges the existence of backup tapes routinely made to preserve the contents of the servers. Ms. Reynolds had no personal knowledge that information requested by plaintiffs' counsel was not copied, and her statement that such material was not copied is false. In fact, the data sought by the plaintiffs *was* copied, both to tape and to a counterpart server in Atlantic City. The Regional Director of Information Technology for the Mid-South Region confirmed this fact to me.

Ms. Reynolds further testified: **"*I personally performed numerous physical and electronic searches of all conceivable records, files and electronic systems, including within the Vital Records database and Accounts Payables system using keywords such as "Walters", "Bus Crash", "Bus Accident", "W AL05" and "WALl 00 1", both in the presence of defense counsel and on my own. I also reviewed past Mississippi Gaming Commission reports to ensure that at no time was commission paid to the Walter's Bus Group or any a known affiliate of this company.*"**

Here, Ms. Reynolds doesn't reveal that the terms she employed would never have found responsive records in the Vital Records database because, as noted, that database only tracks box *labels*. There would not be labels listing any of the keywords she searched. Further, Ms. Reynolds doesn't acknowledge that the "Accounts Payables" system she searched goes back only so far as 2004 (the year of the crash) and, absent access privileges which she doesn't enjoy, Ms. Reynolds was incapable of searching the Payables database for information during the focal years 1998 through 2004.

Ms. Reynolds doesn't disclose that Mississippi Gaming Commission reports exclude reporting of incentives granted to overnight bus operators, which operators are uniformly deemed beyond the pale of the Commission's regulation. Unlike air junket operators, overnight bus tour operators are excepted from Commission licensing, so looking to the Gaming Commission records to "ensure" that commissions were not paid to bus tour operators is like going to Starbuck's to buy a tractor.[3]

**Affidavits of Tundra Meyers and Lance Ewing**

In its July 23, 2009 order, the Court notes that, "*although defense counsel referred the court to the affidavits of Tundra Myers and Lance Ewing to explain that many documents were destroyed by Hurricane Katrina, he failed to file the affidavits with his response to the motion to compel.*"[4] I've looked at these affidavits and closely questioned both Ms. Myers and Mr. Ewing concerning their origins and contents. The affidavits of Tundra Meyers and Lance Ewing are misleading, bordering on outright falsity. Their affidavits were not prepared by them or with their input. Though both affiants should have declined to execute their affidavits due to a lack of personal knowledge, the greater fault falls on counsel who selected these witnesses for the roles thrust upon them.[5] Mr. Ewing knew almost nothing about the Motorcoach Program, and he certainly lacked personal knowledge of whether any computers damaged in the storm held Tour & Travel data or other data. He extrapolated a truth he'd overheard ('some computers were damaged') to a falsehood he swore to (*"computer data were lost regarding tour and travel arrangements booked through the Gulfport office due to damage from Katrina"*).

---

[3] As I am not an authority on Mississippi gaming regulation, I may be in error in this interpretation; but, as recent efforts turned up proof that commissions had, in fact, been paid to the Walters, Ms. Reynolds' claimed reliance upon Gaming Commission records seems either misplaced or careless.

[4] Three months later, in a November 2, 2009 hearing, Mr. Moore made the following remark to the Court: "Before you in this record is the affidavit of a fellow named Lance Ewing, who is the Risk Manager for Caesar's Entertainment back at the time, who has said that he conducted a diligent search of the paper and the electronic records, and he can find nothing that would be responsive to any of these discovery requests. That affidavit was filed when this case was up in Illinois. It is part of the documents we have produced in this case." *Robert Moore, Recording of Hearing 11/2/09 at 8:06.* Mr. Moored erred in these representations. Lance Ewing made no search of any paper or electronic records in connection with this case. Lance Ewing's affidavit does not state that he made any searches. Further, Lance Ewing's affidavit was never filed in the Illinois action.

[5] I questioned Illinois attorney Chris Garcia about the Lance Ewing affidavit and, though it bears his firm's internal document identifier and is a verbatim counterpart of the affidavit Mr. Garcia confirms he drafted for Tundra Meyers, Mr. Garcia disavowed all knowledge or recollection of the Lance Ewing affidavit or its origins. When I inquired of Mr. Garcia why he'd sought affidavits from persons without personal knowledge of the events to which they testified, he explained that it was hard to find persons with knowledge after the storm, so they did the best they could do.

Unlike Mr. Ewing, Ms. Myers never saw the Gulfport Service Center after Hurricane Katrina. She had no personal knowledge of data or record destruction. More, she was aware that the records she characterized as "lost" in the storm had been routinely *copied* to Tunica in day-to-day operations and were safely stored in the Grand Casino's warehouse. In fact, she personally oversaw their periodic collection and dispatch to the warehouse. Offering sworn testimony that "[a]rchive documents and computer data were lost" when you know that copies exist may not be perjury, but it's perilously close.

Both affidavits were drafted to leave the impression that Hurricane Katrina deprived the Defendants of responsive data or records. In fact, while certain computer servers were indeed damaged, i.e., some hardware got wet, the *information* housed on those servers had been safely secured from harm before the storm, and *the Defendants never lost access to this data*. Further, though the Defendants point to the genuine loss of paper records in the storm, the Defendants did not reveal that *copies* of many, if not all, of the responsive records were made *before* the storm and were safely ensconced in Tunica, far from Katrina's wrath. The Defendants did not search these readily accessible sources,[6] electing instead to trade on the story that the hurricane destroyed the evidence. In fact, responsive paper records were not lost until the Defendants destroyed them as part of their routine records destruction program late in 2008, more than two years after the first affidavits attesting to their destruction by *force majeure.* The failure to collect these responsive records before their destruction and the failure to implement a legal hold of these records was grossly negligent.

I now turn to specific examples of paper documents and electronically stored information that may help the Court judge the Defendants' conduct and weigh sanctions.

**Paper Documents:**

**The Las Vegas Documents:** While reviewing file materials at the corporate legal department in Las Vegas on February 11, Mr. Moore found[7] a 36-page group of documents that were relevant, material and never produced by Defendants.[8] Though a few of these were in Plaintiffs' possession from other sources, most were newly discovered evidence. These materials appear to have been present in

---

[6] *See*, Discussions in footnotes 14 and 22, *infra*.

[7] I was working on ESI issues in the Corporate IT Department of Harrah's Entertainment while Mr. Moore reviewed paper records several miles away at the Corporate Legal Department in Caesar's Palace. He found important documents that been omitted from discovery, and I'm certain he appreciated their discovery wouldn't bode well for his client. Nevertheless, he promptly furnished copies to me. It would have been easy (albeit unethical) for him to have withheld them.

[8] Respecting the Las Vegas Documents, I questioned Susan Harmon, the Las Vegas-based paralegal who, while employed by Harrah's Chief Litigation Counsel from 2005-2009, served as custodian of the department's case file and was vested with sole responsibility for information collection and dissemination for discovery in this case. In that February 11, 2010 interview, Ms. Harmon assured me that she'd transmitted the Las Vegas Documents to Chris Garcia, the Seyfarth Shaw attorney defending BL Development in the Chicago litigation. I questioned Chris Garcia on March 12, and he assured me that he never received the documents that Ms. Harmon claims she sent him. Reportedly, there is no unequivocal record of transmittal.

Defendants' litigation files since the earliest days of this case.[9]  Their timely production would have spared the Court and parties the effort expended over such matters as, e.g., the existence of a signed contract with the Walters Group for the October 2004 trip, proof of insurance having been on file and applicable Harrah's policies and procedures.  Defendants lately produced these materials as MSBL 1181 through 1216.

These late-produced documents include MSBL1202, which establishes that there was undisclosed e-mail traffic expressly discussing the Walters Group and acknowledging that the Walters Group had a history of repeat visits to the property.

The confirmed fax transmittal confirmation documents in the group, MSBL1213 through MSBL 1216, demonstrate that multiple sets of the Walters Group documents claimed to have been lost as a consequence of Hurricane Katrina were, in fact, copied via fax to five Harrah's departments that were not impacted by the storm, including the Veranda Hotel, Accounts Payable, Accounts Receivable, Revenue Analysis and the on-site Tour & Travel office, all in Tunica.  My investigation suggests that each of these five departments—and assuredly Tunica Tour & Travel—periodically boxed and transmitted their paper records for storage in the Vital Records archives in Tunica.  That is, eight originals in Gulfport would first proliferate as five distinct sets of documents in five different departments in Tunica. Eventually, these materials would coalesce as five distinct sets of counterparts in five different boxes stored in the Vital Records department.  This proliferation and accumulation becomes important when weighing claims that the documents were "lost," and thus incapable of production.  It's also key to weighing claims that one or more persons searched the Vital Records collections but found nothing responsive.

**The Tunica Vital Records Documents:** In a non-descript administration building not far removed from its Tunica casino, Harrah's maintains a Vital Records Department.  It consists of a desk and chair in a roughly 400 square foot windowless office filled with shelving holding boxed documents recently dispatched to storage.  One floor up, in a well-lit, air-conditioned space comprising many thousands of square feet, row after row of industrial shelves hold thousands more boxes of archived records.[10]  (See photos).  The Coordinator of the Vital Records Department is Jeff Harrell.  My interview with Mr. Harrell and his supervisor, Rhonda Palowski, is summarized in Appendix B of this Report.  In a nutshell, the Vital Records Department retains five years or more of the paperwork generated by the various departments of the Harrah's Tunica hotel, casino, restaurant and administrative operations.  Before the document

---

[9] On February 11, 2010, I questioned Michael Kostrinsky, Harrah's Chief Litigation Counsel, as to why a collection of documents clearly responsive to outstanding discovery were in his files in Las Vegas but had not been produced in discovery.  He replied that he'd only just learned about such events and had no explanation.  He assured me, however, that he would seek to uncover the reason for the failure to produce responsive documents his office had at hand since their first involvement with the case.  As of the filing of this report no explanation has been furnished to me.

[10] There is a third storage component of Vital Records called "Warehouse B" that I did not inspect as I was assured it held only records from another casino property.

retention function was constituted as a department in 2005, document retention obligations were subsumed within the general operation of the Warehouse Department. The Vital Records Department formed to address an accumulation of some 27,000 boxes of archival records stored in the warehouse by 2005.


Tunica Vital Records: 1st Fl., recent arrivals


Tunica Vital Records: 2nd Fl., older records


Tunica Vital Records: 2nd Fl., older records


Tunica Vital Records: 2nd Fl., older records

Respecting the casino's dealings with the Walters Group, Vital Records held five years or more of the paper documents for each of the various departments of the facility that transacted business with the Walters Group or their passengers who visited Harrah's Tunica.[11] These records run the gamut from overnight bus documents from the Tunica Tour & Travel Department to records of every stripe from the hotels, gambling venues, gift shops, buffets and restaurants. Vital Records also held the paper documents generated by the various administrative departments, such as accounting, analysis, compliance, security, etc.

---

[11] References to "Harrah's Tunica" or "the casino" include those facilities when operated under different names for prior owners (e.g., Grand Casino Tunica). The archived records and systems were assets acquired by successor owners, including the Defendants. My understanding is that whatever entity actually owned and operated the business—Park Place, Inc., Grand Casinos, Inc., Caesar's Entertainment, Inc. or Harrah's Operating Company—the nominal entity remained BL Development, as it held the gaming license. I speak of them interchangeably here, but recognize that they may implicate separate jural entities.

Until Hurricane Katrina, the Tour & Travel personnel arranging overnight bus tours to the Tunica property were located in the Mid-South Regional Service Center in Gulfport, MS. Since the buses and passengers they booked came to Tunica, there was also a Tour & Travel office and staff on the ground in Tunica. So that these two groups (and other interested departments) could work in concert, many of the documents generated in Gulfport about Tunica bus tours were copied on a routine basis to various departments in Tunica by facsimile or e-mail. These included documents concerning the various Walters Bus Group excursions that were dispatched to the hotels, to the Accounts Payable, Accounts Receivable and Revenue Analysis departments and, of course, to the on-site Tour & Travel office.

Periodically—e.g., quarterly for the Tunica Tour & Travel department—the various departments boxed up documents pertaining to completed transactions, labeled the boxes to reflect their contents ("Bus Paperwork, Jan 1-March 31, 04") and transferred the boxes to the Vital Records Department for storage. It was the responsibility of the Vital Records Coordinator, Jeffrey Harrell, to put the boxes on shelves and then enter the boxes' labels and locations into the Vital Records Database.

Hence, the Vital Records Database only indexes box *labels* and *locations*. It offers no means to search the records *within* the boxes. The Vital Records Database also tracks the prescribed retention interval for the contents of the boxes, establishing a "Destruct Date" for each box pursuant to Harrah's document retention program, but not less than five years for the documents of concern in this matter. Accordingly, a litigation hold put in place for Vital Records documents in September of 2005 would have preserved documents going back to at least September of 2000.[12] This date is the approximate time Susan Harmon, the Las Vegas paralegal managing the case, claims she addressed the need for a hold with Illinois counsel (discussed *infra*).

Clearly, the Vital Records in Tunica were an obvious and readily accessible source of documents pertaining to the Walters Group's bus excursions. When Hurricane Katrina struck Gulfport in 2005 and paper records of the Mid-South Regional Service Center's Tour & Travel office were adversely affected,[13] the multiple clean and dry copy sets in Tunica became an even more valuable resource for discovery. Unfortunately, because no one met their preservation obligations by implementation of a legal hold, the responsive documents with Vital Records in Tunica continued to be systematically destroyed. Accordingly, the company's shredding activity through the Fall of 2008 wiped out all archived records preceding the Fall of 2003. Apparently, the only responsive records not destroyed are boxes of bus paperwork from 2004. These surviving boxes were searched in January of 2010.

---

[12] A September 2005 hold would likely have resulted in the preservation of documents older than September 2000 because destruction protocols were apparently less well entrenched before creation of the Vital Records Coordinator role in very late 2005 or early 2006.

[13] I have not, despite repeated requests for, e.g., photographs, inventories, insurance documentation or the like, been able to establish that Hurricane Katrina destroyed the Tour & Travel documents at the Mid-South Regional Service Center in Gulfport. The persons I interviewed who claim to have visited the Gulfport Service Center following the storm (i.e., Susan Guidry and Lance Ewing) report boxes of wet or formerly wet documents, but no one can say if they were Tour & Travel records. Susan Harmon describes working with documents sent to her from Gulfport in other matters that showed evidence of mold and described her fears of falling ill as a consequence of working with those documents. Of course, that recollection both confirms documents got wet but belies claims that all documents were lost. I continue to press for detailed evidence of loss.

Though overnight bus records from the Tunica Tour & Travel Department seem an obvious source to have turned to before January of 2010, the boxes nevertheless yielded up a, undiscovered, unproduced trove of obviously responsive material. I'm satisfied that a search of the boxes holding the same records for earlier periods would have turned up responsive documents for the earlier visits by the Walters Bus Group; however, these records were never made subject to a legal hold. Consequently, bus records covering the period from 2000 through 2003 were shredded late in 2008 and those for the period from 1998 through 2000 were reportedly destroyed in 2005. There is no reason to believe that their counterparts for earlier Walters Group trips would not have been precisely where they were expected to be up until the time they were shredded by Harrah's.

On this issue, the Defendants seem to contend that the destruction of the records is harmless because the boxes had been searched at some unspecified time in the past. Yet, despite my efforts, I could not find any credible evidence that anyone ever searched these records.[14] To accept the boxes were searched, I would also have to accept that the person doing the search examined boxes for every date, not just Pulaski Day and Columbus Day, the dates the Walters Group travelled. Then, I would have to accept that this diligent searcher somehow overlooked every one of perhaps 320 pages of responsive material spanning more than forty or more boxes that would hold such records (i.e., five departments holding records for eight trips and eight pages per set). Can we assume that the task that proved so simple when undertaken with respect to the October 2004 box would have proved fruitless when undertaken for records of the many prior trips? Either the records were not searched--the more plausible of scenarios--or they were searched with so little care and attention to the task as to have been tantamount to no search at all.

But to conclude that the records were not searched is not to ignore the Defendants' awareness of their existence and import. Many people knew that there were counterparts of the records presumed damaged in Gulfport stored in Tunica. For example, Tundra Meyers, Jennifer Reynolds, Gary Benson, Wendy Clark and the recipients of the faxed copies in the various departments in Tunica knew of the copies.

Because there was an actual, conscious anticipation of litigation by the casino's risk management personnel within hours of the crash and written notice of anticipated claims was made to the casino's insurance carrier within days of the crash, the obligation to effectuate a reasonable litigation hold likewise attached upon such anticipation of litigation. The appropriate scope of the required hold is debatable, but it certainly would have been insufficient to confine all preservation efforts to Gulfport. The bus and its passengers were heading to Tunica, and there was a recognized history of prior

---

[14] On this point, I learned within the last seven days that Jennifer Reynolds claims that she personally searched the Vital Records, alone and late in the evening of the same date that she demonstrated fruitless electronic searches to Mr. Moore. Putting aside the fact that Vital Records Coordinator Jeffrey Harrell and Warehouse Manager Rhonda Palowski cast doubt on Ms. Reynold's account and that there is no record of her search in the Vital Records sign in sheets or otherwise, it's important to note that the majority of the records were shredded months before Ms. Reynolds claims she searched. Further, when Ms Reynolds did search the remaining boxes at my instance in January 2010, she apparently had no difficulty finding responsive records that had not been previously identified or produced.

patronage between the Walters and the Tunica facility.  Obviously, it would have been irresponsible to confine all document preservation efforts to Gulfport once Hurricane Katrina struck.  There is no justification for continuing to shred responsive documents after BL Development became a party.

In the end, the precise time the duty to preserve attached and its scope are immaterial because the Defendants *never* implemented a proper litigation hold nor undertook a competent search of their records.  This failure, coupled with the unrelenting destruction of evidence important to Plaintiffs' claims, constitutes spoliation.  The destruction of the vital records pertaining to pre-2004 Walter's Group trips was not done in bad faith, but it was grossly negligent.

**Electronically Stored Information**

In its orders and hearings on motions to compel and for sanctions, the Court clearly expressed its skepticism that one of the world's largest gaming companies--a company with substantial Gulf Coast facilities--would have been wholly unprepared for an approaching thunderstorm such that it had no backups of ESI from its many electronic information systems.  The Court stated that such a contention "defies belief."

It should, because the contention isn't true.  Data from key systems in Gulfport and Biloxi were, of course, replicated to systems out of harm's way or backed up to tape.  In some cases, both occurred.  No potentially responsive patron data, financial records or lodging information was lost.  No data was affected in Tunica, and in particular, the e-mail system for the Grand Tunica was unaffected, including for its Tour & Travel staff.  I see no indication that these systems went offline even briefly as a consequence of the storm.

Moreover, the contention that complete or extensive searches of ESI repositories and databases were undertaken in response to the Plaintiffs' discovery requests or the Court's orders greatly exaggerates the true scope and depth of such efforts.  The databases and ESI repositories most likely to yield responsive data were not searched until 2010, and some of these have yet to be searched.  For example, no search whatsoever was made of e-mail of any of the key custodians involved in the transactions made the basis of the suit, not in Tunica, Gulfport or Las Vegas.  Hurricane Katrina didn't destroy this e-mail.

The following table lists the principal databases that would be expected to hold information pertaining to business transacted with the Walters Group and the status of searches of those databases:

| Name | Purpose | Status |
|------|---------|--------|
| Infinium: Payables | The Infinium Payables system is an accounting database containing records of monies paid out by the casino.  It would be expected to hold records of any payments of commissions or refunds to the Walters Group or to Marean or Roosevelt Walters. | The Infinium database was not searched before 2010.  It was recently searched and records of payments, including for commission earned through overnight bus tours, were located. |

| Name | Purpose | Status |
|------|---------|--------|
| Delphi | Delphi is a Sales and Catering database. It was used to generate contracts for overnight bus tours, and it tracks tour arrangements and scheduling. | Delphi was not searched other than with respect to the single ill-fated excursion in October 2004, which search produced responsive information previously produced in discovery.[15] |
| Casino Management System (CMS) | The CMS is the system that holds patron activity data associated with the use of customer loyalty cards tracking coin-in to slot machines and other gaming activity. The CMS was introduced at the Tunica property in March 2006, and only two years of patron information was migrated from the predecessor IGS system. | Harrah's employee, Joseph Long, previously searched the CMS for the Illinois litigation. My recent searches revealed that the data previously produced from searches was incomplete and erroneous. |
| Lodging Management System (LMS) | The LMS tracks hotel transactions, including billing data, room assignments, etc. | The LMS was not searched until I required that it be searched. Responsive data concerning Walters Group passengers was found and produced. |
| IGS Patron Data | The IGS was the predecessor system for tracking patron gaming activity and holds the relevant data for Walters Group passengers brought to Tunica for all known trips. | Though it was online at least as late as 2006, the IGS was not searched in response to discovery in either the Mississippi or the Illinois actions. It has never been searched. I've directed the Defendants to bring it back online and search its contents for relevant data. There remains some uncertainty respecting preservation and access that has not yet been resolved; consequently, searches have not started. |
| Tunica Vital Records Database | This database stores the location of archival records storage boxes and the programmed destruction date for each box. | This database was searched by Jennifer Reynolds. Please see discussion that follows. |
| Various Databases maintained by Jennifer Reynolds | Ms. Reynolds maintained various financial and analytical spreadsheets, as well as an Access database tracking overnight bus tour data. Some of these were stored locally on her desktop hard drive and others were shared on the server to facilitate multi-user accessibility. | Ms. Reynolds searched the databases available to her sometime between July 23 and August 3, 2009 with Robert Moore observing. Ms. Reynolds reported that she could find no responsive data. I had her perform the same searches and others on January 14, 2010 and responsive data was repeatedly found. Ms. Reynolds was unable to offer any credible explanation for why she had missed all responsive data in prior efforts. |

---

[15] The court in Illinois ordered Harrah's employee, Tundra Meyers, to search the Delphi database for records filtered by state and date. When questioned on Friday, March 12, 2010, Illinois defense counsel Chris Garcia, advised me REDACTED as PRIVILEGED at Defense Counsel's Request

Jennifer Reynolds in Tunica seems to have been the person entrusted with principal responsibility for identifying responsive electronic data and paper records. When this Court ordered Harrah's and its counsel to bear down in meeting their discovery obligations, Mr. Moore went to Ms. Reynolds. Mr. Moore reports that he personally sat alongside Ms. Reynolds at her desk while she furiously searched electronic records he cannot identify but believed to be appropriate sources to search. I don't doubt this. However, months later, when I directed Ms. Reynolds to search records from the same desk, responsive material was readily found. My searches were not different or better than those last employed by Ms. Reynolds. The distinction is that I directed her to search within sources likely to hold responsive material, instead of the sources she'd explored with Mr. Moore.

For example, Ms. Reynolds explained that, for Mr. Moore, she'd searched the Vital Records database employing terms like "Walters," "Walters Group," "Marean Walters," and the like. Such a search brings to mind part of the "To-morrow, and to-morrow, and to-morrow" soliloquy from Macbeth: "It is a tale told by an idiot, full of sound and fury, signifying nothing." Despite its lofty name, the Vital Records Database is no more than a simple mechanism used to link the location of records storage boxes to the documents they contain. The entries in the Vital Records Database reflect the contents of box *labels*, so while a search for "Bus Paperwork Disbursement" or "HTU Casino Gift Shop" might have been availing, no labels would have said "Marean Walters" or "Walters Bus Group." Ms. Reynolds is no idiot, and surely understood that the searches she was performing for Mr. Moore signified nothing. Mr. Moore noted the effort but lacked the knowledge to appreciate its futility and probed no further.

In contrast, when I directed Ms. Reynolds to search the spreadsheets she maintains to track overnight bus visits, responsive data was right where it was supposed to be; yet, these records had never been disclosed or produced. This was a scenario repeated time and again in my inquiry. Sources of information that the defense swore contained no responsive data or had been destroyed by the hurricane proved either to hold clearly responsive data in the places one would expect to find it or had been unaffected by the storm.

Ms. Reynolds also pursued database searches for time periods when she knew data from those periods weren't contained within the database. Ms. Reynolds repeatedly asserted that no casino commissions had ever been paid to the Walters; however, a search of the payables data showed that, in fact, such payments had been made. Whatever databases were claimed to have been searched, it was clear to me that no one had ever undertaken to do a minimally competent search in the most likely place to find a record of payments, i.e., the payables records. When these were finally searched at my instance in February 2010, the records of payments were where one would have expected them to be.

I don't mean to suggest that no one made any effort at all to find responsive material, but what little effort came to light was so careless and cursory as to be almost indistinguishable from none. For example, persons given responsibility for searching databases for responsive data were woefully unskilled in the operation of software they use every day. In one instance, a person searching an accounting database had to consult the manual to learn how to initiate a simple search. In another, the user failed to click a box on their screen necessary for the search of the Delphi database to work. Asked

about this, Tracy Franzone, a Delphi trainer and the Harrah's Tunica employee most knowledgeable about the Delphi database (they call her "the Oracle of Delphi"), remarked that the only way such errors could have occurred is if the person undertaking the searches had paid no attention during their training.[16]

Despite diligent effort, the collection, processing and search of electronic records is not complete.  It's an undertaking hampered in equal measure by the passage of time since the events made the basis of the suit and the poor recordkeeping and recollections of the IT staff.  For example, though I directed that a targeted search be made of potentially responsive e-mail more than two months ago, that search has yet to be begin.  A succession of technical glitches and false starts by Harrah's technical staff and vendors has engendered delays.  I am partly to blame for affording the IT contractor that Harrah's required be used too much leeway after repeated failures.  In the end, he couldn't meet any of his promised deadlines.  But I'm satisfied that the ongoing efforts are genuine, closely supervised and proceeding with all deliberate speed.  In my next report, I expect to address in greater detail the status of these ongoing efforts to search e-mail, user storage areas (a/k/a "share"), databases and other ESI resources.

**Did the Defendants Make a Good Faith Effort to Find and Produce the Requested Documents?**

In my investigation, I confirmed that the Defendants indeed made efforts to find responsive documents.[17]  Because of the manner in which Harrah's legal department reserves most evidence gathering and discovery responsibilities to a paralegal in Las Vegas, these efforts were, for the most part, confined to the activities of paralegal, Susan Harmon, and those she tasked to search.

When I interviewed Ms. Harmon on February 11, 2010 in Las Vegas, she'd been laid off for about a year but consented to meet with me.  She was forthcoming and cooperative.  She confirmed that she was the person within Harrah's solely responsible for identifying and collecting responsive information in the 250-odd cases which she managed.  Many of these cases came with the Caesar's merger/acquisition, so there was no predecessor paralegal to assist with transition, and Ms. Harmon described these files as being in "disarray" and as having "no rhyme or reason."  She explained that the way Harrah's handled cases during her tenure, the paralegal supervising the matter was tasked with furnishing information from the company's records and personnel to the outside counsel on the case.

Ms. Harmon put it this way, "Everything came through me.  Outside counsel were not expected to gather evidence--documents or data."  I used the term "chokepoint" to describe her role, and Ms. Harmon agreed with that assessment.

Interviewing Illinois defense counsel, Chris Garcia, REDACTED as PRIVILEGED at Defense Counsel's Request
He expressed his confidence that if he'd wished to contact a Harrah's employee, Ms. Harmon would have

---

[16] In fairness, I should note that those tasked with searches were sometimes the heads of their departments, so they would appear to have been sound choices...but for their lack of competence.

[17] For purposes of this report, and except where otherwise noted, my observations exclude the substantial efforts made by Defendants at my direction and following my appointment.

permitted and facilitated his doing so. After interviewing Ms. Harmon face-to-face, I believe that she tried to gather responsive material, but was hampered by too little time, too much distance and a pervasive unfamiliarity with the people, facilities, procedures and systems she was obliged to understand. I further believe she acted in good faith, but I cannot conclude that Ms. Harmon's good intentions equate to a good faith effort by the Defendants.

Ms. Harmon, an experienced paralegal, was a new hire for Harrah's in mid-2005. Because she had so many matters to assimilate in the summer of 2005, and because her time was fully consumed keying case data into Harrah's Case Track System, Ms. Harmon was unable to contact anyone for evidence gathering prior to Hurricane Katrina.

Ms. Harmon related that when she began her new job, she assessed the cases assigned to her handling, including this cause, and gauged what matters required her immediate attention. She particularly recalled the instant case because, living in Memphis at the time of the crash, she recalled hearing about the event in the news long before she had any role in the litigation. New to her job with Harrah's, Ms. Harmon did not know any of the personnel in Tunica or Gulfport and so sought to identify persons with knowledge using the corporate directory, phone calls and e-mail. She identified risk managers Tommy Reynolds, Lance Ewing, LaDonna Hamilton and Bob Chisolm, along with Compliance Chief, Jimmy Buchalter, as her "go-to" people.

Ms. Harmon expressed the belief that her earliest conversations were with defense counsel Chris Garcia during September or October of 2005, and included discussion of the need for a litigation hold. She confirmed that she expressly understood the need to hold electronically stored information and paper records. Ms. Harmon characterized the scope of the required hold as being, "Every paper document—anything you can find—in any way related to Walters, Marean Walters, Walters Bus Services—many variants. Keep all electronic data until I told them otherwise."

Despite Ms. Harmon's professed awareness of the need for a legal hold, I've not found a single person or written communication that confirms that hold directives were communicated to anyone at Harrah's. Certainly some were tasked to *search*, and retention of responsive items found was implicit, but no hold instructions were given.[18]

Ms. Harmon's statements about legal hold are very much at odds with those of her boss, Michael Kostrinsky, Harrah's Chief Litigation Counsel. I interviewed Mr. Kostrinsky in Las Vegas on February 11, 2010, and he struck me as intelligent, self-assured and decisive. He oversaw upwards of 1,500 matters in or expected to result in litigation, including the instant case. Mr. Kostrinsky explained that he was the sole arbiter of his company's litigation hold decisions. That is, when a case arises, he and he alone decides whether it is to be the subject of a litigation hold, the scope of that hold and the persons tasked with effectuating the hold. He indicated that he understood what a proper litigation hold entails.

---

[18] The failure to implement a litigation hold is undisputed by Defendants, but to be precise, at Plaintiff's insistence, a hold was placed on an AS/400 server in Atlantic City holding pre-Katrina Casino Management System data, and Mr. Moore has lately implemented a legal hold on remaining responsive sources.

Mr. Kostrinsky told me 

[21]

Thus, in gauging good faith, we have a case manager aware a hold was needed, ███████████████████████ and, ultimately no hold directive reaching those who needed to act.  As a result, evidence was lost--not to a hurricane but to a "perfect storm" of incompetence, arrogance and questionable conduct.

Ms. Harmon recalled an event that may be emblematic of the gap between Ms. Harmon's perception and reality.  Ms. Harmon related that she learned of the documents stored in Vital Records in Tunica and was steered to Vital Records Coordinator, Jeff Harrell.[22]  I noted some disparity between what Ms. Harmon imagined the role of the Vital Records manager to be and his actual role.  Ms. Harmon had never before spoken to Mr. Harrell.  She was in Las Vegas and he was in Tunica.  Ms. Harmon knew nothing of the Vital Records collection in terms of its organization or contents except that someone had identified it as a potential source of information sought by Plaintiffs in discovery.

---

[19] I took this to mean a Federal Trade Commission investigation, but the topic never arose with any other witness, and I've seen no evidence that ESI held for another matter encompassed the same ESI and documents sought in this case.  Certainly, enough scrutiny has brought to bear in my investigation that, if there were a cache of information held for a different matter that would serve to mitigate spoliation concerns here, *someone* would have had the presence of mind to bring it forward.  The reference to the FTC hold seemed like little more than deflection.

[20] REDACTED as PRIVILEGED at Defense Counsel's Request

████████████████████████████████████████████

[21] With such top down leadership, it is not entirely surprising that neither Harrah's trial counsel in Chicago nor its counsel in Memphis implemented timely or sufficient legal holds.  Still, counsel have independent duties to insure that their clients are taking prompt and proper steps to preserve evidence.  Trial counsel should not have deferred to in-house litigation counsel or independently failed to implement a legal hold.  This is not a situation where conduct we demand today wasn't customary several years ago.  Even lawyers inclined to contend that preservation of electronically stored information is a "new" duty must concede that the obligation to preserve paper evidence has been with us a long time.

[22] Though Ms. Harmon, without prompting by me, named Vital Records Coordinator Jeff Harrell as the person with whom she spoke, she did so with uncertainty.  Her misidentification of Mr. Harrell as the "warehouse manager" leads me to believe that she actually spoke with Warehouse Manager, David McGuire.  Ms. Harmon denies making any record of these conversations, and though requested, none have been furnished to me.  I'm informed that none exist.  Further, Mr. McGuire, who is no longer employed by Harrah's, won't respond to repeated requests from me and from Harrah's counsel to discuss these events with me, so I can't confirm that Mr. McGuire played any role in what Ms. Harmon describes.  I find Mr. McGuire's subsequent refusal to communicate once he learned the reason for the inquiry to be telling.  My thought is that Mr. McGuire may not want to address the disparity between what Ms. Harmon related and the true scope of any "search."  I have not yet undertaken to compel Mr. McGuire's appearance and testimony.

Ms. Harmon stated that she called Harrell and "instructed him to personally check every box from 1999 through 2004 for "anything having to do with Walter's Bus Group" and for "records of Tour & Travel." Ms. Harmon stated that Mr. Harrell responded by making excuses, protesting that the task was a big job that would take a lot of time. Ms. Harmon's reply was, "Do I have to call your supervisor?" At that, Mr. Harrell reportedly replied that he would see what he could do.

What Ms. Harmon failed to appreciate, even to the point of my meeting with her in 2010, was that Mr. Harrell was responsible for storing and retrieving thousands upon thousands of boxes of information in three storage facilities in Tunica.[23] Further, despite the Coordinator title, Mr. Harrell's role was much more labor than management. He was the fellow who lifted the boxes received from the various departments onto the shelves and who pulled them from the shelves when needed. He logged the boxes in and out, and made sure that people signed for what they took. Asking Mr. Harrell to personally search *all* of the records from 1999 to 2004 for documents about a particular person or company was an absurd request; but either Mr. Harrell lacked the skill to communicate that the task, as outlined, might implicate 27,000 densely packed bankers' boxes or Ms. Harmon found it more expedient to simply say "do it" than to understand why it could not be done as she directed.

Ms. Harmon related that Mr. Harrell called her back later in the day stating that he'd "been out in the warehouse" and that it would be very difficult to do the search. Ms. Harmon expressly recalled Mr. Harrell saying that the task was complicated because some of the boxes were "facing the wrong way;" that is, the labels weren't facing outward on the shelves. Ms. Harmon reported that she was unrelenting and reiterated that what she'd told him to do was "important" and "needed to be done," instructing him to get more help if he needed it. Cowed, Mr. Harrell indicated that he understood. Ms. Harmon recalled that Mr. Harrell called back within "two to three days," reporting that he'd finished the search, and he didn't find anything.

Satisfied, Ms. Harmon informed counsel that there were "no records" from that point forward. Unfortunately, Ms. Harmon made no notation of these efforts to secure written records of the bus trips or of her conversations with Mr. Harrell.

Ms. Harmon gave Mr. Harrell no examples of the documents she sought and no guidance as to how he might limit the search to fewer than the tens of thousands of boxes in his custody. Mr. Harrell, in turn, gave Ms. Harmon no sense of the overwhelming scope of what she demanded or that he had no familiarity with the *contents* of the boxes he shelved. It was the warehouse worker getting phoned-in orders from the clueless, *do-I-need-to-call-your-supervisor* paralegal for the new owners in Vegas. Ms. Harmon acted in good faith to the extent that she believed she'd gotten an answer; but the bullied response, like others put forward by the Defendants in discovery, wasn't *credible*. Yet, it went

---

[23] See Appendix B, Interview of Jeffrey Harrell, Harrah's Vital Records Coordinator in Tunica, MS and Rhonda Palowski, his Supervisor

unchallenged internally, and remained the Defendants' stance long after the falsity of the "no records" claim should have been obvious to them.

So, in gauging whether the Defendants acted in good faith, I looked less at whether individuals acted with a conscious sense that what they said and did was untrue or misleading and more at whether the Defendants' conduct, viewed objectively, was undertaken in good faith. When I reflect on the litany of failure uncovered in my investigation, I cannot conclude the Defendants put forth a good faith effort to meet their discovery obligations or to comply with this Court's discovery orders. To wit:

1. Failing to take reasonable or diligent steps to identify accessible sources of discoverable documents and ESI;
2. Failing to implement a litigation hold;
3. Failing to suspend scheduled destruction of, and then destroying, responsive evidence;
4. Failing to search readily-accessible sources of responsive documents and ESI, even after a Court order to do so;
5. Failing to task qualified persons to conduct searches, and searching in ways certain to fail;
6. Stating under oath that documentary evidence is lost when copies are known to exist;
7. Failing to produce material, non-privileged evidence in corporate counsel's custody;
8. Failing to preserve or produce other relevant, non-privileged records;
9. Promulgating false affidavits;
10. Recklessly making false statements of fact to the Court without personal knowledge;
11. Misstating the testimony of witnesses to the Court; and
12. Capitalizing on the genuine tragedy of Hurricane Katrina to mislead the Court and Plaintiffs.

These are not trivial transgressions, and if lesser errors and omissions were included, it would be a longer list. But as egregious as these actions are, I would be remiss if I didn't acknowledge the significant, ongoing efforts made of late to address these failures; to wit:

1. The Defendants have accorded me unfettered access to personnel, systems and facilities in order to conduct my investigation, Though this was their duty pursuant to the Court's appointment order, the Defendants, and particularly Mr. Moore, have acquitted themselves admirably in compliance;
2. The Defendants have professed their commitment to, and are taking steps to bring, a higher level of transparency to the discovery process;
3. The Defendants have expended considerable sums to secure the assistance of a well-respected technical consultant and outside technical personnel in a diligent effort to locate, recover and produce information that should have been previously produced; and,
4. The Defendants and their counsel have expressed their recognition of the need to examine and change policies and procedures to prevent a re-occurrence of the misconduct described herein, including inviting the Court to impose a reasonable mechanism of supervision and remediation at Defendants' cost.

**Summary**

To begin, it must be understood that much of the information sought in discovery and ultimately recovered resided in the places where one would naturally expect to find it. Pursued with care, competence and purpose, the responsive material could have been identified and brought forward without marked effort or expense. These records were, by and large, readily accessible information, housed in the active, desktop collections of the expected users and within their usual and customary files and archives.

It is no exaggeration to say that most of the electronic and paper records sought and not produced could have been collected within a 50-yard radius in Tunica, Mississippi had their collection been the responsibility of someone with the knowledge and motivation to collect them. In fact, much of the data withheld could have been found without leaving one's desk.

It was largely the passage of time, facilitated by an unjustified and too-convenient reliance upon the fury of Hurricane Katrina, that inflated the cost and difficulty of obtaining the information sought in discovery. In the end, it's clear that the Defendants' failure was not the result of a *force majeure* but flowed from negligence of the gross and ordinary sort: sloth, inattention, indifference and incompetence.

Recently, in Rimkus *Consulting Group, Inc. v. Cammarata*, 2010 WL 645253 (S.D.Tex. February 19, 2010), Judge Lee Rosenthal observed:

> It can be difficult to draw bright-line distinctions between acceptable and unacceptable conduct in preserving information and in conducting discovery, either prospectively or with the benefit (and distortion) of hindsight. Whether preservation or discovery conduct is acceptable in a case depends on what is reasonable, and that in turn depends on whether what was done–or not done–was proportional to that case and consistent with clearly established applicable standards.

Here, the Court is spared the uncertainties. There was prompt anticipation of litigation, with carriers and counsel placed on notice within days of the crash. There was actual awareness in at least three management-level employees that the Walters Group had been to the casino on one or more previous occasions and that there would be written and electronic records of such activity. The principal sources of discoverable information (i.e., Casino Management System, Lodging Management System, Delphi System, Infinium database, e-mail system and archival paper records) were readily accessible in Tunica. Timely preservation of overnight bus documents and ESI pertaining to the Walters Group would have entailed little cost or effort, if undertaken when the obligation to preserve first attached. With respect to the paper records, all it would have required was a search of the electronic systems to establish the dates of prior visits by the Walters Group followed by a notation in the Vital Records database--or on the boxes themselves--to suspend destruction of overnight bus records for those dates. Preserving the ESI would have minimally entailed sending a memo or e-mail to the managers of the IT and Tour and Travel departments advising those departments to take reasonable steps to preserve e-mail and ESI pertaining

to, e.g., the Walters Group and the overnight motor coach program.  Had this been done, and complied with, all of the hardship and expense stemming from the subsequent disposal of information, resurrection of mothballed servers and even the false assumptions about data lost to storm damage could have been avoided.[24]

## Recommendations for Sanctions

The Plaintiffs and the Court have been subjected to a litany of half-truths and non-truths, long after such positions should have been revisited and recanted.  I would not hesitate to call them "lies" if I could be certain that the persons making the statements were consciously aware of their falsehood.  Some may have known.  Certainly, all *should* have known, and just as certainly, some *did not* know that what they swore to was false.  In the case of Lance Ewing and Tundra Myers, my opinion is that they didn't particularly *care* if what they said was untrue.  They were presented with affidavits prepared for their signatures and, though lacking personal knowledge of much of the content, they signed them.

As the Court noted, the Plaintiffs have struggled mightily to obtain the records and information to which they were entitled, and in the face of pointed challenge, the Defendants squandered each do-over the Court has extended.  The failure to comply with the Court's emphatic directives to find and search relevant sources of electronically stored information coupled with the shredding of relevant records subject to a preservation duty, in turn coupled with a callous exploitation of the very real tragedy of Hurricane Katrina as a disingenuous means to shirk discovery duties, all auger for the imposition of significant sanctions.

In the casino business, it's axiomatic that the house always wins; after all, they set the rules of the game.  But in a lawsuit, where the rules are designed to even the odds, the Court may properly wonder, "How can so many people have been so unrelentingly careless or cavalier in ways that *always* kept the Plaintiffs from getting responsive information?"  I've puzzled over the point where incompetence and apathy becomes guile and abuse.  To borrow from Oliver Wendell Holmes, Jr., "Even a dog distinguishes between being stumbled over and being kicked," and I worry if I have a dog's sense to tell the difference here.

I've interviewed twenty people involved in the events that led here and spoken to many more.  I've spent long days at facilities in Tunica, New Jersey and Nevada, read depositions, reviewed proceedings and pleadings, explored e-mail and pored over the contents of databases, desktop, tapes and servers.  If there is a Svengali behind all of the misstatements, omissions and bungling, I've not seen him or her.  Certainly, the vesting of primary fact gathering responsibility in a newly-hired paralegal and the detached management of all litigation from Las Vegas was an important contributor to the failure.  Harrah's legal department tightly controlled the collection and disbursement of information to outside counsel, facilitating the substitution of an opportunistic falsehood (e.g., Hurricane Katrina destroyed the

---

[24] Importantly, the failure to implement a timely legal hold for potentially responsive information was not an oversight.  The Harrah's staff knew how to implement an effective and expertly-executed legal hold because, in 2008, the IT staff effectuated such a hold on an AS/400 server called the CEI Data Warehouse or AC40G when Plaintiffs' counsel demanded such preservation.

discoverable data) for the truth (Hurricane Katrina didn't destroy data or the copies of the paper records in Tunica).

Though I paint a bleak picture of failure and dissemblance, much of my time, and that of Mr. Moore and his e-discovery consultant, Mr. O'Connor, has been dedicated to rectifying the problems uncovered. With the passage of time, some of the data that should have been produced cannot be recovered or replicated; but, much responsive data has been found or restored and is being produced. Databases that should have been searched sooner or better are being searched now. Responsive documents from Tunica and Las Vegas that should have been handed over long ago are now changing hands. This process has been and will continue to be costly to the Defendants; but in that, the Defendants are the architects of their own demise. Had these records been preserved and searched in a timely and competent way, these costs would have been avoided.

What I've seen of the data lately furnished, and from my understanding of what was shredded, this material goes to the issue of the relationship between the Walters Bus Service and the Defendants, but adds little more in support to the plaintiff's agency theory other than being reiterative and cumulative of the information produced before my investigation.[25] Were the material more compelling on the issue, I would have recommended the Court sanction the Defendants by finding against them on plaintiffs' claim of agency. Because I don't regard the material withheld and destroyed as distinctly compelling evidence on the issue, I instead recommend that the Court address the spoliation and other abuses by a rebuttable adverse inference instruction on the agency theory. Such an instruction would inform the jury that the Defendants were grossly negligent in their failure to preserve evidence after the duty to preserve arose. It would also instruct the jury to presume that such lost evidence was relevant and would have supported the Plaintiffs' claims that the Walters Bus Service was serving as an agent of the Defendants *unless* the jury finds that the lost evidence was *not* relevant *or* that the Defendants have rebutted the presumption of agency. Essentially, this sanctions the Defendants and deprives them of benefits flowing from the lost evidence by shifting the burden of proof on the agency issue from the Plaintiffs to the Defendants. It preserves fundamental fairness by allowing the Defendants to defeat the presumption on competent evidence. If the presumption is unfounded, shifting the burden will not be an extreme hardship, and the Defendants should have no difficulty in their rebuttal.

---

[25] Though it appears the paper records shredded pursuant to the Defendants' document destruction program are unrecoverable and truly "lost," much can be divined about what these records were and what significance they had with respect to the merits. The missing paper records would have served to confirm that the Walters Group brought patrons to the casino twice a year through the end of 2003, and that the Defendants offered a program of incentives, including commissions, as an inducement to the Walters to bring players. These are facts that, in good faith, should never have been disputed. The lost records would further reflect, *inter alia,* the names of prior guests, their ages, the fact that the Walters Group had proof of insurance on file, and the terms of the contracts executed between the Walters Group and the casino. In order that the Defendants might not capitalize on evidence they destroyed, these are matters that might best be addressed by stipulation or finding of fact. However, because these are not matters that, after diligent inquiry, should have been in contention, resolving them favorably to the Plaintiffs is hardly sufficient compensation or sanction.

I further recommend that the Court continue the case from its current trial date[26] and reopen discovery with the requirement that the Defendants bear Plaintiffs' out-of-pocket costs and attorney fees for expenditures that wouldn't have been incurred had there been no abuse of discovery. For example, time expended questioning witnesses about belatedly produced documents is time that would have been expended if the documents had been produced in a timely way; however, the expense and time required to travel to a reconvened deposition would not have been required and should be borne by the Defendants. Because of the egregious nature of the failures and the tenacity demanded of the Plaintiffs to bring them to light, I encourage the Court to be liberal in its shifting of costs.

I further recommend that the Court order the Defendants to reimburse to Plaintiffs the reasonable value of attorney time, expert time and expenses incurred in pursuing discovery motions in this case after July 23, 2009 and in connection with my investigation, including the reasonable cost of engaging a Technical Liaison pursuant to the Court's Appointment Order.

I cannot defend the lapses of judgment that led Robert Moore to execute an affidavit attesting to matters about which he should never have injected himself as a witness or putting his imprimatur on untrue assertions of fact in open Court. Mr. Moore was not wrong to rely upon those whom he mistakenly believed to be competent or trustworthy, but he was clearly wrong to channel his misplaced trust into sworn testimony and false assertions. Making himself a witness in a case in which he was counsel was a bad idea, but swearing to the truth of matters about which he had little or no personal knowledge to gain an advantage for his clients was irresponsible. I believe he understands this and rues his action. He's lost face and damaged his reputation in the eyes of the Court and colleagues.

Having spent a lot of time with Robert Moore in this effort, I believe he recognizes the need to reevaluate his conduct in this matter and to discovery obligations generally. Mr. Moore acted at all times with integrity and candor in his dealings with me, even in circumstances where to be less than candid might have redounded to his benefit. Once it became clear to him that his client had, in fact, broadly failed to meet its discovery obligations and that the untrue assumptions he'd made about discovery made him complicit in what occurred, he worked tirelessly to find the outstanding material and rectify the wrong. No one could have been more cooperative or more intent on getting to the truth of what happened. Accordingly, I do not see what might be gained from imposing sanctions on Mr. Moore or his firm, and do not commend same to the Court. I believe it would be wiser to assess sanctions against the Defendants--the sole beneficiary of all the misconduct--and allow attorney and client to allocate fault through other mechanisms.

---

[26] In light of the years that have elapsed since the crash, Plaintiffs will surely regard a continuance as a further hardship; however, I don't see an alternative that will afford the parties the time they will need to complete production of unproduced information and, as desired, re-depose witnesses.

I expect the Defendants will characterize these recommendations as too harsh and the Plaintiffs as too lenient, but I believe them to be consistent with the goal that the courts impose the least harsh sanction necessary to address the harm.[27]

**Respectfully Submitted this 15th Day of March, 2010,**

Craig Ball
Special Master
Texas Bar No. 01632200
3723 Lost Creek Blvd.
Austin, Texas 78735
Tel: 512-514-0182
E-Mail: craig@ball.net

---

[27] The Plaintiffs were likely hampered in their ability to respond to the Defendants' challenges to venue in Illinois by the failure to produce evidence of more substantial contacts between the Defendants and Illinois residents lately found.  For example, an unproduced Excel spreadsheet I found on Jennifer Reynolds' computer identified more than 40 Illinois-based bus tour operators listed as transporting patrons to Harrah's Tunica.  When, in the Illinois action, Plaintiffs sought information about Illinois-based tour operators, I question whether the Defendants seized upon the term "junket" as a way to avoid disclosing the existence of the Illinois-based bus tour operators in the spreadsheet.  Though common usage suggests a "junket" is simply an organized trip to a casino, the Defendants' defined it narrowly as a trip undertaken *by air*.  Thus, the defense may have succeeded in suppressing information about bus tours by furnishing the names of "junket" operators for Illinois (i.e., air tour operators).  It was not an abuse in this action, and I'm not qualified to advise if the missing data would have turned the tide under the Illinois Long Arm statute.  But, the Defendants' success in persuading the Illinois judge that there was insufficient evidence of contacts led to the filing of this case in Mississippi.

Accordingly, I considered recommending a transfer of the case to the Northern District of Illinois as an additional sanction, but ultimately concluded that the proposed rebuttable adverse inference instruction was better tailored to the harm and wouldn't require this Court to address discovery abuses occurring in a different action.

**Appendix A: Statements of Defense Counsel at November 2, 2009 Hearing**

On March 10, 2010, Plaintiffs' counsel Glen Dunn requested that I listen to the recording of the Court's hearing of November 2, 2009 before issuing this report. I did so and personally transcribed portions of the hearing which I felt warranted a response based on the results to date of my investigation. My comments are contained in footnotes. As many of these comments are cumulative of points made in my Report, I've relegated them to this Appendix. The numerical references at the start of each segment indicate the time in the recording when the segment begins.

8:07: Robert Moore: "You have in this record the affidavit of a lady named Tundra Myers. Ms. Myers was, at the time, the manager of the Tour & Travel Department for the Grand Casino Tunica. They were the ones responsible in Tunica for buses that come in and out, and I can pull the affidavit. I brought it here to show you, if you would like to see it. But what it says, in sum and substance, is she's conducted a search of the paper and the electronic documents, and there's nothing there that would be responsive to any of these requests.[28]

You have the affidavit of a lady named Jennifer Reynolds before you, number 3. Ms. Reynolds is the sole survivor, as they say, of the business operations of BL Development back in October of 2004, when all this happened. Not only is she the sole survivor, but she's the Regional Manager of one of the departments that would have been intimately involved in Tour & Travel receiving the buses as they came in and preparing the financial documents.[29]

Under the heading of "for what it's worth," you've got the affidavit of attorney Robert Moore that says, among other things, that I sat down with Jennifer Reynolds and went page-by-page, line-by-line, question-by-question, through the discovery that was propounded by plaintiffs and watched her, and suggested to her, as we did electronic searches of all conceivable databases, even databases where we didn't think it was conceivable to find information.[30] Looking. We talked to the Regional Manager for Information Technology who confirmed that the information that was created down in Gulfport, Mississippi and saved on a server, contrary to what some of think about the, quote, "Internet," isn't stored on the Internet. It's put on a server that was lost in Katrina.[31] I, in my affidavit, say I personally went and spoke to the current Tour & Travel Manager trying to find any document that would be

---

[28] The affidavit of Tundra Myers does not, in any manner, say that she conducted a search of paper or electronic records. Neither does Ms. Myers express any view about whether responsive materials exist.

[29] Ms. Reynolds is the Regional Manager of Accounts Receivable/Inventory Control. She has no responsibilities related to "receiving the buses as they come in," but she did receive financial reporting from Tour & Travel.

[30] It is hard to fathom how the Regional Manager for Accounts Receivable might overlook the Accounts Receivable database, but she did. There was apparently no "conception" of CMS, LMS, Infinium, Delphi, e-mail, IGS or any of the responsive electronic documents residing on Ms. Reynolds machine. Further, no one conceived of searching the Vital Records database for "bus," as doing so would have identified boxes stored just a few yards away that held responsive paper records.

[31] Having interviewed the same Regional manager for Information Technology, he was well aware that information was not lost when servers were damaged. Further, he knew that most of the servers at the Gulfport Regional Service Center were undamaged and transported to Memphis where they were simply put back in service.

responsive to your request. I have spoken to three separate lawyers who handled this case when it was being tried up in Illinois under the heading of jurisdiction to see if they had any documents, anything they had found. I have spoken to two separate paralegals with corporate, emphasizing with all of them the importance of Your Honor's order and the fact that you said it had to be scrupulously complied with, "And is there anything else anywhere," I asked of the current Tour & Travel Manager, of paralegals, of the risk managers, of the security managers, everybody. And the reason that you have what you have, and the reason you don't have more, is because *that's all there is and there is nothing more*.[32] And I can say that to you kind of loud--and I don't mean to be loud, I'm sorry--I can certainly say it to you distinctly, because we've looked for it. I don't want to get crossways with you anymore than you want to get crossways with me. We go back a long way, and we'll be practicing law a long time after these Chicago lawyers go back to Chicago. We've looked, and it's not there.[33] Now, I can't say it any more plain than that."

The Court: "Tell me where somebody says, "There's no backup." Are you telling me there's no backup for the server?"

Robert Moore: "I don't know where the, quote, "backup" is. I presume from the affidavits that it was lost too.[34] Because I can tell you there's been a search for it."

The Court: "But nobody said that anywhere."

Robert Moore: "The best of my way to say it to you, no affidavit has said it was backed up in this-a-way or the backup was lost in that-a-way."

15:00: Robert Moore: "There are five affidavits that I have counted I think, uh, four, maybe five for the proposition that they have looked, we have looked, everywhere where we can and we can't find it. Now on the contrary to that, you have, as you have said, allegations and complaints and the other words that you have used that I won't characterize. But you have *that*. Versus these *affidavits*."

1:26:56: The Court: "So, the conclusion to be drawn, from what I'm gathering you're saying is that not only are they not in the database, that means they're not in the storage shed. There are no hard copies."

---

[32] In fact, we now know there was relevant, unproduced data in the custody of the paralegals with which he spoke, and the Tour & Travel personnel were aware of the duplicate sets of documents stored in Tunica that weren't lost to the storm. There is yet more responsive material coming to light in databases, e-mail collections and archives, all of which could have been found had someone diligently and carefully examined those sources.

[33] The persons identified as having looked (e.g., Myers, Ewing, even Reynolds in large part) did not look.

[34] No backups believed to hold potentially responsive data were lost as a consequence of the storm. No one could have offered any truthful support for that assumption. Further, the affiants knew about the duplicate records in Tunica, and the IT personnel knew of the backups and replications of data.

Robert Moore: "That's true, and the only, the only exception to that statement, that 'that's true,' would be if there's some misidentification of the box.[35] If in the box there's, quote, 'Walters Group stuff' and they put 'Walker' or they put something else, then of course it doesn't show up. But anything that's a document that was kept and archived was then put in a box, put in a barn, and on the outside of the box there's a description of what's in it."[36]

1:41:06 The Court: "At this point, you can surely not disagree that they are struggling to get this information."

Mr. Moore: "Well, then I would say this to you: We've given them not 'nothing,' we've given them everything we've got. And if they're strugg...--and if that's the case, that we've given them everything we've got, then there's nothing to sanction, because you can't sanction someone for giving them everything you've got."

1:42:07 Mr. Moore (referring to further proof of no further responsive material): "If Your Honor wants me, desires for me to produce such an affidavit or such a witness I'd be willing to do it, glad to do it."

The Court: "The question is, at this point, whether it would do anybody any good, frankly."

Mr. Moore: "Well, it's going to show one of two things, isn't it?"

The Court: "Yes sir."

Mr. Moore: "It's going to show either that there isn't anything, in which case all of this has been a lot of paper and a lot of argument."

The Court: "Or I could just order that the plaintiffs be given access to your databases."

Mr. Moore: "Or, it's going to show that my clients have not been forthcoming with a lot of folks, in which case you're going to go a different direction."

---

[35] In fact, there were hard copies, including within the boxes that Mr. Moore is discussing which were tracked by the Vital Records database.

[36] Mr. Moore's description of the Vital Records database mistakenly suggests that a search for "Walters" would find responsive material where a misspelled search for "Walker" would not. That is, he conveys that only a misspelled search would precipitate a responsive document being omitted. In fact, the Vital Records database tracks only box labels, and none of the documents holding responsive material would have labels that would support a search for "Walters" or any variants of the Plaintiffs' names.

**Appendix B:**

**Interview of Jeffrey Harrell, Harrah's Vital Records Coordinator in Tunica, MS and Rhonda Palowski, his Supervisor**

On February 16, 2010, I spent about two hours on the phone interviewing Mr. Jeffrey Harrell, the Vital Records Coordinator for the Harrah's properties in Tunica, MS. I also had a brief discussion with Ms. Rhonda Palowski, who has been Mr. Harrell's supervisor since October of 2007. When I interviewed Susan Harmon in Las Vegas she'd named Mr. Harrell (with some uncertainty) as the person she tasked to search the paper records for the years 1999-2004 in search of "anything that had to do with Walters Bus Group or Tour and Travel information."

Mr. Harrell was helpful and cooperative. He is 36 years old and holds a high school diploma and auto mechanic certificate. After leaving the service, he held many short-term jobs before coming to work at the casino on November 25, 2003. For the first two years of his employment with the casino, he was a courier who delivered packages and picked up paperwork. In May of 2005, he was given the "Vital Records Coordinator" title he holds today and assigned the task of re-arranging and re-shelving the vital records, which by then comprised some 27,000 boxes occupying storage space with a maximum capacity for 22,000 boxes. Mr. Harrell was given a desk, phone extension and computer late in 2005 or early in 2006.

Mr. Harrell's principal responsibilities are to receive boxes of records dispatched to storage from various departments, check the labeling on the boxes to insure it matches the entries in the Vital Records Database and then shelve the boxes in one of three locations: 1) Vital Records Recent storage room, ie., Mr. Harrell's office, 2) The second floor of the Administration Building--used for Grand Tunica records and 3) Warehouse B. Once shelved, Mr. Harrell enters the location (building, aisle and bin number) for each box into the database. Mr. Harrell fulfills requests to pull boxes from storage through use of written requisition forms. Mr. Harrell also effectuates the corporate document retention policy by periodically printing out a "Destruction List" of boxes that have reached their specified longevity dates (minimum five years), locating those boxes and then marking a red "X" on them. From time to time (but always on a Monday, Wednesday or Friday) and assisted by members of the "drop team," Mr. Harrell pulls the boxes slated for disposal and transports them to warehouse staff for shredding. Shredding was done by contractors in the past (e.g., Premier Shredding or Shred-It of Memphis), but now the shredding operation is accomplished in-house.

Mr. Harrell stated the following:
- He was certain that he never received any calls from the legal department in Las Vegas like the ones Ms. Harmon described. He was adamant on this point.
- Prior to January of 2010, no one ever asked him to look for any information pertaining to Walter's Bus Group, Marean Walters or any matter relating the crash.
- Until this matter first came to his attention in January 2010, he had never implemented a legal hold in any matter. In the past, when matters were subject to a litigation hold, the practice was

for the department to retrieve the materials held and be responsible for them. He's recently set aside an area to quarantine records for a hold and will extend the longevity date for such materials indefinitely in the vital records database.

- Except for occasionally pulling a specified incident report folder from a security records box, Mr. Harrell never does any substantive review of the contents of the documents under his supervision. That's not his job. He does no analysis. He does not set retention policy.

- Any examination of the contents of the records boxes must follow upon the submission of a written Records and Retrieval Request. Any other access would be against company policy. Supervisor Rhonda Palowski emphatically made the same point. They appear to be under the impression that the records are routinely kept under lock and key, although Messrs. Moore and O'Connor recall otherwise.

- Mr. Harrell expressed the view that if anyone had been searching through the bus or Tour & Travel boxes before January of 2010, he would have known about it. Ms. Palowski confirmed same, but noted that if someone desperately needed something from Vital Records while Mr. Harrell was on vacation or off work, she would have covered for him. She also had no recall of anyone seeking records in connection with the crash, although she recently heard of the matter when Jennifer Reynolds advised her that people (i.e., Moore, O'Connor, Ball) would be looking through materials. She has only been on the job since 2007.

- Mr. Harrell confirmed that the bus records before late 2004 were not preserved and were, in fact, destroyed as part of the routine records retention effort. He confirms that he recently made a physical search (a "walk through" looking at labels) to establish that the records were, in fact, pulled and destroyed.