IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

**DEONNE MAGGETTE, ET AL**                                                    **PLAINTIFFS**
                                                          **CIVIL ACTION NO.2:07CV181-M-A**
**V.**                                                                       **LEAD CASE**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                         **DEFENDANTS**

**CONSOLIDATED WITH**
**McKINLEY JACOBS, AS SPECIAL**                                              **PLAINTIFFS**
**ADMINISTRATOR OF THE ESTATE OF**                       **CIVIL ACTION NO. 2:07CV182-M-A**
**FANNIE JACOBS, DECEASED; ET AL**

**V.**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                         **DEFENDANTS**

**SECOND REPORT AND RECOMMENDATIONS OF SPECIAL MASTER CRAIG BALL**

Your Honor:

Throughout this investigation, I expected that there would be ample support for Defendants' representation that the paper records in Gulfport responsive to discovery had been destroyed by Hurricane Katrina. My earliest instruction to the defense was to furnish proof of the claimed loss through photographs, insurance claims or persons with knowledge. Yet, I deferred emphasis on the issue because the assertions about destruction of Gulfport documents had been so fervent, unequivocal and unrelenting throughout the litigation that I thought it an unlikely place for a lie.

Over time, however, the myriad false statements about "lost" electronic information described in my prior report caused me to question the veracity of all statements blaming discovery failures on the Hurricane. When I discovered the legal department in Las Vegas was able to obtain Gulfport documentary records after the storm, I became more skeptical of the "lost in the storm" statements. If there were records extant, even if damaged or moldy, why hadn't they been searched and produced? Accordingly, I pressed for proof.

**The Records Were Neither Lost nor Looked For**

Some proof is coming to light. On April 2, 2010, I received several photos, which I'd sought since January, of the Gulfport records storage facility on Seaway Drive (example below). These reveal that,



although there was clearly serious flooding of the records facility, only materials stored on the lowest shelves were inundated. Most records were stored out of harm's way, above the water. Presumably, anyone visiting the facility after the storm would have seen that most of the records at the facility escaped significant storm damage.

When I saw the photos, I asked defense counsel, Robert Moore, to locate and identify the warehouse manager or vital records person in Gulfport so he or she could be interviewed. On April 9, Mr. Moore phoned me with the news that he'd located the Gulfport records manager and learned that the Gulfport records claimed to have been lost were still in the Seaway Drive storage facility in Gulfport. Mr. Moore advised that he would personally visit the facility at his first opportunity.

My suspicions about the existence of documents evolved to a conviction when, on April 16, Mr. Moore confirmed that he'd spent two days at the Gulfport Service Center records storage facility on Seaway Drive[1] and found that numerous boxes of responsive documents predating Katrina were not destroyed. Further, the records manager currently employed by the Defendants, Mr. Kenneth Roberson, was the same person who'd held that job since well before the storm.[2] Mr. Roberson confirmed that the responsive documents long sworn by others to have been lost were right on the shelves, in the places they'd always been and where they were supposed to be.[3] They'd even been catalogued in a database

---

[1] Though I'd been informed that the building had been sold after Katrina, what I did not learn until after Mr. Moore's visit was that Harrah's immediately leased the records storage areas of the facility back from the new owner and remained in continuous control of those areas.

[2] Mr. Roberson has been employed by Caesar's since the Grand Casino opened in Biloxi/Gulfport. He was present in the records storage facility in the days immediately before Hurricane Katrina and returned within ten (10) days after the storm.

[3] Per Mr. Moore, "Mr. Roberson confirmed that while the bottom row of documents throughout the warehouse [was] damaged and lost in the storm, nearly everything above the bottom [was] undamaged and remained in the warehouse to this very day. It was easy to tell what boxes were pre-Katrina because they all carried a green label and bar code. Post-Katrina labeling was done in blue. Although it wasn't completely uniform, mostly blue labeled boxes were on the bottom rows (and then interspersed throughout the remainder of the rows) and green labeled boxes began on the second row (and then were interspersed throughout the remainder of the rows)."

to facilitate search. No one had ever looked for them. No one had ever asked him about them until Mr. Moore's April 2010 inquiry.[4]

Mr. Moore reported that he personally searched more than fifty (50) bankers' boxes of potentially responsive records, the most relevant of which he characterized as "well organized...either by date or name." Mr. Moore's search of these records turned up important, clearly-responsive original records about the Walters Bus Company and prior trips to Tunica, including the complete, original documents for trips made in October 2001 and March 2002.[5] None of these were lost in Hurricane Katrina.[6]

**False Statements by Defendants' Tour and Travel Manager**
The existence of these Gulfport records and other unproduced paper records stored in Tunica were improperly shielded from discovery through the presentment of materially false testimony. For example, Defendants' Tour & Travel Manager at the Grand Tunica, Tundra Myers, testified under oath in Chicago on August 25th, 2006:

**P. 56. beginning at L. 19:**
BY MR. DUNN:
Q. So, I'm unclear. So, clarify for me the document that immediately precedes BL006, which is the Walters group of documents, that was something that you pulled up off the system?
 A. We pulled it from the system, because the documents, the original documents, we did not have access to.
Q. Why is that?
A. Because all those documents were lost during Hurricane Katrina.
Q. The document that is BL006, the Jass Tours document?
A. Right.
Q. That is a copy of an actual original copy that you received, that your casino received?
A. Yes.
Q. Would that information also be located on the computer?
A. Anything after -- it would be on the computer, but the actual copy of this, we would retain now because anything prior to the hurricane, we don't have copies of.

---

[4] Mr. Moore confirmed that, "Mr. Roberson doesn't have a uniform document destruction policy. Boxes are destroyed as needed in order to clear shelf space for new boxes. He has never heard of a "litigation hold" but he described a process in place whereby [the Harrah's legal department] would, from time to time, send for documents or things in the warehouse and then give instructions that these documents be taken from the shelf and placed in a secured area behind a chain link fence." There was no litigation hold put in place for the Gulfport documents relevant to this case until Mr. Moore's April 2010 visit.
[5] The Defendants promptly supplemented production on April 17, 2010, furnishing 185 pages of material from the Gulfport repository as MSBL 1345-1530.
[6] Additionally, Mr. Roberson recounted to Mr. Moore that documents that pre-dated 2001 had been shipped to an outside warehouse owned by Fayard. Mr. Roberson stated that all of these documents were lost in the storm. Mr. Roberson reported that "he saw the documents shipped to Fayard; saw the damage to the Fayard warehouse; knows that Harrah's never did business with Fayard thereafter; and knows that none of the documents ever came back." Notwithstanding Mr. Roberson's recollection, Mr. Moore noted the presence of two boxes of bus documents from the Grand dated 1998, so even the items claimed to have been lost to Fayard do not appear to constitute the eradication Mr. Roberson imagined.

Q. So, all information that was inputted, prior to Hurricane Katrina, the hard copies have been lost, correct?
A. The hard copies are lost, yes.

**P. 72, L. 1.:**
Q. (By Mr. Dunn): Was the manifest something that was also inputted on the computer data, or was that simply an original document that was retained?
A. It is not inputted into the system, no.
Q. Would I be correct in saying that the manifest, the original manifest that was submitted by the Walters Bus Company, was that original document destroyed in the hurricane?
A. Yes.
Q. Copies of that document weren't saved or transmitted to another location that perhaps was not lost in the hurricane?
A. Not that I'm aware of, no.
Q. That you are not aware. Someone who is like a keeper of records or administrator of records for the casino in Grand Tunica?
A. Not that I'm aware of, no.
Q. Not that you're aware of?
A. No.

**P. 81, L. 19:**
Q. (by Mr. Dunn): You told me that all of the original documents relating to the motor coach trips were destroyed after the hurricane, correct?
A. 2004.

**P. 93, L. 19:**
Q. (by Mr. Dunn): So, you wouldn't have the ability to pull that document?
A. (by Ms. Myers) Not certificate of insurance.
Q. Would it have been possible for you to have directed someone to pull it for you?
A. There's no document at the Seaway Drive address pre-Hurricane Katrina.

**Continuing P. 95, L. 10:**
Anything prior to 2004, we would not have. Anything after that, or 2005, which the hurricane happened, we would not have. Anything October 2005 going forward, we would have. Anything prior to that, we wouldn't have.

**Continuing P. 96, L. 5.:**
Q. And it would have been kept at the Gulfport property, but those documents were lost in the hurricane?
A. Yes.

On March 10, 2010, I questioned Ms. Myers concerning the same topics. Mr. Moore participated in the interview. Ms. Myers conceded that she had no personal knowledge of the status of the records in Gulfport, and that she'd never seen the aftermath of Hurricane Katrina at the Gulfport Service center. In short, she didn't know--and had never known--whether the records sought had been damaged or not. She simply swore that the records were lost because she'd heard about damage to the casino facilities in

4

Gulfport.[7]  Further, Ms. Myers confirmed that copies of bus documents from the Gulfport Service Center were routinely transmitted to the Tunica facility.  In fact, Ms. Myers noted that it was one of her job responsibilities to periodically box these copies and transfer them to the casino's records storage facility in Tunica.  Despite her contrary testimony, not only was Ms. Myers aware that copies of the documents were saved to "another location that perhaps was not lost in the hurricane," she was an integral part of the process.

**Conduct of Illinois Defense Counsel**

The Court may recall from my first report that a February 2010 visit to the Harrah's Legal Department in Las Vegas turned up a complete set of key documents pertaining to the ill-fated excursion made the basis of this action.  Notably, some of the most relevant and material of these documents had never been produced to Plaintiffs in discovery.[8]  I interviewed paralegal Susan Harmon, the person whom Harrah's vested with primary responsibility for gathering materials responsive to discovery.  Ms. Harmon assured me that she'd transmitted these documents to Harrah's counsel at the Seyfarth Shaw firm in Chicago, Christopher Garcia.  My impression was that Ms. Harmon was surprised to learn they had not been produced to Plaintiffs.

On March 12, 2010, I interviewed Mr. Garcia, who denied receiving the unproduced materials from Susan Harmon.  Mr. Garcia was adamant on this point.  He claimed they were not sent to him by Harrah's.  When I asked Mr. Garcia if he'd checked *thoroughly* to be *certain* that no one at his firm had received the unproduced documents, he confidently asserted that he had not received them and that neither the associate working with him nor anyone else at his firm had received the material

Mr. Garcia's statements to me were false.  My subsequent examination of e-mail communications revealed that, on January 16, 2007 at 1:48PM CST, Mr. Garcia received an e-mail from Susan Harmon transmitting the documents he claimed not to have.[9]  The message identified the attachment as containing tour materials related to the excursion made the basis of the lawsuit.

My close questioning of Mr. Garcia and his responses warrant some context.  Mr. Moore furnished the unproduced documents to Mr. Garcia in anticipation of my interview so that Mr. Garcia would know what documents were at issue and investigate.  Mr. Garcia clearly understood the significance of the documents, recognized the obligation to produce them and appreciated the gravity of the failure to do

---

[7] Ms. Myers struggled with the concept of "personal knowledge."  She appeared to equate it with having heard things from others.  In weighing the significance of her confusion, I considered that the Defendants chose the witnesses who executed affidavits in support of Defendants' motions and responses.  It was the responsibility of the Defendants and their counsel to insure that their witnesses understood the significance of the oath and possessed the personal knowledge claimed.  Illinois defense counsel, Mr. Christopher Garcia, advised me that he'd based the statements he'd drafted for Ms. Myers' signature on multiple conversations with Ms. Myers and a meeting prior to her deposition. Mr. Garcia further confirmed when I interviewed him that he knew at the time of the affidavits that "nobody assessed the destruction, nobody saw it," but that was "the best he could do."  The Myers affidavit was reportedly not filed in Illinois, but it was filed by Mr. Moore in this cause and argued as fact by the Defendants to this Court.

[8] These are MSBL 1181-1216 as recently produced in discovery.

[9] The materials received by Mr. Garcia from Ms. Harmon but not produced coincide with all of MSBL 1181-1216 excepting only facsimile cover sheets and MSBL 1185, 1187, 1189 and 1202.

so. Mr. Garcia had legal counsel assisting him during the interview. He had adequate opportunity to review his e-mail and files before the interview.[10] There was nothing offhand about his repeated denials that neither he nor his firm had received the material not produced.

Mr. Garcia denies that he intentionally withheld unproduced documents in his mailbox. Perhaps Mr. Garcia was careless in his handling of evidence and responses to discovery. He may have been careless again if he failed to pass on discoverable documents when conveying case materials to Mr. Moore. Whatever justification Mr. Garcia advances for his failure to produce in 2007, there is no justification for his failure to locate and disclose these materials when I interviewed him in March 2010. Mr. Garcia knew the purpose of my interview was to investigate the failure to produce particular materials transmitted to him by Ms. Harmon, yet he now contends that he did not look at his e-mail for transmittals from Ms. Harmon.[11] His answers were untrue on a point about which he had the obligation and opportunity to be truthful and accurate.[12]

---

[10] Mr. Garcia knew before the interview that he would be questioned about the Harmon transmittal and that he should be prepared to address whether or not he had received it.

[11] When he stated he'd never received the documents from Ms. Harmon, Mr. Garcia was unaware I'd be reviewing his e-mail. Once I did, I found the transmittal and advised Robert Moore that Mr. Garcia had the documents he claimed not to possess. Approximately three weeks later, Mr. Garcia's attorney e-mailed me that Garcia would no longer dispute he received the email and attachments from Susan Harmon. I do not know if Harrah's or its counsel advised Mr. Garcia or his attorney about what I'd learned before Mr. Garcia recanted.

[12] Through counsel, Mr. Garcia denies he was either "grossly" mistaken or untruthful in his interview with me. He avers he "was simply incorrect with respect to whether the handful of pages sent to him by Susan Harmon on January 16, 2007 had, in fact, been received." Mr. Garcia's counsel wrote: "Some background is relevant. On or about January 16, 2007, Mr. Garcia was dealing with the imminent death from cancer of the man who had been his step-father for many years, and with the process of trying to provide assistance in these difficult circumstances to his mother, who was living in California, while also attending to Mr. Garcia's professional responsibilities as a lawyer in Chicago and traveling for business. In that mix of circumstances he simply overlooked the attachment to the e-mail from Ms. Harmon. That was an oversight, but it was not dishonest in any respect. As he told you when you interviewed him on March 12th, many of the documents that were attached to Ms. Harmon's e-mail had been produced by others in the Illinois litigation and were no secret to anyone."

Counsel adds: "When Mr. Garcia spoke with you on March 12, 2010, he knew that he was going to be questioned about the Harmon transmittal and should be prepared to say whether or not he had received it. Therefore, he asked the associate who had been in charge of document management and production in the Illinois litigation if he had received the Harmon materials from her, and was told that he had not. Mr. Garcia also reviewed the records of document production in the Illinois litigation and determined that the documents had not been included in Seyfarth's production."

Mr. Garcia's counsel added: "[I]t is important to note that Mr. Garcia did not, in fact, have the advance "understanding" you describe that the focus of your inquiry would be in specific areas that you believed might be important to your work. Nor did I have that understanding. Thus, neither of us saw the need to undertake a comprehensive review of all our firm's records in advance of the telephone conference. So, the simple fact of the matter is that Mr. Garcia did not know - and ought not reasonably be expected to have known - what you in your mind thought was significant to your inquiry.

"From the steps he had taken, and from his own awareness that he had not seen the group of documents together as presented to him before the conference call, he told you what he then unquestionably believed to be true - that neither he nor Seyfarth had received them from Ms. Harmon. Mr. Garcia did not attempt to review his electronic

Mr. Garcia is not counsel in this cause and was not Harrah's counsel (nor under oath) at the time of his statements to me. I do not suggest that the Court need consider his conduct except as it bears on the Defendants' discovery abuse in this cause. Defendants in this cause have adopted the discovery responses and filed the affidavits from Illinois. To that extent, discovery abuse of the Defendants and/or their counsel in the Illinois litigation is inextricably bound up with discovery abuse in this cause.

**Conclusion and Recommendations**

After all of the Defendants' other discovery failures, the revelation that the documents sworn to have been lost in the hurricane were, at all times, intact, in their usual and customary places and cataloged in the Defendants' records database is shocking...and yet perversely consistent with Defendants' conduct throughout this litigation. The Plaintiffs have long suspected as much and were disparaged for their tenacity.[13] There is no evidence that the Defendants ever looked for these records--not in the database that tracked them nor by physical inspection or inquiry of the longtime employee charged with their custody. This is unconscionable.

The Defendants' conduct in discovery is so riddled with materially false representations and efforts to capitalize on same that it would be unjust to indulge them in the notion that these were just an unfortunate series of accidents that all served to conceal evidence in the face of the Plaintiffs' unrelenting efforts in two courts to discover it.

Two courts have been presented with materially false testimony and, at least in the Illinois proceedings, the testimony was presented with, at best, a conscious indifference as to whether it was true or not. The Courts have been repeatedly misled about central issues, in the face of diligent, aggressive challenges that should have prompted competent inquiry. Instead, the Defendants again and again

---

records before the call, and therefore did not see the January 16, 2007, transmittal from Ms. Harmon or the accompanying documents. He is and was a busy lawyer, and he and I thought that merely making ourselves available to consult with you as we understood you had requested was a sufficient accommodation of your needs. To give you an example of the imposition on his time that your view of the obligation which your request for a consultation would have entailed, as of the time he left Seyfarth he believes there were well over 10,000 emails on his system, and a review of that quantity to locate the ones relevant to the Illinois litigation would have been a significant undertaking even if the pertinent events had been fresh in his mind. As you know, it was not until we gathered all of the hundreds of emails related to discovery in the Illinois litigation and sent them to you that the transmittal by Ms. Harmon to Mr. Garcia of January 16, 2007, became known."
...
"Mr. Garcia reported to you on March 12 what he recollected based on his handling the case several years before, his communication before the conference call with the associate in charge of documents in the case, and the limited file review he described. His conclusion that Seyfarth had not received the Harmon transmittal and documents was certainly not accurate but it was not purposefully or intentionally wrong, and I do not believe that you can in good conscience assert anything contrary to be a fact."

[13] For example, on February 13, 2007, Mr. Garcia filed a pleading in Illinois stating, "Plaintiffs assertion that documents were not destroyed as a result of Hurricane Katrina is disingenuous, and nearly sanctionable." *Defendants BL Development Corp. & Caesars Entertainment, Inc.'s Response In Opposition To Plaintiff Patrick's Second Motion To Compel Or For Sanctions* at p. 4. This pleading also recites: "Tundra Myers, Gary Benson, and Joseph Long all testified that Defendants' Mississippi facilities were destroyed after the storm and incalculable records were subsequently lost."

trotted out bold falsehoods and, with bluster and umbrage, presented them as fact. This, too, is unconscionable.

In my first report to the Court, I proposed less harsh sanctions against the Defendants than their misconduct may have warranted because I left open the possibility that such conduct might not have occurred in bad faith. That is, perhaps the loss of paper records in Hurricane Katrina genuinely hampered their ability to make a full and timely response. I indulged the Defendants in the expectation that there was a core of truth in their statements about the wholesale destruction of data and paper records. I can no longer do so.

I would now be inclined to recommend dispositive sanctions and a punitive shifting of costs were it not for two ameliorating factors and a question of law. The first ameliorating factor is that the documents and data withheld appear to be largely--though not uniformly--corroborative or cumulative of other information. Their significance is elevated, if at all, because they might have impacted the Illinois court's assessment of jurisdictional issues[14] and by virtue of the Defendants' questionable challenges to, e.g., whether the Plaintiffs made other trips, the dates of same, commissions arrangements and payments.[15]

The second ameliorating factor is that the Defendants have, in the main, acted cooperatively while expending considerable resources to assist my investigation and identify and produce relevant evidence. Defense counsel, in particular, rendered invaluable assistance.

Finally, this Circuit's standard for imposition of the most severe sanctions for discovery abuse requires more than simple negligence or even gross negligence. There must be a showing of bad faith and that the documents and ESI not produced were relevant and their loss prejudicial. See *e.g.*, *Rimkus Consulting Group Inc. v. Cammarata*, H-07-0405 (S.D. Tex. Feb. 19, 2010). Here, "gross negligence" fails to capture the torrent of false statements of fact made with utter disregard for truth or falsity or the abject failure to meet discovery obligations from the most obvious and accessible sources of information. Yet, I cannot conclude that, considering the extensive, successful efforts undertaken since January to bring forward evidence long withheld, that the effect of the Defendants' misconduct will prove so prejudicial as to substantially deny the Plaintiffs the ability to prosecute their claims. The Defendants' conduct is fairly despicable, but the harm occasioned is not irreparable.[16]

This Court has had a different and perhaps greater opportunity to weigh the Defendants' conduct and may believe dispositive sanctions are warranted. Though I do not now commend dispositive sanctions

---

[14] This is somewhat speculative on my part and should be accorded little weight; but, by withholding production of evidence that might have borne on jurisdiction in Illinois, I question whether the statute of limitations compelled Plaintiffs to abandon their chosen forum and re-file against Defendants in Mississippi.

[15] Perhaps the most significant "smoking gun" to emerge from this investigation is that the Defendants had, in fact, paid commissions to the Walters in connection with at least one prior excursion despite longstanding and categorical denials that commissions were ever paid. I concede that the parties are best situated to demonstrate the significance or insignificance of the evidence withheld and lost. That information may have greater probative value than I recognize.

[16] The claims of any plaintiffs who died during delays, if any, occasioned by the Defendants' discovery abuse may have been irreparably prejudiced.

to the Court for the reasons stated above, it is difficult to imagine a more compelling case for them absent willful destruction of crucial evidence.

**Further Investigation**

Responsive evidence that should have been produced continues to emerge; accordingly, I continue to delve into and work to rectify discovery failures, particularly relevant e-mail communications, ESI and records. I am also still exploring intent and culpability. I've recently initiated a narrow inquiry into whether the Defendants engaged in exaggerated claims of lost records or data attributed to Hurricane Katrina in other matters, in order to gauge whether this case is an isolated instance or part of a broader pattern of discovery abuse.

I recognize that my investigation should have a finite scope, and so I am prepared to cease my work whenever the Court feels that further efforts are not needed. Else, I will stay on top of the unresolved discovery issues and periodically report on progress. Thank you.

**Respectfully Submitted this 7th Day of May, 2010,**

_____
Craig Ball
Special Master
Texas Bar No. 01632200
3723 Lost Creek Blvd.
Austin, Texas 78735
Tel: 512-514-0182
E-Mail: craig@ball.net