**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**DEONNE MAGGETTE, et al**                                                   **PLAINTIFFS**

**VS.**                              **CAUSE NO. 2:07-cv-181**

**BL DEVELOPMENT CORP, et al**                               **DEFENDANTS**

**CONSOLIDATED WITH**

**McKINLEY JACOBS, AS SPECIAL**
**ADMINISTRATOR OF THE ESTATE OF**
**FANNIE JACOBS, DECEASED; ET AL**                         **PLAINTIFFS**

**V.**                              **CAUSE NO. 2:07CV182**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                       **DEFENDANTS**

## **ORDER**

This cause comes before the court on its own motion, setting a June 30, 2010 hearing in this case regarding discovery violations by defendant BL Development Corp. ("BL") and the consequences of same for the dispositive motion and trial portions of this litigation. This is a negligence case arising out of a tragic October 9, 2004 accident in which a bus operated by Walters Bus Company ("Walters") left the roadway and overturned on I-55 near Marion, Arkansas.[1] During this accident, the roof of the bus separated from the passenger compartment and all but one of the thirty passengers were ejected. Fifteen people died in the accident, including the driver, Herbert Walters, and the remaining sixteen passengers were seriously injured. The passengers on the bus were heading to the Grand Casino Tunica, where they had made reservations to spend the night.

A central issue in this case is whether defendant BL, the owner of the Grand Casino

---

[1] Walters is not a defendant in this case, although it is a defendant in related Illinois state court proceedings.

Tunica, is vicariously liable for any negligence committed by Walters. This issue has given rise to extremely heated discovery disputes in which plaintiffs have contended that they have not been provided with full disclosure by BL regarding the nature of its relationship with Walters. This court has reviewed, with increasing concern, the discovery orders issued by the Magistrate Judge and the reports of Special Master Craig Ball in this case. These orders and reports establish that BL has shown complete disregard for the discovery process in this case and has repeatedly submitted false information to this court. The scope and persistence of the violations surpass anything which this court has encountered in prior litigation. BL has, on numerous occasions, made solemn representations to this court which can not be reconciled with the truth, even after the Magistrate Judge expressed serious concerns regarding the accuracy of the information which BL had provided and demanded that it provide full disclosure. The evasions and falsehoods perpetrated by BL and its agents continued even after this court took the extraordinary step of appointing a special master to investigate its conduct during discovery.

It would be naive for this court to conclude that BL is the first defendant to have "dragged its feet" in discovery or failed to be forthcoming in the information which it provided to an opposing party. While such violations are serious enough, they become far more so once they persist through repeated inquiries and sanctions from this court. In eight years on the bench, this court had not once found it necessary to appoint a special master to investigate discovery violations. It should thus be apparent that this case was "off the charts" in terms of seriousness even as of the time of the special master's appointment. Once this court took this extraordinary step, it served as a clear notice to BL, at the highest levels of the corporation, that it should take whatever steps were necessary to obtain the requested information. The special master's report makes it clear that BL failed to do so. Indeed, it was the special master Mr. Ball himself, and

2

not BL, who uncovered much of the information which has recently come to light, even though BL was obviously in a far better position to know where its own records were kept. It would be highly charitable for this court to conclude that BL's failure was the result of simple negligence or inadvertence.

The court suspects that BL may attempt to shift blame for this failure to individual employees and/or counsel. It is clear, however, that BL's official position to this court, for many months, was that the requested documents had been destroyed in Hurricane Katrina when the most rudimentary search, at the expected locations, would have revealed otherwise. For example, the special master wrote in his first report as follows:

> [W]hen I directed Ms. Reynolds to search the spreadsheets she maintains to track overnight bus visits, responsive data was right where it was supposed to be; yet, these records had never been disclosed or produced. This was a scenario repeated time and again in my inquiry. Sources of information that the defense swore contained no responsive data or had been destroyed by the hurricane proved either to hold clearly responsive data in the places one would expect to find it or had been unaffected by the storm.

The special master's report also makes it clear that BL provided descriptions of its search efforts which were clearly calculated to give an *appearance* of diligence and compliance, but which actually proved to be absurd upon closer scrutiny. [See, .e.g. special master's first report at 15-16] This fact reduces the already small chance that BL was simply negligent in providing information to this court.

The special master's second report casts defendant's conduct in this case in an even worse light than the first. The second report presents the absurd scenario of this court's special master "discovering" the defendant's own large trove of documents at its own warehouse which, this court is apparently expected to believe, was unknown to defendant until the master helped discover it. The special master writes in his second report as follows:

> On April 2, 2010, I received several photos, which I'd sought since

3

January, of the Gulfport records storage facility on Seaway Drive (example below). These reveal that, although there was clearly serious flooding of the records facility, only materials stored on the lowest shelves were inundated. Most records were stored out of harm's way, above the water. Presumably, anyone visiting the facility after the storm would have seen that most of the records at the facility escaped significant storm damage.

When I saw the photos, I asked defense counsel, Robert Moore, to locate and identify the warehouse manager or vital records person in Gulfport so he or she could be interviewed. On April 9, Mr. Moore phoned me with the news that he'd located the Gulfport records manager and learned that the Gulfport records claimed to have been lost were still in the Seaway Drive storage facility in Gulfport.

My suspicions about the existence of documents evolved to a conviction when, on April 16, Mr. Moore confirmed that he'd spent two days at the Gulfport Service Center records storage facility on Seaway Drive and found that numerous boxes of responsive documents predating Katrina were not destroyed. Further, the records manager currently employed by the Defendants, Mr. Kenneth Roberson, was the same person who'd held that job since well before the storm. Mr. Roberson confirmed that the responsive documents long sworn by others to have been lost were right on the shelves, in the places they'd always been and where they were supposed to be.

But for the seriousness of these issues, there would be some humor in the notion that an outside investigator would have to notify a large corporation of its own trove of documents at its own warehouse, even after this court had repeatedly directed defendant to make all possible efforts to locate them.

Even if this court could somehow accept the notion that BL's failure to discover its own trove of original documents at its own warehouse was merely negligent, it would also be confronted with the fact, discussed in the special master's first report, that *backup copies of the data* stored at the location were routinely transferred to BL's own backup databases. The special master's report reveals that backup copies of the data in this case were, in fact, transferred to BL's data storage facilities as per routine procedure, a fact which must have been known to BL. The special master noted that counsel for BL had BL employees Tundra Meyers and Lance

4

Ewing sign affidavits which maintained the "company line" that the documents had been destroyed in Hurricane Katrina, even though these employees had no personal knowledge of whether this was the case. Specifically, the special master wrote as follows:

> The affidavits of Tundra Meyers and Lance Ewing are misleading, bordering on outright falsity. Their affidavits were not prepared by them or with their input. Though both affiants should have declined to execute their affidavits due to a lack of personal knowledge, the greater fault falls of counsel who selected these witnesses for the roles thrust upon them. Both affidavits were drafted to leave the impression that Hurricane Katrina deprived the Defendants of responsive data or records. In fact, while certain computer servers were indeed damaged, i.e., some hardware got wet, the information housed on those servers had been safely secured from harm before the storm, and the Defendants never lost access to this data. **Further, though the Defendants point to the genuine loss of paper records in the storm, the Defendants did not reveal that copies of many, if not all, of the responsive records were made before the storm and were safely ensconced in Tunica, far from Katrina's wrath.** The Defendants did not search these readily accessible sources, electing instead to trade on the story that the hurricane destroyed the evidence.

(Emphasis added). When counsel are forced to resort to canned affidavits from unknowledgeable employees which parrot a company line which is patently false, this further fosters the impression that a wilful deception of this court has taken place.

The special master's second report also contains a jarring description of what appear to be outright lies told to him - to this court - by Christopher Garcia - an attorney who played an important role for BL in handling discovery documents arising out of the bus accident in this case. The special master describes these communications with Garcia as follows:

> On March 12, 2010, I interviewed Mr. Garcia, who denied receiving the unproduced materials from Susan Harmon. Mr. Garcia was adamant on this point. He claimed they were not sent to him by Harrah's. When I asked Mr. Garcia if he'd checked *thoroughly* to be *certain* that no one at his firm had received the unproduced documents, he confidently asserted that he had not received them and that neither the associate working with him nor anyone else at his firm had received the material. Mr. Garcia's statements to me were false. My subsequent examination of e-mail communications revealed that, on January 16, 2007 at 1:48PM CST, Mr. Garcia received an e-mail from Susan Harmon transmitting the documents he claimed not to have. The message identified the attachment as

5

> containing tour materials related to the excursion made the basis of the lawsuit.
>
> My close questioning of Mr. Garcia and his responses warrant some context. Mr. Moore furnished the unproduced documents to Mr. Garcia in anticipation of my interview so that Mr. Garcia would know what documents were at issue and investigate. Mr. Garcia clearly understood the significance of the documents, recognized the obligation to produce them and appreciated the gravity of the failure to do so. Mr. Garcia had legal counsel assisting him during the interview. He had adequate opportunity to review his e-mail and files before the interview. There was nothing offhand about his repeated denials that neither he nor his firm had received the material not produced. . . .
>
> Mr. Garcia denies that he intentionally withheld unproduced documents in his mailbox. Perhaps Mr. Garcia was careless in his handling of evidence and responses to discovery. He may have been careless again if he failed to pass on discoverable documents when conveying case materials to Mr. Moore. Whatever justification Mr. Garcia advances for his failure to produce in 2007, there is no justification for his failure to locate and disclose these materials when I interviewed him in March 2010. Mr. Garcia knew the purpose of my interview was to investigate the failure to produce particular materials transmitted to him by Ms. Harmon, yet he now contends that he did not look at his e-mail for transmittals from Ms. Harmon. His answers were untrue on a point about which he had the obligation and opportunity to be truthful and accurate.

The court finds Mr. Garcia's conduct to be nothing short of outrageous and an insult to this court and its processes.

While Garcia does not appear to have been serving as counsel for BL at the time of the interview, he clearly handled important discovery documents relating to the bus accident on its behalf. That being the case, on what basis might this court presume that Garcia or some other BL employee did not hide and/or destroy important evidence which crossed his desk? It is only due to the special master's diligent investigation that the e-mails between Harmon and Garcia have come to light. What other evidence might have existed regarding the relationship between BL and Walters which has been effectively concealed by BL and/or its agents? The court can be excused if it suspects that a pervasive culture of deception exists at BL regarding litigation and discovery matters. Moreover, now that BL has - with the special master's prodding -

6

"discovered" its own trove of documents at its own warehouse, why should this court presume that damaging documents have not been removed from that location? This court would be very naive to think that its power to uncover BL documents in any way approaches BL's power to conceal them, particularly since the special master began his work years after BL's deception began.

The special master recommends two possible courses of action for the court vis a vis BL: 1) submitting this case to the jury with an adverse inference instruction against BL; or 2) specifically instructing the jury to find BL vicariously liable for any negligent acts committed by Walters Group.[2] While the court does not rule out the possibility that it will choose the first option, it does have concerns regarding whether the issue of vicarious liability is one of law which should be decided by a court, rather than a jury. The issue of vicarious liability is one which depends heavily upon matters of law and public policy, and a court is clearly in a better position to analyze those issues than a jury. In this case, the vicarious liability issues are also inextricably intertwined with discovery issues with which this court is already familiar and is in a far better position to assess than a jury. If BL's deception in this case related to the underlying bus accident or some other issue of fact which a jury is particularly well suited to decide, then an adverse inference instruction might be a more attractive option than it is now.

In setting forth the argument against dispositive sanctions, the special master noted that there is some Fifth Circuit authority suggesting that spoilation of evidence may only warrant

---

[2]Granting summary judgment to BL is not one of the options submitted by the special master, and it is unclear to this court how it could possibly grant BL summary judgment when it has such overwhelming doubt that, even now, full disclosure regarding the scope of the relationship between BL and Walters has been provided. Moreover, as a simple matter of justice, entering an order summarily dismissing BL after its conduct to date would seem almost perverse. However, the court recognizes that BL has the right to file such a motion, and it will be given an opportunity to do so.

dispositive relief if there is both proof of bad faith and that the missing evidence would have been relevant and probative. *See, e.g. Rimkus Consulting Group, Inc. v. Cammarata*, --- F.Supp.2d ----, 2010 WL 645253 (S.D.Tex. 2010), *citing Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 & n. 8 (5th Cir.2005). While this authority is instructive, the court is of the view that the issue of primary concern in this case is not the "mere" spoilation of evidence, but rather the repeated flouting of discovery orders in such a manner as to call into question the integrity of this court's orders and to also raise questions regarding exactly what, if anything, BL might be attempting to hide in this case.

In *Condrey*, the discovery/spoilation issues appear to have been of much more tangential importance than in the instant case. The Fifth Circuit noted in *Condrey* that "Harrell Equipment asserts that the district court failed to draw the proper evidentiary presumptions from SunTrust's failure to produce evidence regarding its purported investigation of certain SunTrust employees." *Condrey*, 431 F.3d at 203. In rejecting the argument for an adverse inference instruction, the Fifth Circuit wrote in a footnote that:

> Harrell Equipment has failed to specifically allege what evidence SunTrust destroyed or to demonstrate what documents are missing. Harrell Equipment did not point to facts in the record to suggest that an investigation took place and it has not named specific documents that it cannot locate. Therefore, even if Harrell Equipment had alleged that SunTrust acted in bad faith when it destroyed evidence, we would still affirm the district court's award of summary judgment on this issue because Harrell Equipment apparently cannot demonstrate that SunTrust destroyed relevant evidence.

*Id.* at n. 8. It thus appears that *Condrey* involved a rather garden-variety discovery dispute which did not involve the repeated disregard of court orders by a litigant. It also appears that the plaintiffs in that case did not specify, even in general terms, how the missing evidence would have assisted their case. Indeed, the basic issue of spoilation appears to have been something of an afterthought in that case, while BL's lengthy defiance of this court's discovery orders has been

8

central to this case.

Moreover, to reiterate, this court is very far from persuaded that it has before it - even now - all relevant information regarding the scope of BL's relationship with Walters. How might this court determine whether any missing evidence might be "relevant" or its absence "prejudicial" when it is far from clear what that evidence even is? It seems clear that Garcia attempted to conceal the existence of specific e-mail communications between himself and Ms. Harmon. If this deception had not been revealed, would the plaintiffs be required to guess at the e-mails' existence and then prove that they were relevant and their absence prejudicial? The notion borders on the absurd.

In the court's view, an order finding the existence of an agency relationship between Walters and BL may also be essential to maintain the integrity of the court's discovery process and the credibility of its threats. In so concluding, the court would note that today is very close to the one-year anniversary of the Magistrate Judge's order finding BL in gross violation of its discovery obligations and warning that any additional failure to comply would result in an agency relationship being found as a matter of law between BL and Walters. Specifically, the Magistrate Judge wrote in a June 2, 2009 order as follows:

> The court will not tolerate dilatory tactics and gamesmanship that prejudices either party. As the exchange of discovery is in the best interest of justice, the court directs defendants, once again, to supplement their responses to the plaintiffs' interrogatories as previously directed in the April 21, 2009 Order; supplementation must be complete by June 13, 2009.
> **The court declines at present to enter an order establishing an agency relationship between the defendants and Walters Bus Service existed at the time of the occurrence. Nonetheless, because defendants disobeyed the court's April 21, 2009 order, the court finds that monetary sanctions are warranted. Defendant is forewarned that further failures to abide by the court's orders or rules will without question result in much more severe sanctions**.

(Emphasis added). Many falsehoods, evasions and half-truths had yet to be made by BL as of the

date of the Magistrate Judge's warning.

Indeed, it is apparent that BL "doubled-down" on its deception after this date, even making repeated appeals of the Magistrate Judge's sanctions in which it breathlessly and indignantly recounted the near-heroic efforts which it had made to discover the relevant documents and argued that the Magistrate Judge had committed clear error in doubting its efforts in this regard. For example, in its August 3, 2009 appeal of the Magistrate Judge's sanctions, BL attorney Robert Moore wrote as follows:

> Upon receipt of the requests for admissions, Mr. Moore made additional inquiry of multiple persons with knowledge of the facts at a local and corporate level. Mr. Moore personally participated (again) in a manual and electronic search of every conceivable data base in an effort to locate documents and information requested by plaintiffs' counsel in discovery. This included reviewing line by line interrogatory requests, requests for production and requests for admissions with persons believed to have the most knowledge concerning these requests. Mr. Moore spoke with additional persons with knowledge so that he could confirm that the documents which could not be located were housed on the Mississippi Gulf Coast and were destroyed by Hurricane Katrina. Along with the paper files which were stored on the Gulf Coast the server that contained electronic copies of documents was also housed in this same location, and that the server which housed the electronic information was likewise destroyed. Other lawyers within Mr. Moore's office conducted a similar investigation, both as assistance to Mr. Moore and to be sure that every conceivable data base was considered and checked for information that would be responsive to these requests.

Apparently, Mr. Moore's description of his search of "every conceivable database" must now be amended to reflect the truth of the matter, which is that originals and copies of the data in question were stored at the ordinary and customary locations where they would be expected to be found and that both originals and copies survived Hurricane Katrina intact. It seems very likely that, if the Magistrate Judge had not taken the extraordinary step of appointing a special master, the truth in this regard would never have been revealed.

While the special master has done an extraordinarily competent job of searching the relevant databases and warehouses, it is not clear that he is aware of the specific warnings made to BL by this court regarding the consequences that it would face if it continued to disregard its

10

discovery obligations. In light of BL's sustained and contemptuous disregard of the Magistrate Judge's warnings, it appears at this juncture that this court has no real choice but to find that an agency relationship exists as a matter of law between BL and Walters. BL will be given an opportunity at the June 30 hearing to persuade the court otherwise.

Ironically, the dispositive sanction may, in some ways, be better for BL than if the court were to issue an adverse inference instruction to the jury. If the court were to issue such an instruction, the jury would be very likely to find against BL on the vicarious liability issue, and it might also be in a punitive mindset when it considered the underlying liability for the accident and the damages resulting from same. The court recognizes, however, that responsibility for punishing BL for its discovery violations lies with the court, rather than the jury, and the June 30 hearing will assist it in that function. Assuming that this court does not grant plaintiffs' motion for partial summary judgment regarding the issue of the bus company's negligence,[3] the jury will be tasked with the role it customarily performs: deciding issues of fact such as liability and damages. The court sees no reason why the jury should even be told of BL's discovery violations, unless the violations are shown to impact the liability and damages issues before it.

Regardless, it is clear that the trial presently set for July can not go forward as scheduled, given the delays caused by defendant's misconduct. The court will therefore re-set a trial date in this case for October 12, 2010, and the Magistrate Judge is requested to set pre-trial and motions deadlines accordingly. As noted previously, a hearing will be set beginning on June 30, 2010 so that the parties may argue the issues raised in this order.

This court's role in civil litigation is typically to serve as an appellate court in discovery

---

[3]The court would note that plaintiffs' negligence claims appear strong, but it would be very unusual for it to grant plaintiffs summary judgment on fact issues which are so readily understood and decided by a jury.

matters and to make original rulings upon dispositive motions and trial issues. The June 30 hearing will reflect that fact. The Magistrate Judge has imposed ongoing monetary sanctions against BL for its discovery violations, and she is in the best position to decide whether, and how, those monetary sanctions should be modified in light of recent revelations. The court wishes to avoid the possibility that BL might be subjected to a form of double jeopardy by having two federal judges issue separate monetary sanctions for the same discovery violations.

Accordingly, the primary topics at the June 30 hearing will be 1) the proper handling of the vicarious liability issue and pretrial and trial motions relating to same; and 2) the conduct of BL counsel in this case, in particulars attorneys Moore and Garcia, and the implications of same for them and this case. This court is particularly interested in hearing an explanation from BL counsel as to how the representations made in their appeals of the Magistrate Judge's rulings, such as the one quoted above, can be reconciled with the special master's findings. The explanations which this court receives in this regard will assist it in determining the role of BL counsel in this case going forward.[4] The court may also address other relevant dispositive motions and trial issues at the hearing, as it sees fit.

The court would note that it has before it a number of motions, including summary judgment motions [218, 261, 263, 272, 275, 285, 293, 296, 304-318], which were filed in October and November, 2009, i.e. well before the special master's reports. It is unclear to this court to what extent the parties will wish to revise and/or withdraw these motions in light of those reports, but it is clear that the basic nature of this case has changed since last fall. The

---

[4]The court notes that Mr. Garcia's credibility with this court has been shredded, while Mr. Moore's credibility has been seriously damaged. The June 30 hearing will give Mr. Moore an opportunity to explain his actions in this case and perhaps to rehabilitate himself in the eyes of the court.

12

court will therefore dismiss these pending motions without prejudice so that the parties may re-file them, if they wish, with any modifications dictated by recent events. At a bare minimum, BL will wish to change the tenor of its briefing, which, as noted by the special master, often demonstrated an aggrieved and strident tone which appears singularly inappropriate in light of recent revelations.

      **SO ORDERED** this 17th day of May, 2010.

      **/s/ MICHAEL P. MILLS**
      **CHIEF JUDGE**
      **UNITED STATES DISTRICT COURT**
      **NORTHERN DISTRICT OF MISSISSIPPI**