IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

**DEONNE MAGGETTE, ET AL**                                                    **PLAINTIFFS**

                                                                **CIVIL ACTION NO.2:07CV181-M-A**

**V.**                                                                        **LEAD CASE**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                          **DEFENDANTS**

**CONSOLIDATED WITH**

**McKINLEY JACOBS, AS SPECIAL**                                              **PLAINTIFFS**

**ADMINISTRATOR OF THE ESTATE OF**                            **CIVIL ACTION NO. 2:07CV182-M-A**

**FANNIE JACOBS, DECEASED; ET AL**

**V.**

**BL DEVELOPMENT CORP.**
**d/b/a GRAND CASINO TUNICA; ET AL**                                          **DEFENDANTS**


### THIRD REPORT AND RECOMMENDATIONS OF SPECIAL MASTER CRAIG BALL

Your Honor:

Despite six months of hectoring the defendants, I cannot declare to the Court that discovery problems are resolved.  As late as Wednesday, July 21, 2010, almost six years after the bus crash, relevant Walters Bus Co. documents that had ***never before been produced*** turned up in casino boxes that at least three defense attorneys claimed to have thoroughly searched  at various times.  In the end, plaintiffs' counsel quickly found them when permitted to inspect the boxes.[1]

In fact, since my last report to this Court, the list of discovery issues has grown longer, not shorter.  Although plaintiffs' counsel and I have recently received more data than we can possibly assimilate before the sanctions hearing, this investigation is still hampered by defendants' untoward conduct— both in respect to the merits and the "discovery about discovery" aspects of the case.

---

[1] I'm persuaded that this failure is nothing more than a mistake; albeit one that should never have occurred at this juncture, and certainly not three times in succession.  The documents lately found are not significant in terms of the merits; but, the failure of the defense to find them calls in question the integrity of their searches during the pendency of my investigation.  If the lawyers and support personnel searching the boxes are missing documents concerning the Walters Group (the company that mounted these excursions), what assurance do we have that they are *only* missing merely cumulative and reiterative materials?  I've asked counsel to propose a mechanism to improve quality control here, and I await their proposals.

- Defendants still cannot ascertain that their production to plaintiffs is complete for any of 21 key custodians. For most of these, I see no indication that *any* production has been made, although I have confirmed that responsive material exists within those custodians' data.

- Defendants' Hurricane Katrina data loss stories pertaining to discoverable matter in this case continue to prove 100% false. No server holding responsive data was damaged, except one whose contents had successfully been copied to Atlantic City specifically to protect the information from storm damage. Undamaged backup media existed for all implicated servers. No responsive documents have proven to be unavailable as a result of the hurricane or subsequent flooding. Most were simply disposed of—i.e., shredded--with the passage of time, lost only as a consequence of the defendants' refusal to look for them.[2]

- In a late May 2010 filing on the discovery sanctions issue, the defendants again offered false sworn and unsworn statements to the Court. Affiant LaDonna Hamilton admitted she swore all responsive records were destroyed simply because that's what Susan Harmon of defendants' in-house legal department in Las Vegas told her had occurred, though Ms. Hamilton had no personal knowledge of same.

- Defendants' former counsel, Robert Moore, has charged that Susan Harmon's successor, Jill Eaton, and Harrah's litigation chief, Michael Kostrinsky, discouraged (albeit unsuccessfully) Moore's cooperation with this Court's investigation. Moore further contends that, between February and May of this year, someone in Harrah's legal department deleted entries from its CaseTracker database to conceal such efforts to discourage Moore's evidence gathering.

- In May 2010, I returned to Las Vegas to inspect what was billed as the complete in-house litigation file in the bus crash litigation. The file materials proved incomplete and chaotic, even after reported efforts to organize them in anticipation of my review. In this visit, I met with Duane Holloway, the in-house counsel currently overseeing the case. He candidly conceded Harrah's failures and assured me that he would endeavor to turn things around.

- Harrah's engaged a new defense team and took the highly unusual step of waiving all privilege in the bus crash litigation through May 17, 2010. The defendants are in the process of voluntarily producing defense counsels' files and ESI to Plaintiffs.

- Subsequent investigation has uncovered curiously missing email from defendants' in-house legal department, including a large volume of Ms. Harmon's messaging and of her superior, then chief of litigation Michael Kostrinsky. I further recently identified intentional efforts by someone in

---

[2] I use the term "refusal" because this Court is not the first to insist the Defendants look again for the items falsely claimed to have been lost. When the case was in Illinois, Judge Duncan-Brice ordered the Defendants to take "another look" for the documents requested, but Ms. Harmon, the paralegal running the case, would brook no further search. This occurred on 12/14/06, when the numerous copy sets of the documents sought hadn't yet been shredded.

the Heaton & Moore firm to delete (or sequester from discovery) emails to and from the Seyfarth Shaw firm in connection with this case in order to prevent their discovery. In a truly bizarre development, forensic examination of Ms. Harmon's workplace computer (recovered from a Chinese golf resort in Macau) turned up 121 Outlook emails between Ms. Harmon and Chicago attorney Christopher Garcia embedded in two identical blank Word documents on the eve of Ms. Harmon's layoff. Notably, copies of the same documents turned up on the Harrah's legal department server, and these revealed that someone in the Harrah's legal or IT departments—no one owns up to having done so—found the documents on February 1, 2010, opened one of them (altering it in the process), and did not disclose their existence…at least not to me. Adding to the intrigue, the document opened was the *only one* of thousands of Ms. Harmon's documents touched between her departure and the date I discovered what transpired.

- The Seyfarth Shaw law firm, particularly attorneys Christopher Garcia and Justin Beyer, remained deeply involved as compensated advisors and strategists to Ms. Harmon and to Heaton & Moore in the Mississippi litigation. Their role went far beyond merely assisting in transition of the file.

**Status**

Since my last report, I've followed up on long outstanding requests for evidence. When I thought the inquiry was justified, I've agreed to the requests of one party or the other to inspect voluminous files, interview witnesses and investigate numerous questions and irregularities in connection with the discovery abuse and contempt issues facing the Court. And I've sought evidence tending to demonstrate whether the persons who made materially false statements to this Court and the plaintiffs did so with conviction and on personal knowledge, or whether they simply made things up, parroted rumors as truth or offered the fanciful-but-expedient without regard to its truth or falsity.

Where the recovery of responsive information not timely produced had once been a trickle—a few documents found in a few old boxes or several databases not searched—it accelerated to a gush when thousands of boxes of undamaged records were found in Gulfport and when responsive sources of relevant e-mail and attachments long ignored began to be searched. But now, the challenge for concluding this investigation is the deluge of information raining down. A staggering volume of new material has very lately been produced by the Defendants and former counsel. Though rife with yet-unexplained gaps that stand either for a lack of candor or a lack of competence—I cannot always discern which—I can say that, in sum, nothing has emerged from the mass and morass of information recently examined that prompts me to question the accuracy of the findings previously shared with the Court or moves me to ameliorate my recommendations supporting significant sanctions.[3] None against whom I

---

[3] As to the gaps seen, I distinguish between the very early point at which the Defendants were obliged to anticipate litigation and preserve evidence going to the merits of the plaintiffs' claims and the much later date on which allegations of discovery abuse and attorney misconduct should have triggered a preservation duty encompassing, e.g., legal department records and e-mail. There's little justification for evidentiary gaps flowing from the delay in identifying and preserving potentially responsive material going to the merits. But, as to material

leveled criticism have proved unworthy of same, and some have shown themselves still more deserving of censure.

What transpired here was shameful and abusive, but as the Defendants now acknowledge same, I won't belabor the point.  However, the Court should not be further misled to believe that what occurred was simply a series of unrelenting oversights by persons acting diligently and in good faith.  It was not.  Doubtlessly some who made false statements deemed them as potentially true in some respects.   If you don't search, perhaps you're not "lying" to say you found nothing.  If you search in ways you know are incapable of finding what's sought, maybe it's accurate to say you "searched."

Further, what's too-often overlooked here, is that the anticipation of litigation was immediate, the filing of the first suit naming the casino defendants occurred not long after and discovery was served in the Illinois action months before Hurricane Katrina was on anyone's radar.  Had a timely, diligent search been made of readily available information, no tales of Münchausen would be required.  Moreover, even if it had been true that the hurricane wrecked all of the havoc to data and records claimed, the electronic and paper discovery efforts directed at surviving and unaffected records failed to meet even minimum thresholds for competence attendant to the times.[4]  That is, even responsive records, e-mail and ESI never imagined lost were ignored or subjected to slapdash search, well into 2010.

As I write this, the defense cannot certify that it has made full production for any of 21 key custodians, neither for witnesses on the merits or for custodians on discovery issues.  Nearly six years after the crash, the defense cannot ascertain that the potentially responsive e-mail or other documents or ESI of *any* of their key custodians have been searched or that production of same is complete.  They cannot provide that assurance for current employees, like Jennifer Reynolds, nor for employees recently terminated, like Susan Harmon, nor even for employees long departed who planned and approved these bus excursions, like Wendy Clark, Gary Benson or Gaylia Robey, though these persons' data has been available and immutable for years.

I do not remotely suggest that no efforts have been expended and no monies spent.  There has been a great deal of both put forward these six months.  I again commend all counsel for the courtesies and assistance they've shown me.  There has been steady progress, especially attendant to e-mail claimed to be gone but now being found.  Much of the still-existing information that could have been readily produced in the past has been found and some of it has been produced.  In the last two weeks, a flood of information has swept down on counsel and on me; but even now, after all that's transpired, this flood carries undisclosed evidence that should have been tendered years ago.

By the time this concludes, I do not exaggerate to suggest that plaintiffs' counsel may have more the other side's information than occurs in 99.9% of litigated matters—and not necessarily for the good.  In

---

going to their discovery abuse, I cannot fault the defendants' for a failure to anticipate a duty to preserve before allegations of abuse were made.

[4] To be clear, I am not grafting a 2010 standard onto 2005 preservation duties.  The obligation to preserve paper records and even relevant database content and e-mail was not unfamiliar five years ago.  More to the point, the obligation *was well known to these Defendants at that time*.  They undertook preservation of such material in other cases.  Here, they elected to do otherwise.

an unprecedented step not at my instance, Defendants waived their privileges and began to produce even defense counsels' files.[5]  This won't cure the lack and loss of evidence on the merits, but it affords plaintiffs' counsel much the same vantage as I've had to observe the defendants' efforts, errors and omissions.  The Plaintiffs are now better situated to address issues of discovery abuse and contempt without the intermediation of a Special Master, or at least they will be given time to review all of the recent and forthcoming production.  Unfortunately, neither Plaintiffs' counsel nor I have had much chance to absorb the hundreds of thousands of pages and gigabytes of data lately shared.

**Lessons Not Learned**

Considering whether and how to sanction the misconduct of Defendants and/or their counsel here, I expect the Court must weigh to what extent sanctions are needed to deter further misconduct by these parties or others.  Factors bearing on that assessment might include whether the misconduct has ceased, whether the persons responsible have been disciplined or terminated and whether significant remedial measures have been adopted to prevent recurrence of the misconduct.  I've looked for evidence of such changes and, while not entirely absent, they remain sorely lacking.  Save for change of counsel, I've seen little to indicate that the persons whose gross neglect or dishonesty contributed to the problem have been disciplined or discharged.  Several continue to enjoy managerial responsibilities.

Despite the need to revamp policies and procedures to address glaring deficiencies in, *inter alia,* case and project management, litigation hold practices, electronic discovery compliance, records and information management and ethics, I've neither observed nor been apprised of remedial efforts in place or in process.  I do not mean to discount the encouragement I gained on May 24 in meeting Mr. Duane Holloway in Las Vegas.  Mr. Holloway, Harrah's Vice President of Litigation and Labor and Employment, now holds oversight responsibility for this case following Michael Kostrinsky's resignation.  Mr. Holloway conceded that Harrah's had mishandled this matter and expressed that he regarded such failings as serious and requiring change.  I thought him genuine and sincere in those sentiments.  Mr. Kostrinsky's departure, coupled with Mr. Holloway's hands-on role, seemed to signal a new direction in terms of the obstruction and abuses that afflict this case.

However, the proof of the pudding is in the eating, and Harrah's has lately demonstrated that its appetite for misdirection and skewed testimony is undiminished.  While the Defendants' failure to meet their discovery obligations is serious by itself, the procurement and presentment of misleading testimony eclipses discovery abuse as the greater threat to the integrity of the judicial process.  Even while the Court warned in sternest terms about the gravity of Defendants' misconduct and contempt, the Defendants and their counsel were about the collection of still more stilted testimony.

The new nadir came in the form of the affidavits and arguments presented in Document 368 and styled, "Memorandum In Support Of Defendants' Combined Objection to Special Master's First Report and

---

[5] The defendants waived privilege for all records and ESI prior to May 17, 2010, including those of Heaton & Moore, Seyfarth Shaw and Harrah's in-house legal department.

Motion to Adopt Special Master's Second Report Recommendation That Dispositive Sanctions Not Be Imposed."[6]

In the weekly joint conference calls with all counsel, Plaintiffs' counsel (who has an ear for disingenuity) urged me to interview the persons whose statements and declarations were quoted in the Memorandum and attached as exhibits. Thus, I interviewed Wendy Clark, LaDonna Hamilton, Ken Roberson, Paige Lion, Guy Guidry, David Cutshall and Anthony DelVescovo. All counsel participated in these interviews and were invited to suggest questions to pose to the witnesses.

Information furnished by two of the witnesses exemplifies why the Court must be concerned that the misconduct and dissemblance that has brought us here has not ceased.

**LaDonna Hamilton**
LaDonna Hamilton was Harrah's Risk Manager at the Grand Casino in Biloxi. She joined Harrah's about nine months after Hurricane Katrina and remains an employee today. She was the person who verified Defendants' discovery responses in this action, attesting on personal knowledge that Hurricane Katrina had destroyed all records responsive to the discovery.

On May 27 of this year, Harrah's counsel drafted an affidavit for Ms. Hamilton and secured its execution under oath. In that affidavit, Ms. Hamilton stated:

> Beginning in June 2006, I had multiple occasions to search for litigation or other claim records from pre-Katrina but was never able to find anything. I literally spent days searching through documents in boxes in the warehouse. I would meet with Ken Roberson and together we would formulate search requests on his software database looking for legal files, litigation files, claims files and risk management files. Mr. Roberson would pull boxes for me and I would personally go through those boxes looking for information that might be pertinent to a particular claim. I specifically looked for anything that looked like it could be related to the October 2004 bus crash litigation but I found nothing.

> In or around March 2007 I was asked, in connection with a search for information concerning this case, as to whether I had personal knowledge of the facts set out above or if I knew anyone who might have this information and I answered that I did have that type of first hand knowledge.

*Hamilton 5/26/10 Affidavit, made Exhibit 8 to Memorandum In Support Of Defendants' Combined Objection, Id.*

To read this artfully drafted testimony, one might conclude that Ms. Hamilton is describing labors made for this case, but that would be an error. Interviewing Ms. Hamilton on June 30, 2010, I learned

---

[6] To their credit, the new defense team has moved to withdraw this pleading and its exhibits. But, retreating from the latest efforts to deploy false or misleading testimony doesn't erase the recent efforts to engineer and procure same. Neither does it leave the witnesses in good stead to offer genuine candor in the future. Once executed, even false declarations tend to bind witnesses fearing charges of perjury or public ignominy.

that she'd now been persuaded to execute two patently misleading affidavits for presentment in this case.

Ms. Hamilton claimed no recollection of ever looking into even a single box in this case and explains that when, in her affidavit given a few weeks earlier, she stated that she'd "literally spent days searching through documents in boxes in the warehouse," she didn't mean in THIS case. She conceded that the pulling of boxes she related in her affidavit and the searching of boxes she described had "nothing to do with this case." She never actually looked through *any* of the records having to do with the October 2004 bus crash.

Ms. Hamilton believes she never looked into any boxes of records in connection with her searches for Tunica "legal," "litigation," "claims" or "risk management." She was adamant that she never searched for bus or motor coach records, and "very sure" that she did not look for Tour & Travel records or records of specific dates or events. "Never dreamed" to look there.

She offered: "I just told Ken [Roberson, the warehouse man at the Seaway Road records warehouse] that I was looking for any legal or litigation or claims files that he might have from the Tunica property. I don't know how he looked for them in his database." She had no idea how the records database was set up or what terminology it uses. She looked to the warehouseman for that, and she has no idea how his searches were conducted.

Though she swore she "looked for anything that looked like it could be related to the October 2004 bus crash litigation," she does not recall ever searching for anything related to "October 2004" to "bus" or to "crash." She has no recollection of ever describing to Mr. Roberson that he should search for information relating to a Nov. 2004 bus crash.

Ms. Hamilton agreed that she had testified "countless times" in this case and others that the records were destroyed by the hurricane. With respect to the records at the Seaway Road Service center (a/k/a MSSC), she believes she has always testified that the records at the service center were destroyed by Hurricane Katrina "because she was never able to find any records." She makes this statement acknowledging that there were many thousands of boxes of records surrounding her when she visited the service center. Her explanation was always that she searched for "litigation" documents ("those are the only types of documents I have looked for"), and finding none of these, she attributed her lack of success to the hurricane because that's what she was told.

I asked Ms. Hamilton, "Let me be very direct with you, Ms. Hamilton, because I want to be able to have a clear record. Why is it that it was your practice, countless times, that if you couldn't find a record, you swore that the record was destroyed by Hurricane Katrina?"

She responded, "Because that is what I was told by my legal department, and they asked me as the point of contact here on the coast if I could sign off on that…and I had no reason to believe that anyone would lie to me about it."

I inquired, "By the 'legal department,' do you mean Ms. Harmon?"

"Yes," she replied.

I further inquired, "You always swore that the records were gone because of Hurricane Katrina, right?"

"Yes."

"The reason you did that was *not* because you knew it from personal knowledge but because that's what you were told to say by the legal department, correct*?"*

 "That is what I was told had happened by the legal department."

"By the people in Las Vegas?"

"That's correct.  There was no legal department here."

"So, the message telling you to swear that the records were destroyed by Katrina was coming to you from Las Vegas, not the other way around?"

"I had no personal knowledge of what was destroyed in Katrina.  All I had was the information that I had been given."  Ms. Hamilton added, "I signed those affidavits willingly because I believed their explanation of what happened because it was reasonable, not because I was directed that I had to sign something."

"And not because you knew it to be true based on your personal knowledge, correct?"

"That's correct."[7]

**Anthony DelVescovo**
Anthony DelVescovo was employed as Defendants' corporate counsel in Gulfport, MS. from before the bus crash through and beyond Hurricane Katrina.  When I interviewed Mr. DelVescovo on June 29, 2010,

---

[7] Ms. Hamilton's remarks should be considered in conjunction with the following March 30, 2007exchange from Ms. Harmon's e-mail:
"Hi LaDonna,
The above litigation [Clark v. Grand Casino] is resulting from a tour bus from Illinois which was bound for Grand Casino in Tunica, MS and crashed in Arkansas. We are being sued and are presently engaged in litigation disputing jurisdiction of the IL courts.  I need an affidavit signed stating that we lost all of our paper records in the Seaway office as a result of the hurricane. I guess the northerners don't believe a hurricane actually hit the Gulf Coast!

Do you have actual knowledge that there are no records remaining stored in the Seaway office? If not, do you know someone with first-hand knowledge that would be able to sign my affidavit? I don't have the draft affidavit yet but am trying to determine if we have anyone, and who that person is before outside counsel drafts the affidavit."

Ms. Hamilton responded:
"I would be comfortable signing that.  I have personally searched several times for records from pre-Katrina and have found none.  We have now gone through everything that even remotely looked like it could be litigation or claim related and found nothing."

I questioned him about the contents of his statement, presented to this Court as Exhibit 7 to the Memorandum in Support. When I referred to his statement, Mr. DelVescovo stated, "I didn't say any of that in the statement because it's not an official statement. That was filed without my signature." He went on to explain that "probably ninety-something percent that's in there I would be more than happy testifying to," but added that there were some definitive statements in the document that gave him pause and moved him to seek personal legal counsel before signing. However, while seeking such counsel, "the next thing I knew, the statement was part of the court record," adding, "I am a little taken aback that it was filed as an official record without my signature on it."

As an example of parts of the document that didn't fully or fairly reflect his views, Mr. DelVescovo pointed to paragraph 6 of the statement attributed to him and explained that though the statement recites that the legal department did not review policies and procedures for Tour & Travel, in fact, the legal department did conduct such reviews from time-to-time. As he put it, "No, we at times did reviews."

Mr. DelVescovo notes that he did not expressly communicate to defense counsel his discomfiture with the statements attributed to him. He just didn't sign the statement sought or respond to multiple requests that he sign. Mr. DelVescovo, in his words, "sat on it." Undeterred, Harrah's nonetheless presented the statement as if the witness has executed same. Per Mr. DelVescovo, "Mr. Moore simply jumped the gun."

The statement presented as Mr. DelVescovo's recites that, "Everything that was within 2-3 feet of the floor had been damaged and/or destroyed by the tidal surge." Though Mr. DelVescovo's "statement" recites that, "There was a wholesale loss of legal documents. There was wholesale damage to legal documents, some of which we sought to remedy by placing the documents into a freezer in order to retard the growth of mold and the further, complete destruction of the documents."

In fact, when I questioned him closely about the status of the Gulfport legal department's documents, Mr. DelVescovo allowed that there was no "wholesale" destruction of documents at all. In fact, only the documents on the lowest one or two drawers of what he described as a seven drawer file cabinet were damaged at all and, when all was said and done, most of the legal department's documents were recovered and usable.


**Legal Department Issues**

On May 24, 2010, I spent approximately ten hours reviewing written materials presented to me as being the complete, unredacted physical litigation file maintained by the Harrah's legal department in Las Vegas and documenting the investigation and litigation of the Arkansas bus crash.[8] The physical file materials filled five large document boxes. I was afforded a conference room in which to undertake my review under the supervision of Messrs. Moore and/or O'Connor throughout the day. I was not limited

---

[8] These materials were largely undifferentiated in terms of the various parties and courts involved.

in my examination, and I was furnished photocopies of such portions of the file as I designated for duplication. I was afforded full and courteous cooperation.

I understood the file materials I examined to be the same materials examined by Mr. Moore on February 11, 2010, save perhaps for any lately-created material subsequently added; however, I was advised that the file had been extensively and lately reworked to organize it following Mr. Moore's inspection. Notwithstanding such efforts, the physical file lacked the organization that I associate with customary and prudent law firm/department practice. Materials were added to folders without discernable consistency, order or purpose. Most folders were not labeled or were labeled cryptically. At least one folder labeled to contain information was empty. File materials, particularly pleadings, were not indexed or tabbed and very little was arranged in any customary or consistent manner, such as by chronology, case or type of document. My impression from Mr. Moore's descriptions and my inspection is that documents had heretofore been dumped into boxes, a handful organized in folders with two-prong metal file fasteners, and the lot lately and somewhat arbitrarily grouped into folders.

Though I located some items in my review that Mr. Moore did not furnish to me from his inspection, these materials are not especially significant. My overall impression is that Mr. Moore's inspection and review of the physical file materials in February was thorough, diligent and forthcoming, especially considering how much more unstructured and chaotic the file was reported to be at that time.

I cannot say the same for the persons in the Harrah's legal department responsible for the file. It's important to note that, although the primary litigation files for the Illinois and Mississippi matters would be maintained by outside counsel, Harrah's in-house counsel retained close control of the investigation and responses to discovery and vested such control in the paralegal assigned to the case. Outside counsel ceded such control because they were afforded no other choice if they wished to retain Harrah's business.[9] Thus, in practice, the primary and nearly-exclusive responsibility for collection of information in discovery and the internal investigation lay with the Las Vegas legal department. The incomplete and disorganized character of the file mirrors the haphazard and incoherent manner in which the investigation and discovery proceeded.

---

[9] My concern about the potential for abuse and the rigor with which outside counsel may have been discouraged from acting responsibly in making reasonable inquiry or exercising independent judgment is exemplified by a notation which in-house paralegal Susan Harmon, made to herself in the CaseTrack system employed by Harrah's legal department. On 12/14/2006, Ms. Harmon referenced a telephone conversation with outside counsel in the Illinois litigation, Chris Garcia (CG), wherein Mr. Garcia apparently reported on the conduct of a hearing on Plaintiffs' Motion to Compel Discovery Responses. Ms. Harmon wrote, "Court did not order additional depositions, nor did it order additional discovery. The judge did ask that we take another look for the documents requested. I informed CG that the documents, for the most part, had been lost in the hurricane and we can't produce what we don't have. Also informed CG not to allow Justin to call property for information. Reminded him that all info must be obtained through this office unless otherwise authorized on a case by case basis. Oc asked if we want JB off case, but said he was OK to assist but has to change his attitude and conform to the outside counsel guidelines. Sent copy of guidelines via email." Justin Beyer (JB) is a lawyer at Seyfarth Shaw who worked on the case while filed in Illinois. I believe "Oc" signified outside counsel.

When I drafted the preceding paragraphs on May 31, 2010, I transmitted them to Harrah's counsel to review same for factual accuracy and to identify content deemed privileged.[10] On June 1, 2010, Robert Moore replied:

> With respect to the substance of the proposed language, I would take issue with the statement that "Outside counsel ceded such control because they were afforded no other choice if they wished to retain Harrah's business." I don't believe this to be the case. Certainly, I as outside counsel wished to retain their business yet I went directly to the property and interviewed Ms. Reynolds, Mr. McGee and others face to face and had them go through their information with me and then I sent them looking to IT and to other sources for more information. I then communicated what I learned (or didn't) back to the legal department. Your previous reports are consistent with this fact, and I therefore respectfully suggest that this sentence is not necessary although it does convey your impressions based on these facts.

This would have been unremarkable were it not for a remarkable letter (EXHIBIT 1, attached) produced in discovery by Harrah's latest counsel. The letter sets alleges a discrepancy between Harrah's outward mien of contrition and their internal conduct. This letter is erroneously dated May 19, 2010, but reportedly was sent by Robert Moore to Mr. Duane Holloway, Harrah's Vice President of Litigation and Labor and Employment, on June 21, 2010. The letter insinuates that, Jill Eaton, the Harrah's paralegal in Las Vegas who succeeded Susan Harmon as case manager on this matter, made remarks tending to discourage genuine cooperation with the Court's investigation into discovery misconduct. It further intimates that Michael Kostrinsky, Harrah's former chief of litigation may have discouraged Mr. Moore's efforts to the same end. Most seriously of all, it charges that someone at Harrah's deleted material evidencing Mr. Kostrinsky's discouragement in anticipation of my examination of the file and case database.

I don't know what to make of this refugee from a law school ethics exam except to note that while the e-mails from Mr. Kostrinsky (furnished to me by Mr. Moore's counsel) were fairly benign and nonspecific to my eye; they were nevertheless inexplicably omitted from Harrah's production of Mr. Kostrinsky's e-mail to me, although *other* messages from the *same* date were furnished. Intentional deletion of the messages remains the most likely explanation for their absence, and Harrah's has yet to furnish another.

To date, Harrah's new counsel contends that Harrah's, after inquiry of Ms. Eaton, can find no record of the allegedly deleted CaseTracker entries having ever existed; but, concede the entries might have

---

[10] Though unorthodox and not a courtesy afforded the Plaintiffs, my rationale has been that it is the Defendants' privilege rights that are implicated and, in light of the fact that the evidence turned up in the investigation has demonstrated so much serious misconduct on the part of the defendants, my findings of fact should scrupulously be grounded on objectively verifiable matters not in dispute among those who attended the same interviews and observed the same events. Where Harrah's or its counsel has identified errors or intrusion into privileged communications, I've endeavored to make corrections or redactions, as appropriate.

existed, but can't currently be found in the database.[11]  They further report that, if Ms. Eaton had remarked that Mr. Moore "had better stop looking" for the evidence not produced or similar comments, these were light-hearted exchanges offered in jest.

**Unexplained and Unresolved**

The Court will recall that corporate legal department responsibility for management of this matter and collection of material responsive to discovery was, from mid-2005 through December of 2008, reposed in Susan Harmon, a paralegal employed by Harrah's in Las Vegas.  Until it was dismissed in Illinois, the predecessor action to this was handled by Ms. Harmon and Christopher Garcia, then counsel with the Seyfarth Shaw law firm in Chicago.  I've previously reported on various issues involving Harmon and Garcia, and after much additional investigation, I stand by all prior reporting concerning them.

Beginning in May of 2010, Harrah's counsel reported to me that Ms. Harmon, who had previously been notably cooperative, was refusing to take calls from defense counsel and refusing to come to the door when defense counsel visited her home.  Defense counsel expressed concern that Ms. Harmon's sudden-and-unexplained lack of cooperation might adversely impact Harrah's ability to prepare for the sanctions hearing then set for June 30, 2010.  As I had also heard Ms. Harmon express her desire to cooperate and support Harrah's defense, I was curious as to what might have triggered such a turnabout, and I directed all counsel to inquire of their clients and co-counsel whether anyone had contacted Ms. Harmon since I interviewed her in Las Vegas on February 11, 2010.  Both plaintiffs' and defense counsel denied such contact; however, Mr. Byman of Jenner & Block, Harrah's new counsel, confirmed that the only person they could confirm had contact at the time with Ms. Harmon was Christopher Garcia, but they conveyed that Mr. Garcia, communicating through his counsel, denied taking steps to encourage Ms. Harmon to be uncooperative in this investigation or in connection with the Court's hearing.

Harrah's requested that I hold an evidentiary hearing in Las Vegas on July 19, 2010.  After securing the Courts' permission to do so, I issued process for Ms. Harmon and placed it in the hands of a process server in Las Vegas who tried to serve Mr. Harmon at her home for more than a week.  She never returned home, and I have no information to explain her absence, whether due to bad timing (i.e., vacation) or because she was warned off to avoid being served.

By way of background, Harrah's has been unable to supply the Sent Items or folder messages from Ms. Harmon's e-mail account.  They are at a loss to explain why because Sent Items and foldered items are found for others in the Harmon's department.  Ms. Harmon's messages are gone, and Harrah's doesn't know why they are gone.

In consideration of the missing messages (numbering in the thousands or tens of thousands), Harrah's located the desktop computer used by Ms. Harmon before she was laid off in December of 2008.  The machine had been reformatted and shipped to a Harrah's golf resort in Macau, China.  The parties asked

---

[11] I've directed Harrah's to turn to its backup tapes to secure a copy of the CaseTracker database as it existed prior to the alleged deletion.  Unfortunately, Harrah's has so far been unable to locate any of the tapes before February 11, 2010.

that the machine be examined to determine if any of Ms. Harmon's missing data could be resurrected, and, as I am a certified computer forensic examiner, they agreed that I should conduct the examination. Harrah's also created its own forensic image of the machine and had its own expert conduct an exam.

In my examination on June 26, I recovered, among many other items, two Microsoft Word files that had been deleted from the machine. One was named "Doc 1.doc" and the other "Garcia emails.doc." Each was created on December 12, 2008, immediately prior to Ms. Harmon's last day with Harrah's. Each was a hefty 24.8 megabytes in size, and though they were Microsoft Word document files, they contained no text. Instead, each had embedded in them 121 Outlook message files (.MSG format). Both files resided in subfolder called "Garcia." Excepting a few of a personal nature, all of the embedded messages had passed between Christopher Garcia and Susan Harmon and concerned this bus crash litigation. All of these passed between them after April 8, 2008; long after the Illinois litigation had been dismissed.

Embedding native e-mails in Word documents is a peculiar way to handle e-mail message data because the resulting Word documents won't permit reading or printing the messages in Word. However, it enables the Word documents to serve as wrappers or containers to carry the messages for extraction back into another e-mail client. In my experience, it's a method a technically unsophisticated user might employ to store the messages for transport without forwarding each message to a personal account. Instead, the user simply drags-and-drops the messages from Microsoft Outlook to a Word document and can then e-mail the Word document as an innocuous attachment or copy it to portable media.

As to why Ms. Harmon (or someone using her machine) would do this, I cannot say; but the mystery deepened when I identified identical counterparts to these files in the area dedicated to Ms. Harmon's file storage on the Harrah's legal department network. Such areas, called "file shares," are set up to insure that an employee's documents are periodically backed up to protect them against loss due to hard drive failure. The same "Garcia emails.doc" file with the same creation date was in the file share, but this copy had been opened and altered[12] on February 1, 2010, long after Ms. Harmon was laid off, but only a few days following my system inspection in Atlantic City in this matter. This was the only file of more than 2,500 files in Ms. Harmon's file storage that was accessed between Ms. Harmon's discharge and my discovery of the file. Harrah's cannot identify who accessed this file on February 1, 2010 or why it was altered.

A tale like this deserves an epilogue that makes everything clear, but I can't furnish one. It is simply very strange. Of the 250-odd cases Ms. Harmon managed, it appears she sought to spirit away correspondence related to just *this* case and *only* communications with Christopher Garcia. The sole person I can confirm she dealt with before severing all contact respecting this matter was Christopher Garcia.

**Missing E-Mail**

A few days ago, the Seyfarth law firm produced a redacted set of its e-mail in this matter to the Jenner & Block firm who, in turn, produced same to me. Because production as TIFF images was contrary to my

---

[12] I believe this alteration to be inconsequential, likely limited to the file's metadata.

direction to produce e-mail in its native PST format and made this production incompatible with all prior e-mail productions, I objected.  The use of TIFF images was defended, in part, as a means to redact information withheld as privileged respecting "pertaining to cases other than the bus crash cases."

Much of the redacted material passed between Seyfarth and Heaton & Moore; consequently, I thought the claim respecting privileged material in "other cases" to be suspect.  To investigate, I checked the counterparts in the Heaton & Moore production.  I found the counterparts strangely absent from the Heaton & Moore production, though no claim of privilege had been asserted, and I'd been assured that the materials produced were all of Heaton & Moore's e-mail communications with Seyfarth.

Some of the redacted messages and the missing counterparts were exchanges between Chandley Crawford, a lawyer at Heaton & Moore, and Justin Beyer, a lawyer at Seyfarth Shaw.  I am concerned that someone at Heaton & Moore intentionally double deleted (or sequestered) these exchanges from the production.[13]  I've raised these concerns with Heaton & Moore's counsel; but, I have yet to receive a credible explanation other than intentional deletion or data hiding.  At this writing, all indications are that the absence of these messages is the result of deliberate action.

**Lost Data and Servers**

After six months seeking proof of the claimed hurricane loss of servers holding responsive data, I've yet to identify a single server that held potentially responsive data that was lost or damaged due to the storm.  The only exception to this is the AS/400 server whose contents were safely copied to Atlantic City before the storm.[14]  After repeatedly asking for it, I've yet to be shown that a dime's worth of damage to servers or data occasioned an insurance claim.  Yet, Harrah's itemized for its insurers and claimed the loss of a single sixty-one cent pen (doc 368-7 p. 25) and a seventy cent baseball cap (doc 368-7, p. 23).

There are other irregularities, anomalies and unknowns that I could relate here, but they add little of moment to the central conclusions I've previously shared with this Court.  Both sides are now more equitably situated to address these matters *de novo*.

**Conclusion**

In the final analysis, the Plaintiffs and this Court have been misled through false affidavits and false testimony inadequately vetted by counsel with ample cause to question the accuracy of the evidence presented.    Several of the affiants and witnesses knew they had no personal knowledge of the

---

[13] "Double deletion" refers to deletion of the message from the user's Inbox or other folder, followed by a second deletion of the message from the user's Deleted Items folder.  Double deletion is the method most users employ to obliterate messages.

[14] I recently learned that Hurricane Katrina wasn't the first time this server had been "role swapped" to Atlantic City, making the delay in the discovery that the data existed in Atlantic City even more questionable.  The same data had been shifted to Atlantic City in anticipation of Hurricane Ivan in 2004.  Additionally, I've learned that the defendants had a cache of 36 backup tapes that replicated all data on the servers immediately prior to the storm.  These safely resided in Memphis until destroyed much after Katrina in the usual course of business.

statements they offered as fact. Competence and diligence are evident here only in the consistent way in which the defendants have failed the Court and managed to keep the evidence from their opponents.

It may be that the defense was dealt the better hand on the law and facts, and could have won handily on the merits. But the defendants were not content to fairly meet their duties under the law. They stacked the deck through discovery abuse, dishonesty and a studied disregard for the evidence that was within their easy reach.[15] Through a mix of artifice and ineptitude, the defendants delayed compliance with their discovery obligations until the passage of time and their mismanagement of data truly brought about the destruction of evidence they'd falsely attributed to the storm.

By my signature below, I attest that these findings and the findings contained in my two prior reports are my findings of fact after diligent investigation. All matters which I relate as my observations and any quotes I attribute to others are true and correct to my personal knowledge.

**Respectfully Submitted this 23rd Day of July, 2010,**

Craig Ball
Special Master
Texas Bar No. 01632200
3723 Lost Creek Blvd.
Austin, Texas 78735
Tel: 512-514-0182
E-Mail: craig@ball.net

---

[15] As Christopher Garcia advised Heaton & Moore attorney, Chandley Crawford on June 5, 2009:
Chandley,
Please understand that the sanctions being asked for by Glen [Dunn, plaintiffs' counsel] would overturn two years and two opinions indicating that no agency relationship existed between the Grand Casino Tunica and Walter's Bus. **Harrah's would not allow that precedent to be established at any costs.** I would make sure that Robert and Dawn know precisely what is at stake. I'll take this stuff home and work on an outline. (Emphasis added).

**EXHIBIT 1: Letter sent by Robert Moore to Mr. Duane Holloway, Harrah's Vice President of Litigation and Labor and Employment, on June 21, 2010 (erroneously dated May 19, 2010)**

WILLIAM W. HEATON
ROBERT L. MOORE*
DAWN DAVIS CARSON*

## HEATON AND MOORE, P.C.
**TRIAL LAWYERS**
100 North Main Building, Suite 3400
Memphis, Tennessee 38103-0534
Phone (901) 526-5975 – Facsimile (901) 527-3633

JAMES E. CONLEY, JR.
RUSSELL B. JORDAN*
J. CHANDLEY CRAWFORD*
WILLIAM C. SESSIONS III

Sender's direct e-mail: rmoore@heatonandmoore.com

*Also licensed in Mississippi

May 19, 2010

Mr. Duane Holloway, Esq.                    ***VIA E-MAIL ONLY***
Vice President, Litigation
And Labor and Employment
Harrah's Entertainment, Inc.
Post Office Box 98905
Las Vegas, Nevada 89193-8905

                Re:    *Maggette and Jacobs v. Harrah's*
                        My File No.:        RM-46698
                        AIG Claim No.:    169-163339
                        Zurich Claim No.:  972-21712

Dear Duane:

I am sending you this letter in confirmation of the several discussions which we have had together over the last several weeks. I first told you of these things in May 2010 after Michael Kostrinsky left Harrah's and later told Bob Byman when the decision was made to bring him into the case.

After the court's first order on motion to compel, I contacted Jill Eaton who told me that she wasn't aware of any information responsive to discovery apart from what had previously been produced in Chicago. Her understanding and belief, as expressed to me, was that everything that had survived Hurricane Katrina and that was still in existence had been sent to counsel in Chicago and that I should contact Chris Garcia in order to prepare discovery responses consistent with what had been previously prepared. She contacted Jennifer Reynolds and sent me an email concerning that contact but that email made it clear to me that I needed to speak directly to Jennifer, both because of the court's order (that was putting a responsibility on me as counsel) and also because of some obvious errors in the email exchange between Jill and Jennifer. After speaking with Jill, I went to Tunica on May 19, 2009, taking the discovery requests along with me. After meeting with Jennifer Reynolds and Mike Magee (and after having Jennifer meet with the Regional IT Manager Ken Clayton and a separate manager in convention sales), I reported to Jill Eaton by telephone that we had been unable to uncover any additional information. Ms. Eaton told me that I "had better stop looking" and that "After all of this time I am not sure I want you to find anything." I have never been questioned about this conversation by anyone (including Mr. Ball), so this information is not generally known.

Of course, I did not stop looking for documents and I continued to go to the property and

to speak with Jennifer and others concerning the on-going searches for information. My meetings and efforts to locate documents were not always pre-approved, but I felt it necessary to continue looking for documents or other responsive information regardless of whether I was able to speak with Ms. Eaton in advance of those searches. On September 9, 2009 Michael Kostrinsky sent me an e-mail, telling me that all contact with the property should be authorized either by him or by Ms. Eaton in advance. The e-mail was not designated as to any particular file, and I did not immediately associate it with this particular file. Mr. Ball has access to all of Mr. Kostrinsky's e-mails and so has access to this particular e-mail, but he has never mentioned it to me, nor questioned me concerning it.

However, when I was in Las Vegas on February 11, 2010 I saw within the printed claim notes on this particular file the notation that I had been counseled with concerning my going to the property and looking for discoverable information without authorization. When we returned to Las Vegas on May 24, 2010 I saw that this notation had been removed from the printed claim notes. Mr. Ball has the notes as printed out in May. He does not have the printed notes from February. I have never been questioned concerning this fact by anyone (including Mr. Ball) so this information is not generally known.

Finally, one of the lawyers who assisted me on this case is my partner Chandley Crawford. She became involved in the case early on, primarily assisting on discovery issues. When you look through the e-mails you will see many exchanges between Susan Harmon and Chandley and between Chandley and the Seyfarth Firm working on discovery and other matters. Susan did not have an objection to getting Chandley on board to help discovery, and certainly the case merited an additional assistant. When Susan was terminated and Jill Eaton came on board, Chandley sent an e-mail to Jill and Jill responded directed to me stating that Chandley was not authorized to work on any Harrah's case. In other conversations, Jill told me that she did not have any objection to paralegals working on the file at a paralegal rate, and so I reduced the number of hours that Chandley had worked from a total of 335 hours down to 120 hours. I then arbitrarily assigned those remaining 120 hours either to me or to another partner on the file when the other partner started helping. The result was that the total hours Chandley worked were billed at a total of $19,800 rather than $45,225. As you can see, the firm wrote off $25,425 in time in doing this.

Very truly yours,

**HEATON AND MOORE, P.C.**

*Robert L. Moore*

Robert L. Moore

RLM/lb
cc:    Bob Byman