**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**


**DEONNE MAGGETTE, ET AL**                                    **PLAINTIFFS**

**V.**                                                                        **NO. 2:07CV181-M-A**
                                                                              **LEAD CASE**


**BL DEVELOPMENT CORP. d/b/a GRAND**
**CASINO TUNICA;  ET AL**                                    **DEFENDANTS**
                              **CONSOLIDATED WITH**


**McKINLEY JACOBS, AS SPECIAL**
**ADMINISTRATOR OF THE ESTATE**
**OF FANNIE JACOBS, DECEASED; ET AL**              **PLAINTIFFS**

**V.**                                                                        **NO. 2:07CV182-M-A**


**BL DEVELOPMENT CORP.  d/b/a**
**GRAND CASINO TUNICA; ET AL.**                         **DEFENDANTS**



<u>**ORDER**</u>


        The court held a sanctions hearing in the above entitled action between July 26 and July

30, 2010.   At this hearing, the court heard extensive testimony relating to the actions of BL

Development Corp. ("BL") and its counsel in this case.[1]  While the testimony at the hearing was

at times enlightening, it did not give this court reason to significantly change its view, formed

---

        [1]This court has consistently referred to the primary defendant in this case as "BL," and it
will continue to do so in this order, even though most parties have begun to refer to it by the
name of its parent corporation Harrah's.

after reading the special master's first three reports, regarding the basic nature of BL's conduct in this case.  In attempting to persuade this court of its good faith, BL is confronted with the basic and simple fact that the special master found in five minutes information that BL, a sophisticated corporation with very significant financial resources, had repeatedly and stridently insisted did not exist for close to five years.

The special master conducted his investigation on BL's own databases, which obviously put BL in a position to discover the information even more easily than he did.  The Magistrate Judge and this court already strongly suspected that BL was concealing information even before the special master had made his first inquiry, and it should thus be apparent that the burden facing BL at the hearing was quite heavy.  Even considering this fact, the July hearing did not proceed in a positive manner for BL, as discussed below.

In its June 10, 2010 order, this court framed the issue before it as being whether it:

> [h]ad the authority, either through contempt law or simply the court's inherent judicial authority, to issue its June 2, 2009 "final warning" that BL would face dispositive sanctions if it continued to evade its discovery obligations. The court certainly believes that it had such authority: is it required to decide an issue of law even if it believes that one party has consciously withheld information which is crucial for it to make an informed decision on that issue? It seems inconceivable that the court would be required to do so. Moreover, sanctions which might arguably be excessive absent a prior warning are more than fair in cases where a party is provided with a warning of specific sanctions and told how it might avoid the imposition of such sanctions. In such cases, the party has "the keys to its own jail cell" and can avoid the harsh sanctions simply by making efforts which it should have made in the first place.

Ultimately, the court views the instant issue as involving its own authority and ability to deal effectively with litigants who, it believes, have reached a firm decision to stonewall and obstruct its processes.

2

This court benefits greatly from having magistrate judges who are heavily involved in the discovery process.  In this case, this involvement included the holding of case management and discovery hearings during which the Magistrate Judge was able to interact extensively with the parties and assess their attitude and demeanor as it relates to this litigation.  While the written record in this case is instructive, it does not encompass the full scope of information which was at the Magistrate Judge's disposal, and at this court's disposal, regarding BL's basic approach to this case.  Beginning at an early stage of this litigation, the Magistrate Judge relayed her concerns to this court that BL was not proceeding in good faith.  As the litigation proceeded, this court gradually formed two conclusions of its own.  The first conclusion was that the Magistrate Judge's perceptions regarding BL's lack of good faith were very likely accurate.  The second was that BL had likely decided that the potential dollar value of a finding of vicarious liability in this case was so high that it could essentially write off the comparatively minor discovery sanctions which this court might issue as an acceptable cost of a strategy of obstruction and stonewalling.

There is admittedly a subjective element to both the Magistrate Judge's and this court's conclusions regarding BL's basic approach to this litigation.  At the same time, prior to the special master's reports, this court's suspicions that BL had repeatedly made false statements of fact could also have been regarded as subjective.  In light of the reports, these suspicions are now accepted as fact by all parties.  BL would have this court believe that, while its suspicions regarding the state of the record may have been accurate, the court should accept its assurances that these false statements were the product of simple negligence rather than bad faith.  Having actually observed this litigation for a period of many months, the court does not find this assurance to be credible.

In her November 24, 2009 order appointing the special master, the Magistrate Judge

wrote as follows:

> In this case, the defendants have produced information and affidavits and have
> stated at the hearing on these motions that they have searched for documents and
> information responsive to the plaintiffs' discovery requests and produced all
> information responsive to those requests. Nevertheless, despite the court's direct
> order that "*all* defendants . . . search any available databases for responsive
> information and produce it to the plaintiffs. . . , " the defendants are unable to
> describe the databases searched, the search terms, methods or parameters used to
> search the databases or provide any expert information confirming that there are
> no documents, electronically stored information or other information responsive
> to plaintiffs' discovery requests. Docket 177, p. 13. Further, the defendants have
> not provided any concrete reason or rationale for the numerous discrepancies
> within their discovery responses and the deposition testimony of their own
> employees.  Nor has defendant articulated a satisfactory response to the court's
> doubts expressed at the hearing that corporations as large and sophisticated as the
> defendants, which operate numerous gaming facilities across the country with
> various operations centers, do not have either paper files, electronic files or
> information or – even in light of Hurricane Katrina – backup measures and files
> for at least *some* of the information requested by plaintiffs. . . .

After noting her skepticism regarding BL's discovery efforts, the Magistrate Judge ordered as

follows:

> Although the court cannot say with certainty whether the defendants have
> legitimately fulfilled their discovery obligations, it does not appear that they have
> done so. The guiding principle of this court is to reach the truth in any case before
> it. Accordingly, the court declines to rule on the plaintiffs' motions until it is
> satisfied that the standards for preservation of electronic evidence and disclosure
> of *all* relevant evidence have been met or not met, as the case may be. The court
> cannot make such a determination without further review by a third party expert in
> the field of electronic discovery and who has knowledge of the gaming industry.
> To aid the court in its decision a third-party expert is needed, and because
> defendants have failed to satisfy the court's inquiries calculated to determine the
> legitimacy of their searches to date or whether they have in good faith attempted
> to use preservation techniques reasonably available to them, the costs of the expert
> will be borne by the defendants.

The results of the special master's investigation speak for themselves.  The court can not fathom

how anyone reading the special master's reports, even in isolation, would doubt that BL as a

corporation had acted in bad faith in this case.  This court did not read the special master's

reports in isolation, however, since it already believed, based upon its own first-hand

observations, that BL was acting in bad faith.  As such, the reports merely confirmed the court's

suspicions in this regard, and it would be extremely difficult for BL to persuade the court

otherwise at this juncture.

As far as the sanctions for the stonewalling of discovery in this case, BL was already

warned that it would face dispositive sanctions if it did not comply with its obligations.  In her

June 2, 2009 order, the Magistrate Judge warned BL, after consulting with this court, as follows:

> The court declines at present to enter an order establishing an agency relationship
> between the defendants and Walters Bus Service existed at the time of the
> occurrence. Nonetheless, because defendants disobeyed the court's April 21, 2009
> order, the court finds that monetary sanctions are warranted. Defendant is
> forewarned that further failures to abide by the court's orders or rules will without
> question result in much more severe sanctions.

To reiterate, this court only issued this warning after it had reached a conclusion that BL had

likely written off any lesser discovery sanctions as an acceptable cost of its litigation strategy.  If

this court were to impose such lesser sanctions now, this would give comfort to future litigants

who might be inclined to adopt a similar strategy.  It is only in very unusual cases that dispositive

sanctions will be required, indeed, this court has not previously found occasion to impose or even

threaten such sanctions.  In most cases, the threat of lesser discovery sanctions is sufficient to

ensure compliance, but in cases where, as here, such proves insufficient, it is essential that this

court not permit a strategy of stonewalling and non-compliance to prevail in its courtroom.

Quite apart from the its desire to maintain the integrity of its processes, the court feels

that dispositive sanctions are also supported by the fact that the record before it is still, in all

likelihood, incomplete. BL suggests that this court now has all the relevant information to decide

the legal issues at hand, but the court seriously doubts that this is the case. The information

presently before the court is merely a snapshot in time, reflecting information that the special

master was able to uncover in his very effective, but limited inquiries. The court fully expects

that, if it were to order the special master to conduct further investigation, he would uncover

additional information that should have been disclosed.  This would no doubt be followed by yet

another flurry of affidavits from BL explaining that its failure to produce the information was an

honest mistake.  The special master's reports support the court's conclusion in this regard.

> In arguing that dispositive sanctions are inappropriate, BL has cited authority stating that:

> A dispositive sanction is appropriate only if: (1) "the refusal to comply results
> from willfulness or bad faith and is accompanied by a clear record of delay or
> contumacious conduct"; 2) a lesser sanction would not substantially achieve the
> desired effect; (3) the discovery violation prejudiced the opposing party's
> preparation for trial; and (4) the violation was attributable to the client instead of
> the attorney. *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380-81 (5th Cir. 1994); *see also
> United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003);
> *Plasticsource Workers Comm. v. Coburn*, 283 Fed. App'x 181, 184, 2008 WL
> 313107 (5th Cir. Feb. 1, 2008).

This court views this authority as being distinguishable, for the reasons explained below.  Even if

this authority were considered applicable, however, it is apparent that all four requirements are

met in this case.  This court has long believed that BL's basic approach to this litigation was

taken in bad faith, and the special master's reports amply support that conclusion.  The existence

of a "clear record of delay or contumacious conduct" is evident in this case, as is the fact that

lesser sanctions did not have the desired effect of forcing compliance on the part of BL.  BL's

discovery violations clearly prejudiced plaintiffs in their trial preparations, and, as discussed

below, the court concludes that BL acted in bad faith in this case.  The court further finds that lead trial counsel Robert More has committed no sanctionable acts in this case.[2]

This court's suspicions regarding BL's lack of good faith are also heightened by the nature of this litigation and its sheer duration.  On or about October 6, 2004- more than five <u>years</u> before the appointment of the special master, BL learned of the bus accident which claimed the lives of fifteen individuals who were traveling to its casino as part of a complimentary or "comps" package which it offered.  It seems implausible to this court that BL, a sophisticated corporation, would not have conducted immediate (if not frantic) inquiries to determine its legal exposure to the accident, in particular the nature of its relationship with Walters Bus Company. Assuming that BL did conduct its own private inquiries, it very likely identified knowledgeable employees who could actually provide it with the information it needed.  This is in stark contrast to BL's practice during discovery of identifying unknowledgeable employees who were asked to sign affidavits containing words which were not their own.

Moreover, once BL identified these employees, it seems likely that they were far more forthcoming to their own employer than they were to this court.  This court very seriously doubts, for example, that BL's private inquiries were met with sham search efforts such as those made by BL manager Jennifer Reynolds, who, the special master found, merely went through the motions of performing non-sensical searches which she must have known were meaningless.

The court does not base its decision today upon the above conclusions, since they are

---

[2]The court has previously found that it lacked personal jurisdiction over former BL counsel Christopher Garcia, and there was accordingly very little testimony at the hearing relating to his actions in this case.  The court has expressed its intention to leave the issue of Garcia's conduct to the Illinois Bar Association, and it will not further address this subject in this order.

admittedly speculative in nature.  It seems entirely valid to recognize, however, that BL's

purported ignorance of its own records would be much more plausible in a case of lesser

importance and shorter duration.  The court now knows that even a cursory examination of BL's

records, at the expected locations, was sufficient to uncover the documents in question.  It is

quite difficult for this court to accept that a multi-billion dollar corporation facing very high-

stakes litigation was unable - for close to five years - to uncover its own documents at its own

facilities when the special master was able to do so with ease almost immediately.

     While the court therefore concludes that the four factors cited by BL are met in this case,

it also views them as distinguishable because of the fact that a <u>specific warning</u> was given that it

would face dispositive sanctions if it did not comply with its discovery obligations. As stated by

this court in its June 10 order:

> [S]anctions which might arguably be excessive absent a prior warning are more
> than fair in cases where a party is provided with a warning of specific sanctions
> and told how it might avoid the imposition of such sanctions. In such cases, the
> party has "the keys to its own jail cell" and can avoid the harsh sanctions simply
> by making efforts which it should have made in the first place.

Barring some indication from the Fifth Circuit otherwise, this court is not prepared to accept its

helplessness in the face of a litigant who, it believes, has made a specific calculation that it will

not comply with its discovery obligations and who appears largely indifferent to the lesser

sanctions which this court has issued.

     The appointment of a special master on discovery issues is an unusual procedural device,

and it is one which BL likely did not anticipate in this case.   BL likely believed that this court

would never be in a position to discover the true facts, such as the fact that backup copies of the

data in question were routinely sent to secure databases, just as the Magistrate Judge had openly

suspected in her November 2009 order.  Now that its bluff has very unexpectedly been called and the absurdity of its protestations has been revealed, BL seeks for this court to decline to impose the sanction which it specifically warned it would.  To do so would be both inequitable within the context of this case and would also damage this court's ability to deal with comparable behavior in other cases going forward.   This court will proceed under its belief that it has wide discretion regarding the tools at its disposal to ensure that litigants do not make a mockery of its processes and that the authority of the federal courts is respected.

BL had several months between the issuance of the court's final warning and the appointment of the special master to consider the implications of what might happen if this court followed through with its final warning.  BL's attitude during this period, as well as throughout this litigation, is well summarized by a June 5, 2009 e-mail from Christopher Garcia to Chandley Crawford, an attorney at Moore's law firm.  Referencing the threat of dispositive sanctions, Garcia wrote as follows:

> Please understand that the sanctions being asked for by [plaintiffs' counsel] would overturn two years and two opinions indicating that no agency relationship existed between the Grand Casino Tunica and Walters Bus.  Harrah's would not allow that precedent to be established at any costs.

As discussed below, BL very implausibly argued at the hearing that it was unaware of the court's threat of dispositive sanctions.  Garcia's e-mail demonstrates that, not only was it aware of the threat; it was determined "at any costs" to prevent that threat from being carried out.  As discussed below, however, this determination did not take the form of BL's re-doubling its efforts to produce the documents in question.  Rather, BL chose instead to increase the stridency of its appeals and apparently to discourage a thorough search from being carried out by those

who may have been seeking in good faith to do so.

BL's attitude following this court's issuance of its "final warning" was further demonstrated by Moore's description of his May 2009 conversation with paralegal Jill Eaton, who succeeded Susan Harmon as Harrah's supervising paralegal in this action, and who was BL's "contact person" for Moore in this litigation.  In a June 2010 letter to Duane Holloway, Harrah's Vice President of Litigation and Labor and Employment, Moore writes that:

> I reported to Jill Eaton by telephone that we had been unable to uncover any additional information.  Ms. Eaton told me that "I had better stop looking" and that "After all this time I'm not sure I want you to find anything."  I have never been questioned about this conversation by anyone (including Mr. Ball) so this information is not generally known.

In his third report, the Special Master aptly described the significance of this information:

> The letter . . . alleges a discrepancy between Harrah's outward mien of contrition and their internal conduct. This letter is erroneously dated May 19, 2010, but reportedly was sent by Robert Moore to Mr. Duane Holloway, Harrah's Vice President of Litigation and Labor and Employment, on June 21, 2010. The letter insinuates that, Jill Eaton, the Harrah's paralegal in Las Vegas who succeeded Susan Harmon as case manager on this matter, made remarks tending to discourage genuine cooperation with the Court's investigation into discovery misconduct. It further intimates that Michael Kostrinsky, Harrah's former chief of litigation may have discouraged Mr. Moore's efforts to the same end. Most seriously of all, it charges that someone at Harrah's deleted material evidencing Mr. Kostrinsky's discouragement in anticipation of my examination of the file and case database.
>
> I don't know what to make of this refugee from a law school ethics exam except to note that while the e-mails from Mr. Kostrinsky (furnished to me by Mr. Moore's counsel) were fairly benign and nonspecific to my eye; they were nevertheless inexplicably omitted from Harrah's production of Mr. Kostrinsky's e-mail to me, although *other* messages from the *same* date were furnished. Intentional deletion of the messages remains the most likely explanation for their absence, and Harrah's has yet to furnish another.

[Special Master's Third Report at 10.]   In his testimony at the hearing, Moore specifically

declined to endorse the suggestion of BL's counsel that Eaton was merely joking when she told

him that he had "better stop looking" for the documents in question, testifying that he did not

know what she meant by the words.  Moore testified that, regardless of whether Eaton was

serious, he did not stop looking for the documents in question.  Specifically, Moore testified as

follows:

> Q. Okay. Now, Mr. Moore, I know you've made reference in a letter to a comment
> that you say Ms. Eaton made to you about - - and I ' m paraphrasing a little bit, but
> words to the effect of, " I hope we don' t find anything or don' t look too hard for
> the information. " Did you take her to be seriously telling you, Don' t look too
> hard for information; or did you think that Ms. Eaton - - we're going to take, for
> the moment, that she said it - - she was saying that to you in jest?
>
> A. I didn' t take her either way. I knew that question was coming, Mr. Mayo; and
> my answer on my oath would be this, I don' t know what was in her heart or mind,
> but it didn' t stop me from looking. I 'll tell you how it affected me; it didn' t stop
> me.
>
> Q. Did she try to stop you from looking?
>
> A. It depends on how you take her statement . But the answer to her question is it
> didn' t stop me.

It is telling that even BL's former lead trial counsel could not assure this court that BL's primary

contact person for him on this case did not actively seek to discourage him from complying with

this court's orders.

    As the above quote indicates, a significant development at the hearing was the apparent

adversity which had developed between Moore and BL on important issues, one of them being

the issue of Ms. Eaton's statements to him.  Moore also explicitly testified that BL employee

Tundra Meyers "lied" to this court, and he took serious issue with BL's attempts to argue that it

was not kept adequately informed of this court's discovery sanctions.  In its opening statement at

the hearing, BL appeared to float, for the first time, its contention that it was unaware of this

court's discovery orders at senior levels, a contention which, as discussed below, Moore sharply contested in his testimony.

The fact that its former trial counsel contested many of its central arguments at the hearing must be regarded as yet another obstacle for BL in its already daunting efforts to persuade the court of its good faith. At the same time, Moore strongly supported BL's position in some aspects of his testimony, and, while there are legitimate questions surrounding his handling of this case, he did appear to approach the hearing in good faith.[3]

Unsurprisingly, the primary concern of many witnesses at the hearing was protecting their personal and professional reputations by arguing that, while they may have been less than diligent, they committed no knowing deception upon this court. This court is not in a position to exonerate or inculpate most of these witnesses, nor does it view the issue of individual culpability to be of primary importance in this context. The court did find it interesting that a

---

[3]This court has known and worked with Mr. Moore for many years, and his standing in the legal community in this district is deservedly high. The court wrote in its May 2010 order that his credibility with this court had been damaged but that he would have an opportunity to rehabilitate that credibility at the hearing. Moore made considerable progress in this regard at the hearing. Aided in part by BL's waiver of the attorney-client privilege, Moore presented extensive testimony at the hearing regarding the steps which he took to elicit information from BL representatives, often with little effective cooperation on their part.

Moore committed, by his own admission, significant errors in this case, including by providing inaccurate descriptions of affidavits in a hearing before the Magistrate Judge, an error he insists was unintentional. It also appears that Moore belatedly increased his discovery efforts after the appointment of the special master, and he should not have represented to the court that he had made all "conceivable" efforts to discover the information well before this time. Moore should also have been less strident in his appeals of the Magistrate Judge's orders and more respectful of the efforts she was making to uncover the truth. At the same time, the court does not believe that Moore was acting with any intent to deceive this court, and he did make extensive efforts to discover the information in question even before the appointment of the special master. It is the court's view that, while Moore's handling of this case was far from perfect, the bad faith lies with BL rather than Moore.

primary concern of BL/Harrah's former general counsel for litigation Michael Kostrinsky at the
hearing was attempting to convince this court just how little knowledge he had of its discovery
orders, even though he was - by his own admission - informed by Moore that very serious
discovery issues were ongoing and actually worked with Moore in resolving certain discovery
issues in this case.  This court's orders are readily available on PACER, and it is clear that, as an
attorney overseeing a multi-million dollar litigation, Kostrinsky could and should have ensured
that either he or his paralegal kept close tabs on this court's orders by regularly checking the
docket online.

Moore testified at the hearing that Kostrinsky's basic approach to this case was to have
him direct most inquiries to the paralegal handing the matter on behalf of BL/Harrah's.   It is
difficult for this court to know what to make of BL's approach of assigning such crucial
oversight responsibilities to paralegals.  The charitable explanation would be that BL showed an
extraordinary lack of interest in a multi-million dollar case by making a paralegal its "go to"
contact person for its trial counsel.  A more sinister explanation would be that BL as a
corporation was well aware of the nature of its discovery practices and wished to create a firewall
behind which more senior representatives could claim plausible deniability in the event that a
discovery issue arose in a particular case.  Whatever the reason, it does seem clear that the
assigning of crucial litigation matters to paralegals was a consistent Harrah's policy.  As noted by
the special master in his third report:

> It's important to note that, although the primary litigation files for the Illinois and
> Mississippi matters would be maintained by outside counsel, Harrah's in-house
> counsel retained close control of the investigation and responses to discovery and
> vested such control in the paralegal assigned to the case. Outside counsel ceded
> such control because they were afforded no other choice if they wished to retain
> Harrah's business.

This case was handled primarily by two Harrah's paralegals. The first of these paralegals was Susan Harmon, and she was succeeded by Eaton after being terminated in December, 2008. Given that crucial responsibilities were vested to these two paralegals, it is quite damaging to BL that, as discussed further below, serious questions have been raised regarding the actions of each in this case.

Moreover, if BL's intent in assigning immediate oversight of litigation to paralegals was, in fact, to create a legal firewall, then it is a firewall that was seriously damaged by the testimony of Mr. Moore. At the hearing, Moore described in detail one particularly long August, 2009 conversation in which he managed to get Kostrinsky on the phone and conveyed to him the seriousness of the discovery issues which were pending in this courtroom:

> I was in my car, I pulled off on the side of the road, 3 miles from my house in Starkville because I don't get cell coverage at the house. I told him, because we were preparing responses to the request for interrogatories and the production of documents and requests for admissions, that we had a judge in Oxford that I had known for 26 years who was saying that we had falsified responses and who had sanctioned us. And it was a judge that I respected, and we can't have that. ...
>
> I mean, I told him about Judge Alexander. I told him about her order. I told him about the sanctions. I told him about the payments that were coming. I told him about all of that. I told him that we couldn't be messing around on this. And if there's any information, it's got to be turned over. And it was a 20- or 30-minute conversation, going over the discovery responses that had been prepared that he had in his hand. Ms. Eaton was on the phone too, as I recollect, because I talked to her first. And I said, " I 've got to talk to Kostrinsky. " So we got Kostrinsky on the phone.

Under questioning, Moore conceded that he did not provide Kostrinsky with copies of this court's orders, but he testified that none were requested:

> Q. And that's the conversation that you recall having on August the 20th?
> A. Yes.
> Q. And your testimony is that you told Mr. Kostrinsky about which orders?

A. All that had been entered to that point, which includes the July 23 order.
Q. Did you send him a copy of the orders?
A. No, sir.
Q. Did he ask you for a copy?
A. No, sir.
Q. Did you find it strange he wouldn' t ask you for a copy?
A. No, sir. The first time I heard that he was apparently going to say he didn' t

know was in your opening statement.

In light of Moore's testimony, any attempt by BL to utilize an ignorance-based defense seems quite inappropriate.  Indeed, Kostrinsky specifically conceded that he was informed by Moore that this court had issued discovery sanctions and that they were "a big deal."  Nevertheless, he testified that he did not bother to read this court's orders until shortly before he testified at the sanctions hearing this summer.

Wilful ignorance of this court's orders is clearly no defense, and the fact that BL sought to use it as a defense heightens the court's suspicion that the actual misconduct of senior BL representatives may have been of a much more serious nature.  The court's suspicion in this regard is heightened by the fact that, as noted by the special master in his reports, there are missing e-mails and other information regarding whose content the court can only speculate.  Significantly, however, the special master noted in his third report that there is some missing information in the record whose content can, in fact, be discerned from other sources. In discussing Moore's May, 2010 letter, the special master wrote as follows in his third report:

> The [Moore] letter insinuates that, Jill Eaton, the Harrah's paralegal in Las Vegas who succeeded Susan Harmon as case manager on this matter, made remarks tending to discourage genuine cooperation with the Court's investigation into discovery misconduct. It further intimates that Michael Kostrinsky, Harrah's former chief of litigation may have discouraged Mr. Moore's efforts to the same end. Most seriously of all, it charges that someone at Harrah's deleted material evidencing Mr. Kostrinsky's discouragement in anticipation of my examination of

the file and case database.

The relevant portion of Moore's letter is as follows:

> On September 9, 2009, Michael Kostrinsky sent me an e-mail, telling me that all
> contact with the property should be authorized either by him or by Ms. Eaton in
> advance.  The e-mail was not designated as to any particular file, and I did not
> immediately associate it with any particular file.  Mr. Ball has access to all of Mr.
> Kostrinsky's e-mails and so has access to this particular e-mail, but he has never
> mentioned it to me, nor questioned me concerning it.  However, when I was in
> Las Vegas on February 11, 2010 I saw within the printed claim notes on this
> particular file the notation that I had been counseled with concerning my going to
> the property and looking for discoverable information without authorization.
> When we returned to Las Vegas on May 24, 2010 I saw that this notation had
> been removed from the printed claim notes.

This evidence is interesting on multiple levels.  First, it should be noted that the e-mail from

Kostrinsky to Moore counseling him against "going to the property and looking for discoverable

information without authorization" was written on September 9, 2009.  This was in the crucial

period after this court's issuance of its final warning but before the appointment of the special

master, i.e. when the need for BL to demonstrate good faith was particularly acute.  Second, the

letter casts doubt upon Kostrinsky's attempts to suggest that his role in this case was a limited

one, and it raises the question of why he would specifically advise Moore not to do his own

digging on Harrah's property without authorization.

BL produced evidence at the hearing that it had a general policy against lawyers going

onto properties without authorization, and it argues that Kostrinsky's e-mail was consistent with

this policy.  However, context is crucial with regard to this issue.  First, Kostrinsky testified that

he supervised in excess of 1,000 cases as Harrah's general litigation counsel, and it is well

established that he had paralegals handle most communications with attorneys.  It thus strikes the

court as being significant that he took the time to send an e-mail to Moore specifically advising

16

him against going on Harrah's properties during this crucial discovery period.  If BL were truly interested in discovering information, then the court can not discern why they would not want as many eyes as possible looking for it.   Kostrinsky testified at the hearing that his "no contact" policy could be waived and was, in fact, waived in this case.  Assuming this is the case, it is unclear to this court why this e-mail was written.

Kostrinsky's actions appear particularly suspicious when considered in light of Garcia's June 2009 e-mail stating that "Harrah's would not allow that precedent to be established at any cost."  It seems clear that Harrah's was greatly concerned by the threat of dispositive sanctions during this period, and the court found Kostrinsky's efforts at the hearing to portray an almost detached and disinterested attitude on his part to be far from persuasive.  Moreover, the special master noted in his report that the most damaging aspect of Moore's letter was his notation that "[w]hen we returned to Las Vegas on May 24, 2010 I saw that this notation had been removed from the printed claim notes."   In the court's view, while both damaging and innocent inferences could reasonably be drawn from Moore's description of these events, it becomes significantly more difficult to draw innocent inferences if Moore's suggestion that documents were removed from BL's files is accurate.  BL would apparently have the court give it the benefit of the doubt in this regard, but it has done little in this case to earn such benefit.

As noted previously, paralegals Harmon and Eaton were entrusted with crucial responsibilites in this case, and the court has previously noted Moore's damaging testimony relating to Eaton's alleged comment that he had "better stop looking" for documents.   It is thus significant that there are serious questions regarding the actions of Harmon in this case as well. The court will quote extensively from the special master's third report in this regard:

17

Harrah's requested that I hold an evidentiary hearing in Las Vegas on July 19, 2010. After securing the Courts' permission to do so, I issued process for Ms. Harmon and placed it in the hands of a process server in Las Vegas who tried to serve Ms. Harmon at her home for more than a week. She never returned home, and I have no information to explain her absence, whether due to bad timing (i.e., vacation) or because she was warned off to avoid being served.

By way of background, Harrah's has been unable to supply the Sent Items or folder messages from Ms. Harmon's e-mail account. They are at a loss to explain why because Sent Items and foldered items are found for others in Harmon's department. Ms. Harmon's messages are gone, and Harrah's doesn't know why they are gone.  In consideration of the missing messages (numbering in the thousands or tens of thousands), Harrah's located the desktop computer used by Ms. Harmon before she was laid off in December of 2008. The machine had been reformatted and shipped to a Harrah's golf resort in Macau, China. The parties asked that the machine be examined to determine if any of Ms. Harmon's missing data could be resurrected, and, as I am a certified computer forensic examiner, they agreed that I should conduct the examination. Harrah's also created its own forensic image of the machine and had its own expert conduct an exam.

In my examination on June 26, I recovered, among many other items, two Microsoft Word files that had been deleted from the machine. One was named "Doc 1.doc" and the other "Garcia emails.doc." Each was created on December 12, 2008, immediately prior to Ms. Harmon's last day with Harrah's. Each was a hefty 24.8 megabytes in size, and though they were Microsoft Word document files, they contained no text. Instead, each had embedded in them 121 Outlook message files (.MSG format). Both files resided in subfolder called "Garcia." Excepting a few of a personal nature, all of the embedded messages had passed between Christopher Garcia and Susan Harmon and concerned this bus crash litigation. All of these passed between them after April 8, 2008; long after the Illinois litigation had been dismissed.

Embedding native e-mails in Word documents is a peculiar way to handle e-mail message data because the resulting Word documents won't permit reading or printing the messages in Word. However, it enables the Word documents to serve as wrappers or containers to carry the messages for extraction back into another e-mail client. In my experience, it's a method a technically unsophisticated user might employ to store the messages for transport without forwarding each message to a personal account. Instead, the user simply drags-and-drops the messages from Microsoft Outlook to a Word document and can then e-mail the Word document as an innocuous attachment or copy it to portable media.

As to why Ms. Harmon (or someone using her machine) would do this, I cannot say; but the mystery deepened when I identified identical counterparts to these files in the area dedicated to Ms. Harmon's file storage on the Harrah's legal

18

department network. Such areas, called "file shares," are set up to insure that an employee's documents are periodically backed up to protect them against loss due to hard drive failure. The same "Garcia emails.doc" file with the same creation date was in the file share, but this copy had been opened and altered on February 1, 2010, long after Ms. Harmon was laid off, but only a few days following my system inspection in Atlantic City in this matter. This was the only file of more than 2,500 files in Ms. Harmon's file storage that was accessed between Ms. Harmon's discharge and my discovery of the file. Harrah's cannot identify who accessed this file on February 1, 2010 or why it was altered.

A tale like this deserves an epilogue that makes everything clear, but I can't furnish one. It is simply very strange. Of the 250-odd cases Ms. Harmon managed, it appears she sought to spirit away correspondence related to just *this* case and *only* communications with Christopher Garcia. The sole person I can confirm she dealt with before severing all contact respecting this matter was Christopher Garcia.

If an IT expert as learned as the special master is unable to clarify the mystery of Harmon's missing e-mails, then this court will certainly be unable to do so.  It does not require an expert, however, to realize that there is a great deal of smoke in this case emanating from multiple offices in Harrah's corporate legal department, and this court will be excused if it suspects the existence of a fire.  To state the obvious, documents do not alter or delete themselves, and when the special master informs the court that documents in this case - and this case alone - were inexplicably accessed and altered or deleted, the court finds it impossible not to harbor great suspicions regarding what information those documents might have contained.  It would certainly have been helpful if Harmon could have appeared at the hearing to explain her actions, but she instead e-mailed a letter from her doctor professing her inability to do so due to medical reasons.

This court has long believed that BL's basic approach to this litigation was taken in bad faith, and the special master's reports confirmed these suspicions. Through its actions, BL ensured that mid-level and low-level employees would handle the most important discovery tasks in this case and that more senior employees would have - at least ostensibly - a very limited role

in this process.  It is therefore unsurprising - indeed, it was inevitable - that the special master would develop his strongest proof of bad faith as it related to mid-level and lower-level employees such as Jennifer Reynolds and Tundra Meyers.  BL is not entitled to use the alleged ignorance of more senior counsel and employees as a defense when they, by design, were given a limited role in this process.  It seems clear that at least some of BL's designated representatives regarding discovery matters acted in bad faith in this case, and it is therefore apparent that BL itself acted in bad faith in this case.

At the hearing, it appeared to the court that the BL employee who had some of the greatest involvement in its discovery violations was Jennifer Reynolds, a BL manager who actually designed the database - located a very short distance from her office - which produced a trove of discoverable information when the special master searched it.  While not an executive, it would be inaccurate to characterize Reynolds as a low-level employee, since she had managerial responsibilities over the vital records department.  Given Reynolds' obvious familiarity with the database, and the numerous searches of it at the hands of the special master which could and did provide discoverable information, her protestations of simple negligence were quite unconvincing.

The special master obviously believed that Reynolds lied to this court repeatedly in her affidavits and deposition, and she only agreed to testify at the hearing after receiving immunity from prosecution for perjury based on her prior affidavits and testimony in this case.  In the court's view, the testimony at the hearing strongly supported a conclusion that Reynolds was consciously and repeatedly dishonest with this court, and it is clear that this dishonesty occurred while she was acting in the course and scope of her employment as a manager at BL.  The

20

following testimony occurred during Reynolds' examination by the special master:

> Reynolds:  I believe that I 've already conceded to the Court that I signed documents that I should not have signed. And yes, they were - - they are riddled with misleading statements in the way that they're worded, and I can absolutely concede how they might be interpreted a very different way than the way I communicated that information to begin with.

> Special Master: I ' m not personally comfortable with *misleading* when something is categorically false. All right? I want to be sure we've established that there were some things in here you could read and not just it was a language issue; it was a bald-faced lie. It simply was not true by any reading, and you swore to it anyway. That' s what I want to establish here. Now, you have immunity. That' s why you're here because you have immunity.  You can' t lie now.

> Reynolds: I ' m not trying to lie, Mr. Ball.

In his examination, the special master emphasized that not only did Reynolds swear to false statements regarding the status of records, and not only did she repeatedly fail to find documents which were easily accessible in her own database, but she also submitted misleading and false information to this court that she had searched Mississippi Gaming Commission records to confirm that commissions were not paid to Walters Bus Company when she was fully aware that those records would contain no information of this kind.[4]  Reynolds conceded that she was aware that the records would contain no information of this nature:

> Q. You didn' t search the Mississippi Gaming Commission records to insure that commissions weren' t paid, as you stated it, because you knew that records of bus commissions are not reported to the commission. So finding those records - - not finding those records in the commission tells you nothing about bus commissions, and you knew that. You knew that.

> A. I did not expect to find anything in regards to bus commissions, no; and I would not expect to find anything in regards to bus commissions under Mississippi Gaming Reporting, because we were not required to report.

---

[4]The special master's investigation revealed that commissions were, in fact, paid to Walters by BL, contrary to its repeated assurances to this court.

The special master was harsh - but accurate - in his assessment of the information submitted by

Reynolds in this case:

> Q. So your suggestion that the review of those records insures that no
> commissions were paid to the Walters is just another big whopping lie, but this
> one was your idea?
> A. No, sir. I searched that.

In the court's view, the submission of affirmatively misleading information to this court, such as

that relating to Reynolds' alleged search of Mississippi Gaming Commission records, greatly

strengthens the inference of bad faith on the part of Reynolds- and thus BL - in this case.   This

bad faith could already be inferred through Reynolds' repeated failure to discover information in

her own database which was easily found by the special master, but the submission of

affirmatively misleading information to this court makes the inference much stronger.

At the hearing, defendants objected to what they characterized as the special master's

"withering" examination of Reynolds, arguing that, as an extension of the court, he had crossed

the line of proper judicial demeanor and demonstrated bias.   This objection was misplaced.

Reynolds came into the hearing having been given immunity from prosecution for having

perjured herself in her prior affidavits and deposition testimony - for having lied to this court.

After consulting with counsel, Reynolds obviously feared that a criminal jury could conclude

beyond a reasonable doubt that she had told, in the special master's words, "big whopping lie(s)"

to this court.   Reynolds obtained the legal protection which she sought, but she was not entitled

to protection from the court's displeasure at having been lied to.   The special master's

examination of Reynolds was appropriate.[5]

_____

[5]BL has filed a motion seeking for this court to declare the special master's investigation
at an end.  While the court assumes that the special master's investigations are largely complete,

Testimony at the hearing revealed that the special master managed, at separate locations, to discover, in five and seven minutes respectively,  information whose existence BL had denied for almost five years.  Faced with this extremely difficult fact, there was some suggestion at the hearing by counsel that this may have been due to the special master's high level of IT competence.  This court will defer to the special master himself with regard to his analysis of how difficult it would have been for Reynolds or other BL representatives to discover the information in question.  In his questioning of Reynolds, the special master made it abundantly clear that he felt that she should have been able to easily discover the information in question and that she had repeatedly lied to the court in claiming otherwise.

The special master testified that some of the missing data which BL should have found most easily were records of the commission payments to Walters, the relevance of which  is clear and the existence of which BL had repeatedly denied.  In discussing the significance of the evidence of commission payments, the special master testified as follows at the hearing:

> Q. Well, you would agree with me, sir, that the only thing that that document did was verify that commissions had been paid on something like eight or nine different occasions for a total of something less than $10,000?
>
> Ball: Perhaps one of the most vehemently described and easily ascertained information in this case that repeatedly had been said it never happened; it never happened; it never happened, when there were, what, 8 or 10 places they could have gone to determine it? And yet they continued to say it ain' t so.

This court is obviously not an IT expert, but it does seem clear that evidence that the payment of commissions on several different occasions from BL to Walters is something that should have - and in fact did - leave a paper and electronic trail in numerous different databases, both

---

it reserves the right to consult him further regarding discovery and evidentiary matters in this case.

administrative and financial.  The special master testified that he had no difficulty whatsoever in uncovering this information, and he was clearly unpersuaded by BL's assertion that it was unable to do so.

While Reynolds clearly bears considerable responsibility for BL's discovery violations, the court also suspects that she may have received encouragement in this regard from above. Kostrinsky testified at the hearing that his paralegals personally contacted Reynolds and other BL employees involved in the search for documents.  Given that one of those paralegals - Jill Eaton - allegedly told Moore that he "better stop looking" for the documents in questions, it is not unreasonable to suspect that a similar message may have been conveyed to Reynolds.  While Moore testified that he still looked hard for the information regardless of whether Eaton was serious in her comments, there is every indication that Reynolds did not do so.  Even assuming that Reynolds acted without direction from above, however, it is apparent that her actions as a BL manager are more than sufficient to bind the corporation itself.

The court's suspicions regarding BL's bad faith are strengthened by the nature of the business in which it operates.  Visitors to a modern casino are almost invariably struck by the degree to which they are able to use modern technology to track gambling activity so that they may issue competitive "comps" packages to customers.  It strikes this court as being highly implausible that a business which is able to track gambling activity, from penny slots to poker tables, from casino to casino, indeed from sea to shining sea, would somehow be unable to produce information regarding a long-standing relationship between itself and Walters, a company which was heavily involved in the "comps" packages so closely tracked by casinos.  By far the most plausible explanation is that BL simply lied to this court and elected to continue

these lies in the face of escalating warnings and sanctions.  BL apparently felt that it was in a

position to prevent, "at any costs," a federal court from following through with that threat.  BL

was mistaken in this regard.

This court has not previously discussed in this order the fact that BL repeatedly - and

falsely - represented that facilities containing physical documents relating to its relationship with

Walters were destroyed in Hurricane Katrina.  At the hearing, the best defense BL could offer

was that it had simply been negligent in this regard, but, particularly in light of other evidence of

bad faith on its part, the court found this argument to be unpersuasive.  This issue does not

involve an isolated document or file, but rather the basic existence of a large document storage

warehouse located at the Mississippi Gulf Coast.  As a corporation, BL managed to provide for

the staffing, operation, maintenance and upkeep of this facility for years after Hurricane Katrina,

yet it would have this court believe that the fact that it had survived the storm intact somehow

escaped its attention.  The court did not find this argument to be plausible.  Moreover, it strikes

the court as being a highly cynical maneuver on BL's part to use the tragedy of Hurricane Katrina

as a mantra of sorts which it repeatedly raised when questioned by the Magistrate Judge

regarding its claims that the documents in question were unavailable.

In issuing its final warning, this court was simply interested in having BL respect its

processes and fulfill its basic discovery obligations.  It was of no concern to this court whether

these obligations were met by a paralegal or by the CEO of the corporation, as long as they were

met.  It was BL's obligation to ensure that it paid adequate attention to this court's rulings and

acted in accordance with them, and it utterly failed in this regard.  The judicial process is just

that: a process. In the case of dispositive motion practice before this court, this process requires

that parties first deal honestly with the court and provide it with the information needed for it to make an informed decision. In this case, the process ground to a halt before it even reached the decision stage, due to BL's repeated deceptions and obstructions.

A student who is disqualified for cheating prior to taking an exam is not entitled to argue that he knew the material and would have been able to pass it even without cheating.  That is essentially what BL is arguing at this juncture, but its own actions - in the face of specific warnings from this court - ensured that it lost the opportunity to sit for the exam.  Moreover, it is significant to note that BL's own internal legal analysis indicated its belief that the plaintiffs in this case had sufficient evidence of a joint venture between BL and Walters  to survive summary judgment.  A twelve-page legal analysis prepared by attorney Christopher Garcia and sent to Mr. Kostrinsky concluded as follows:

> In conclusion, we believe that the instant agreement does not provide for joint control of the property or mutual management of the alleged enterprise, nor does it provide for profit sharing.  Therefore, we believe that the instant agreement does not constitute a joint venture as defined by Illinois or Mississippi case law. However, because the issue of whether a joint venture exists is a matter of fact, we anticipate that it will be difficult to defeat plaintiffs' assertions that the agreement constitutes a joint venture on summary judgment.

[Plaintiff's exhibit 72].   Defendants expressly waived their attorney-client privilege with regard to their prior representation in this case, and they are to be commended for their decision to let the "chips fall where they may" in this regard.  This waiver was particularly helpful to Mr. Moore and his efforts to rehabilitate himself, since the documents do reveal that he was making good faith efforts to uncover the documents in question, even though he received little if any effective assistance in this regard from BL itself.  It should be noted, however, that some of the chips did fall in a way that is adverse to BL's case, such as Garcia's letter and Moore's letter describing the

comments from Harrah's paralegal.  Moreover, the large number of missing and deleted Harrah's documents relating to this case preclude it from arguing that it truly provided full disclosure in this regard.

It is clear from Garcia's analysis that BL took the threat of this litigation very seriously, and the notion that they had no motive to seek to minimize any evidence of agency/joint venture, such as by denying that commissions were paid to Walters, is clearly false.  In a wrongful death case involving as many plaintiffs as this one, the likelihood that BL would have to face a lengthy trial was sufficient to give it a great financial motive to seek to maximize its chances of prevailing on summary judgment.  The tone of many of BL's arguments in this case suggest that it regards the claims against it as being almost frivolous in nature, but it is apparent that it viewed the legal obstacles facing it as being quite significant.[6]

The court notes that BL has recently filed a motion for judgment on the pleadings, but this motion strikes this court as being both untimely and inappropriate in light of the fact that all parties appeared to recognize that discovery was essential for the resolution of the dispositive motion issues in this case.  The court obviously believes that discovery was necessary in this case, or it would not have engaged in such lengthy attempts to ensure that BL complied with its obligations in this regard.  The parties have also pre-emptively sought to have this court determine whether Mississippi, Arkansas or Illinois law will apply to this case.   It is this court's

---

[6]BL argues that the Illinois state court judge's ruling that an agency relationship did not exist between it and Walters is entitled to full faith and credit and/or collateral estoppel. This court disagrees.  This court is basing its ruling today upon 1) a conclusion that BL concealed information in this case from both the Illinois court and this court and 2) upon this court's inherent authority to police BL's actions in its own courtroom.  Accordingly, the Illinois state court ruling is clearly not entitled to dispositive effect in this courtroom.

view that the law of Arkansas should apply in this case, as the location where the accident occurred.  It strikes this court that the considerations that would favor Mississippi and Illinois law being applied largely cancel each other out, and there are serious concerns regarding the application of Mississippi law in this context.  Indeed, in *Estate of Klaus ex rel. Klaus v. Vicksburg Healthcare, LLC*, 972 So. 2d 555, 558-59 (Miss. 2007), the Mississippi Supreme Court suggested that the $1,000,000 cap on non-economic damages set forth in Miss. Code Ann. § 11-1-60 would apply to all plaintiffs in a wrongful death action, even though it openly questioned whether such was the Legislature's intent in drafting the statute.

This court likewise has very serious doubts that the Mississippi Legislature's dictate in § 11-1-60 that the "plaintiff" recover no more than $ 1 million in non-economic damages was intended to preclude the wrongful death beneficiaries of fifteen deceased individuals from recovering more than $ 1 million in non-economic damages cumulatively.  Indeed, the application of the law to this case would result in an almost shocking limitation upon the amount of damages that the family members of the deceased could recover for such elements of damages as loss of society and companionship.  Accordingly, any suggestion that policy considerations supporting the application of Mississippi law apply strongly in this case is clearly without merit. This is particularly true when one considers that the deceased were all tourists who were supporting the Mississippi economy through their travels.

## CONCLUSION

The central fact of this case remains that BL was somehow unable - for almost five years - to discover documents at its own facilities which the special master discovered in short minutes, on multiple occasions and at multiple locations.  BL offered no good explanation for

this fact at the hearing, nor could it plausibly do so.   The special master's investigation did, in fact, reveal an explanation for this fact, namely that BL repeatedly and knowingly sought to conceal information from the court.  As damaging as the special master's reports were, they did not come as a surprise to the court.  Indeed, this court suspected that this was precisely the sort of conduct that was taking place in this case, or else it would not have appointed the special master in the first place, and particularly not at BL's expense.

This court is not naive.  It is aware that litigants are frequently successful in concealing information from courts, largely because the power to conceal one's own documents is far greater than a court's power to uncover them.  It seems very likely that, for every case in which conduct of this nature is uncovered, there are dozens in which the deception is successful.  It is simply too expensive in judicial resources for courts with heavy dockets to uncover this sort of misconduct. In this case, it would have been far simpler for the Magistrate Judge and this court to take the information which BL was submitting and then rule upon BL's incomplete summary judgment motion.

The Magistrate Judge first and later this court decided not to permit these tactics to prevail in our courtrooms and to insist upon full disclosure, in this case at least.  It did not appear that anything less than the threat of dispositive sanctions would secure BL's attention and compliance, and the court therefore issued its final warning.  If this court is found to have exceeded its authority in this regard, then it seems very likely that fewer district courts in this circuit will take the trouble to insist upon honesty and full disclosure in future cases: it is far easier for courts to simply shrug their shoulders and move on.  The court now finds itself in a position where it has explicitly threatened dispositive sanctions, and it can find no indication

whatsoever that this warning had any kind of beneficial impact on BL's conduct.  Indeed, BL seems to have decided that the proper response to this court's threat was to increase the stridency of its briefing rather than the intensity of its search efforts.  Under these circumstances, the integrity of the judicial process clearly requires that this court impose the sanction that it said it would.

The court therefore finds that dispositive sanctions are warranted in this case.  It seems clear that, at least in the procedural posture which this case finds itself now, the issue of agency is one of law informed by considerations of public and judicial policy, rather than a true fact issue.  This would seem to make an adverse inference instruction - or any other jury resolution of this issue - inappropriate.  Accordingly, the court will simply instruct the jury - as it specifically warned BL it would - that an agency relationship existed as a matter of law between Walters and BL.  The parties should thus proceed to trial with the understanding that the sole issue for the jury's consideration will be the negligence of Walters and the damages suffered by plaintiffs.  For plaintiffs, this means that they should make no mention of any discovery violations or other misconduct by BL in this case.  For BL, this means that it should not try to persuade the jury that it was not at fault in the accident, since the jury's task will simply be to decide whether Walters acted negligently.  The litigation of this case has been highly contentious to date, and the parties should act in good faith to ensure that the actual trial proceeds in a much more professional and courteous manner.

In light of the foregoing, it is ordered that:

1. The court hereby adopts the reports and recommendations [351-1, 358-1, 426-1] of the special master, except to the extent of any contrary findings in its own three orders addressing

these reports.  Plaintiff's motion [369-1] seeking adoption of the reports with certain objections, will be granted in part and denied in part.

2. The defendant's motion for judgment on the pleadings [454-1] is denied.

3. The defendant's motion to discharge the special master [436-1] is denied.

4. Plaintiffs' motion for partial summary judgment [447-1] as to the negligence of Walters Bus Company is denied.

5. The jury will be instructed at trial that an agency relationship existed as a matter of law between BL and Walters.

**SO ORDERED** this 2nd day of September, 2010.


**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**